**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EDWIN ROMERO**, | **CIVIL ACTION** |
| Petitioner, | |
| *v.* | **NO. 08-0528-KSM** |
| **JEFFREY BEARD**, *et al.*, | |
| Respondents. | |

## <u>MEMORANDUM</u>

**MARSTON, J.**                                                **May 2, 2024**

### Table of Contents

I.   BACKGROUND ................................................................................................ 3

   A.  Factual Background ................................................................................... 3

   B.  Procedural History .................................................................................... 7

II.  LEGAL STANDARD .................................................................................... 10

   A.  Exhaustion of State Court Remedies ...................................................... 10

      1.  Cause and Prejudice .......................................................................... 11

      2.  Fundamental Miscarriage of Justice ................................................. 12

   B.  Denial on the Merits................................................................................ 12

   C.  Independent and Adequate State Court Rule .......................................... 13

   D.  Section 2254(d) ...................................................................................... 13

   E.  De Novo Review...................................................................................... 14

III. ANALYSIS..................................................................................................... 14

   A.  Procedural Default .................................................................................. 16

   B.  Claim 1:  Interpreter............................................................................... 19

      1.  State Court Record, Findings, and Conclusions................................ 22

      2.  Alleged Unreasonable Finding of Fact.............................................. 33

   C.  Confrontation Clause Claims .................................................................. 39

      1.  Claim 8:  Barbosa's Statement ......................................................... 39

      2.  Claim 9:  Lopez's Statement ............................................................. 67

    D.  *Brady* Claims ............................................................................... 86

        1.  Claim 10:  Photo Array .......................................................... 86

        2.  Claim 11:  Promises Made to Moreno ................................... 97

        3.  Claim 12:  Lopez's Prior Conviction ..................................... 98

    E.  Claim 13: Jury Instructions ...................................................... 104

        1.  Barbosa Prior Statement Instruction ..................................... 106

        2.  Vicarious Liability Instructions ............................................. 111

        3.  Conclusion ............................................................................. 148

    F.  Claim 14: Jury Pool .................................................................. 148

        1.  Alleged Unreasonable Findings of Fact ................................. 151

        2.  Alleged Unreasonable Application of Federal Law ............... 154

    G.  Claim 15: Cumulative Prejudice ............................................... 157

IV.  Conclusion ..................................................................................... 158

In 1996, a jury in the Lehigh County Court of Common Pleas convicted Petitioner Edwin Romero of murder in the first degree and sentenced him to death. (Doc. No. 3 ¶ 49.) In 2008, Romero petitioned this Court for a writ of habeas corpus, asserting fifteen claims of constitutional error during the guilt and penalty phases of his trial. (Doc. No. 3; Doc. No. 81-1.) Respondents, the Commissioner of the Pennsylvania Department of Corrections and Superintendents of various state correctional institutes in which Romero has been incarcerated (collectively, the "Commonwealth"), oppose the petition to the extent it challenges the guilt phase of Romero's trial. (Doc. No. 91.)[1] For the reasons discussed below, Romero's petition is granted in part and denied in part.

## I.      BACKGROUND

The Court begins with a high-level overview of the facts and procedural history relevant to all of Romero's pending claims, providing a more detailed discussion of the facts and procedural history later in this Memorandum as necessary to each claim.

### A.      Factual Background

On January 3, 1995, David Bolasky, an Allentown-based architect and landlord, visited one of his properties to collect rent from his tenants. *Commonwealth v. Romero*, 722 A.2d 1014, 1015 (Pa. 1999) ("*Romero I*"). One of those tenants, Miguel Moreno, met Bolasky on the first floor of the building to deliver a portion of the rent owed before luring Bolasky upstairs to Moreno's third-floor apartment under the pretense that the remainder of the rent payment was there. *Commonwealth v. Romero*, 938 A.2d 362, 368 (Pa. 2007) ("*Romero II*"). That was not the case. *Id.* When Bolasky entered the third-floor apartment, he was ambushed, robbed, and

---

[1] The Commonwealth withdrew its opposition to penalty phase relief on Claim 2 of Romero's petition and agreed to not pursue a new capital sentencing hearing. (Doc. No. 133.) Accordingly, the Court granted relief as to Claim 2 and vacated Romero's death sentence. (Doc. No. 134.) Romero's claims challenging the guilt phase of his trial remain pending. (*Id.*)

killed.  *Id.*  Three days later, the police found Bolasky's body in a secluded area outside of Allentown.  *Id.*  He had been hog-tied and wrapped in bed sheets.  *Id.*  The medical examiner found that Bolasky sustained a blow to the head and that his cause of death was strangulation by ligature.  *Romero I*, 722 A.2d at 1019 n.6.

During the course of the murder investigation, the police spoke with Moreno on multiple occasions.  After making numerous fabricated statements to the police, Moreno eventually implicated himself and three other men—Jorge Ortiz Barbosa, George Lopez, and Petitioner Romero—in Bolasky's murder.  *Id.* at 1015.  In the days that followed, all four men were charged with the murder and robbery.  In exchange for Moreno's cooperation, the prosecution agreed not to seek the death penalty in his case.  N.T. Mar. 11, 1996, at 39:23–40:1; N.T. Mar. 12,1996, at 57:12–17, 108:3–4.  Eventually, Barbosa also admitted his role in the murder and on the eve of trial pleaded guilty in exchange for a life sentence.  *Romero II*, 938 A.2d at 368.  That left Romero and Lopez, who were tried jointly.  *Id.*

The trial was bifurcated into two phases:  the initial phase regarding their guilt for the charged offenses and a subsequent phase (to be held only if they were found guilty of first degree murder) regarding whether the death penalty would be imposed.  *Id.* at 368–69.  During both phases of the trial, Romero was represented by Attorney Glennis Clark.  During the guilt phase, the Commonwealth stipulated that there was no forensic evidence connecting Romero to the crime or the crime scene.  *See* N.T. Mar. 13, 1996, at 243:6–252:7.[2]  Instead, the prosecution primarily relied on the testimony of three witnesses:  Moreno, Barbosa, and Romero's pre-trial

---

[2] Two full-day transcript volumes (marked Volumes III and IV) are dated March 12, 1996. Volume IV seems to be mislabeled and should have been dated March 13.  Accordingly, the Court will utilize the date of March 13 when referring to testimony in Volume IV (Doc. No. 112-26).

cellmate, Timotao Paladino.[3]

Moreno testified first, stating that he, Barbosa, Lopez, and Romero initially devised a plan to rob Bolasky but, because Bolasky could identify Moreno, the plan changed to killing him as well.  N.T. Mar. 12, 1996, at 26:7–36:25.  Moreno also explained that the plan evolved from robbing and killing Bolasky in the alleyway outside of the apartment, to robbing and killing him inside of the apartment.  *Id.*  When Moreno lured Bolasky upstairs, the other three men were waiting in the third-floor apartment.  *Romero I*, 722 A.2d at 1015.  Moreno left the apartment before the murder occurred but testified that he later observed Barbosa and Romero carrying Bolasky's body, tied and wrapped in bed sheets, downstairs and placing it in the back of Bolasky's van.  *Id.* at 1015–16.

Next, Paladino testified that while Romero was incarcerated pending trial, Romero spoke to him multiple times about the murder.  In the initial accounts, Romero claimed that he was sitting at a pizza shop down the street when the murder happened, and he only learned about it after the fact when Barbosa, Lopez, and Moreno asked him to help dispose of the body.  N.T. Mar. 13, 1996, at 150:17–151:8, 155:10–158:16.  Paladino testified that when he pushed back on that story, however, Romero admitted to being in the apartment during the murder.  *Romero I*, 722 A.2d at 1016.  According to Paladino, Romero claimed that he had gone to Moreno's apartment and hidden in the bathroom with Barbosa while waiting for Bolasky to arrive.  *Id.*  Once Bolasky was in the apartment, Barbosa and Romero grabbed him, while Lopez hit Bolasky on the head with a gun.  *Id.*  Barbosa then strangled Bolasky with a towel.  *Id.*  According to

---

[3] "Timotao Paladino" is an alias used by Daniel Lopez while incarcerated at Lehigh County Prison.  *See* N.T. Mar. 13, 1996, at 134:25–135:7.  To make it easier to distinguish between Romero's cellmate (Daniel Lopez) and his codefendant (George Ivan Lopez), the Court refers to Daniel Lopez as "Paladino" throughout this Memorandum.

Paladino, Romero claimed that he "did not agree with what was happening." *Id.* (quoting N.T. Mar. [13], 1996, at 163); *see also* N.T. Mar. 13, 1996, at 176:1–23 (Paladino confirming on cross examination that Romero informed him that he "never agreed to help kill Mr. Bolasky," and there was no "mention of any plan or agreement with him, Lopez or anybody else to kill Mr. Bolasky going into that apartment").

Last, Barbosa testified about Lopez and Moreno's involvement in the murder, but he refused to answer any questions regarding Romero's role. *Romero II*, 938 A.2d at 368. Because Barbosa refused to testify about Romero, the trial court permitted the detective who took Barbosa's confession, Captain Anthony Bucarey, to read a transcript of Barbosa's statement to the jury.[4] *Id.* In that statement, Barbosa claimed that Romero was in the apartment during the murder, and after Bolasky arrived, Barbosa struck Bolasky in the head with a pistol, and he, Lopez, and Romero took turns tightening a towel around Bolasky's neck until he died. *Id.* The three men then hog-tied Bolasky's body, wrapped it in bed sheets, and carried it out of the apartment to Bolasky's van. *Id.*

At the close of the guilt phase of the trial, the court gave the standard jury instructions for criminal homicide (including first, second, and third degree murder), robbery, theft, and receiving stolen property. N.T. Mar. 19, 1996, at 173:6–184:7. The court also explained that the jury could find each defendant guilty of any of these crimes, "without finding that he personally engaged in the conduct required for commission of that crime," if the jury found the defendant

---

[4] Barbosa gave two statements to Captain Bucarey. In the first statement, given on September 7, 1995, Barbosa reiterated the pizza shop story, telling Captain Bucarey that Lopez and Moreno killed Bolasky, while Barbosa and Romero were in a pizza shop down the street. N.T. Mar. 18, 1996, at 81:21–83:4. On February 1, 1996, Barbosa gave a second statement to Captain Bucarey. *Id.* at 66:5–22. In that second interview, Barbosa confessed to helping murder Bolasky and implicated Romero. *Id.* at 70:24–78:11. It is the transcript of this second statement that the prosecution introduced against Romero through Captain Bucarey's direct examination, and which the Court discusses below.

acted as an accomplice or a coconspirator. *Id.* at 184:13–186:20. The court then gave the standard jury instructions for accomplice liability and coconspirator liability. *Id.* Last, the court defined the only remaining charge, which was for the crime of criminal conspiracy to commit criminal homicide, robbery, theft, and/or receiving stolen property. *Id.* at 186:21–192:23.

After deliberations, the jury found Romero guilty of criminal homicide (murder in the first degree); robbery; theft; receiving stolen property; and criminal conspiracy to commit criminal homicide, robbery, theft, and receipt of stolen property. Verdict at 1–2; *see also Romero II*, 938 A.2d at 368. And after the penalty phase, the jury returned a verdict of death. *Romero II*, 938 A.2d at 368.

### B.    Procedural History

Romero appealed his conviction to the Pennsylvania Supreme Court. *Romero I*, 722 A.2d at 1014. On appeal, he raised a single claim of error—that "the trial court erred in allowing Barbosa's prior statements from his interview with Captain Bucarey to be read into evidence because Barbosa was unavailable to be cross-examined on those prior statements." *Id.* at 1016. The Pennsylvania Supreme Court agreed that it was error to permit Barbosa's prior statements to be read into evidence but found the error harmless and affirmed Romero's sentence. *Id.* Romero attempted to take his case to the United States Supreme Court, but the Court denied certiorari. *Romero v. Pennsylvania*, 528 U.S. 952 (1999).

In 1999, Romero petitioned the Commonwealth for relief under Pennsylvania's Post Conviction Relief Act ("PCRA"), raising multiple claims for trial court error, ineffective assistance of trial counsel, and ineffective assistance of direct appeal counsel. *Romero II*, 938 A.3d at 368–69. The PCRA court held an evidentiary hearing and denied the petition. *Id.* at 369. Romero appealed that denial to the Pennsylvania Supreme Court, which affirmed the lower court's ruling in 2007. *See generally id.* The appellate court found that Romero had waived his

claims for trial error and ineffective assistance of trial counsel because none of the issues identified in those claims were raised at trial or on direct appeal. *Id.* The court recognized that Romero's claims for ineffective assistance of appellate counsel (for failure to raise the underlying ineffective assistance of trial counsel claims) had not been waived but denied those claims because Romero had failed to show that the "underlying claim[s] of trial counsel's ineffectiveness ha[d] arguable merit." *Id.* at 370–71.

      In 2008, Romero filed a petition for a writ of habeas corpus in this Court.[5]  (Doc. No. 3.) From the time he filed his petition through late 2009, Romero's counsel requested—and was granted—eight extensions of time to file a memorandum of law in support of his petition. (*See, e.g.*, Doc. Nos. 4, 11.)  In April 2010, Romero filed a motion seeking discovery of "the complete Lehigh County Police investigation regarding the homicide of David Bolasky," which he argued might contain evidence showing his actual innocence or, at least, would impair the credibility of witnesses who testified against him at trial.  (Doc. No. 20.)  In August 2011, the Court granted Romero's motion in part, permitting him to obtain discovery of "any and all polygraph examinations of cooperating defendants Barbosa and Moreno" and "any and all statements, reports, notes, memoranda, writings, transcripts or recordings regarding Moreno's interrogation." (Doc. No. 31.)  The Commonwealth began providing the requested discovery on December 27, 2013.  (Doc. No. 91 at 14.)

      In that discovery, Romero learned that the Commonwealth had previously neglected to turn over evidence that Moreno had failed to identify Romero in a photo array.  (Doc. No. 54 ¶ 1.)  Upon learning this, Romero filed a successive PCRA petition on May 27, 2015, claiming

---

[5] This matter was originally assigned to the calendar of the Honorable Petrese B. Tucker; it was reassigned to the calendar of the Honorable Karen Spencer Marston on June 29, 2022.  (Doc. No. 100.)

that the prosecution's failure to turn over this exculpatory information at the time of trial violated *Brady v. Maryland* and its progeny. (*Id.* ¶ 8.) Romero also sought leave to amend his habeas petition to include the *Brady* claim. (*See generally id.*) The Court permitted him to do so and stayed this matter pending the resolution of the second PCRA proceeding. (Doc. No. 56.) The PCRA court denied the second petition as untimely following an evidentiary hearing. *See* PCRA Opinion (Oct. 25, 2016) (filed in this action as Doc. No. 112-13, at 61–72). Romero appealed, and the Pennsylvania Supreme Court upheld the denial. *Commonwealth v. Romero*, 181 A.3d 283 (Pa. 2018) ("*Romero III*").

In March 2018, the parties informed this Court that the proceedings surrounding the second PCRA petition were complete and asked that the stay be lifted. (Doc. No. 66.) The Court lifted the stay in August 2019 (Doc. No. 68), and in November 2019, set a deadline by which Romero could amend his habeas petition, should he choose to do so, and ordered briefing on the same. (Doc. Nos. 71, 74, 78.)

On April 22, 2020, Romero filed a Consolidated and Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (Doc. No. 81-1), and on November 6, 2020, he filed a memorandum of law in support thereof (Doc. No. 89). The petition asserts 15 claims for habeas relief under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Doc. No. 81-1 ¶ 68.)[6] The Commonwealth initially opposed the petition in its

---

[6] The petition also requests an evidentiary hearing on Claims 3, 10, and 11. (Doc. No. 89 at 25–27.) On August 16, 2022, the Court ordered briefing on whether it could, and if so, whether it should, hold an evidentiary hearing on Romero's petition. (Doc. No. 105.) The Commonwealth contended that a hearing was inappropriate because the Antiterrorism and Effective Death Penalty Act ("AEDPA") greatly restricts the availability of evidentiary hearings and none of AEDPA's exceptions provide for a hearing on any of Romero's claims. (Doc. No. 107.) In response, Romero withdrew his request for an evidentiary hearing as to all claims except for Claim 3, which sought relief pursuant to *Atkins v. Virginia*. (Doc. No. 108 at 4); *see also Atkins v. Virginia*, 536 U.S. 304, (2002) (holding that the execution of individuals with certain intellectual disabilities violates the Eighth Amendment). He argued that an evidentiary hearing was appropriate as to Claim 3 because it was a new claim based on new diagnostic

entirety (*see* Doc. No. 91), but as stated previously, *see supra* n.1, later withdrew its opposition to penalty phase relief pursuant to Claim 2 and agreed not to pursue a new capital sentencing hearing (Doc. No. 133).  Accordingly, the Court vacated Romero's death sentence.  (Doc. No. 134.)  Romero's nine claims challenging his conviction and the guilt phase of his trial remain pending and are the focus of this Memorandum.

## II.   LEGAL STANDARD

An individual in state custody may request that a federal court issue a writ of habeas corpus ordering his release.  *See* 28 U.S.C. § 2254.  The writ may issue "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  *See id.* § 2254(a).  Out of principles of comity and federalism, the availability of the writ is "narrowly circumscribed."  *Shinn v. Ramirez*, 596 U.S. 366, 375 (2022).  Below, is a brief overview of the narrowing principles that govern the Court's review of Romero's petition.

### A.   Exhaustion of State Court Remedies

Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies.  28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the state . . . .");  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (explaining that the state court must be given the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights" (quotation marks omitted)).  A claim is exhausted only if it was "fairly present[ed]" through all available levels of the state appellate system.  *See Baldwin*, 541 U.S. at 29 (holding that a federal

---

standards that was not presented to the PCRA Court.  (Doc. No. 108 at 5–6.)  The Court held oral argument on this issue on October 4, 2022 (Doc. No. 114) but has not yet ruled on it.  Because Claim 3 is now moot following the Commonwealth's concession that penalty phase relief is appropriate on Claim 2, the Court need not decide whether to hold an evidentiary hearing as to the *Atkins* claim.

claim is "fairly presented" to the state court when the petitioner includes it in a petition or brief before that court); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (explaining that the claim must be presented at each level of the state appellate system)  "This means that a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."  *Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001); *see also Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("[M]ere similarity of claims is insufficient to exhaust.").

When a claim is unexhausted, and it would be futile to raise the claim in state court now, the claim is procedurally defaulted.  *See, e.g.*, *Keller*, 251 F.3d at 415 ("Keller is barred from seeking further relief in state court because the statute of limitations for filing another PCRA petition has expired.  As a result, his federal due process claim is now procedurally defaulted." (citation omitted)).  The procedural default renders the claim unreviewable in federal court unless the petitioner can show that:  (1) the default is excused by cause and actual prejudice, or (2) failure to consider the claim will result in a fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Keller*, 251 F.3d at 415–16.  The Court explains each exception in turn below.

### 1.      Cause and Prejudice

Under the first exception, "cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Keller*, 251 F.3d at 415 ("To show cause, a petitioner must demonstrate some objective factor external to the defense that prevented compliance with the state's procedural requirements.").  And actual prejudice results when the errors at trial "worked to [the petitioner's] actual and substantial disadvantage, infecting his entire trial with error of

constitutional dimensions." *Murray*, 477 U.S. at 494.

Ineffective assistance of counsel may satisfy this standard. *See Strickland v. Washington*, 466 U.S. 668, 697–98 (1984). To make such a claim, a petitioner must show: (1) "counsel's performance was deficient," meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment";[7] and (2) "the deficient performance prejudiced the defense," meaning "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

### 2.   Fundamental Miscarriage of Justice

In addition to cause and prejudice, a procedural default will be excused if the petitioner shows that the federal court's refusal to consider the claim will result in a "fundamental miscarriage of justice." *Keller*, 251 F.3d at 415. "To show a fundamental miscarriage of justice, a petitioner must demonstrate that he is actually innocent of the crime, by presenting new evidence of his innocence." *Id.*; *see also Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995) (explaining that the petitioner must support his allegations of constitutional error with new, reliable evidence and show that this new evidence renders it "more likely than not that no reasonable juror would have convicted him").

### B.   Denial on the Merits

"[N]otwithstanding the failure of an applicant to exhaust the remedies available in the courts of the State," the federal court may deny an application for habeas relief on the merits. 28 U.S.C. § 2254(b)(2). Merits review may be preferable when, for example, the substantive issues

---

[7] In *Strickland*, the Supreme Court explained that counsel's role of assisting the defendant includes "the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." 466 U.S. at 688. "Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.*

are straightforward, and the procedural concerns involve complicated issues of state law. *Lambrix v. Singletary*, 520 U.S. 528, 525 (1997).

### C.      Independent and Adequate State Court Rule

If a petitioner shows that his claim is exhausted, the court must examine whether the state court issued a ruling on the merits of the federal constitutional claim.  If the state court did not consider the merits and instead, rejected the claim under an independent and adequate state rule, the claim is procedurally defaulted and cannot be considered by the habeas court.  *See Walker v. Martin*, 562 U.S. 307, 315(2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.") (quotation marks omitted).  A state rule is independent if it is not intertwined with federal law.  *Coleman v. Thompson*, 501 U.S. 722, 733 (1991).  And it is adequate if it is "firmly established and regularly followed."  *Johnson v. Lee*, 578 U.S. 605, 608 (2016).

### D.      Section 2254(d)

If the state court ruled on the merits of the federal claim, the federal court must defer to the state court's ruling and deny habeas relief unless the petitioner satisfies the standard outlined in § 2254(d)(1) or (2).

Under the first subsection, the court will not defer to the state court's ruling if the petitioner shows that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law."  28 U.S.C. § 2254(d)(1).  For a state court decision to be "contrary to" clearly established federal law, "the state court [must] arrive at a conclusion opposite to that reached by the Supreme Court on a question of law or . . . decide[ ] a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Hameen v. Delaware*, 212 F.3d 226, 235 (3d Cir. 2000) (cleaned up).  A state court decision

13

involves an "unreasonable application of" clearly established federal law when "[it] resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 891 (3d Cir. 1999).  This occurs when the state court "identifie[s] the correct governing legal rule . . . but unreasonably applie[s] it to the facts of the particular . . . case" or when the state court "unreasonably extend[s] a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuse[s] to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 367, 407 (2000).

Should the petitioner fail to satisfy § 2254(d)(1), the court will defer to the state court's ruling (and thus, deny habeas relief), unless the petitioner can show that the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  There is a presumption of correctness for factual determinations made by state court judges, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Lambert v. Blackwell*, 387 F.3d 210, 234 (3d Cir. 2004).

### E.    De Novo Review

If "the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by [§ 2254(d)] . . . do not apply."  *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).  In such instance, the federal court will review questions of law and mixed questions of law and fact de novo.  *Id.*; *see also McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999).

### III.    ANALYSIS

Because the parties have reached an agreement as to the penalty phase claims, only the nine guilt phase claims remain open for consideration.  As to those claims, Romero argues that

this Court should grant habeas relief because:

Claim 1: Romero was denied his Fifth, Sixth, Eighth, and Fourteenth Amendment rights where all proceedings were conducted in English, a language that Romero was unable to meaningfully understand, without a Spanish interpreter.  Trial and appellate counsel were ineffective for failing to raise this claim.

Claim 8: Romero's right to confront witnesses against him, as guaranteed by the Sixth and Fourteenth Amendments, was violated by the improper introduction of Barbosa's inadmissible statement to Captain Bucarey.  This violation was not harmless.

Claim 9: Romero's right to confront witnesses against him, as guaranteed by the Sixth and Fourteenth Amendments, was violated by the improper introduction of George Lopez's inadmissible statements at trial.  Trial and appellate counsel were ineffective for failing to raise this claim.

Claim 10: The prosecution failed to disclose material impeachment evidence and correct false and misleading testimony about Moreno's failure to identify Romero in a photo array, in violation of Romero's Sixth and Fourteenth Amendment rights to due process of law and a fair trial.

Claim 11: The prosecution suppressed material exculpatory evidence and presented false testimony pertaining to the implicit deals and promises made to Moreno in exchange for his testimony, in violation of Romero's Sixth and Fourteenth Amendment rights to due process of law and a fair trial.

Claim 12: The prosecution failed to disclose material exculpatory evidence of George Lopez's involvement in a factually similar crime in violation of Romero's Sixth and Fourteenth Amendment rights to due process of law and a fair trial.  Trial counsel was ineffective for failing to discover this evidence, and appellate counsel was ineffective for failing to discover this evidence and raise this claim on appeal.

Claim 13: The jury instructions violated Romero's Sixth and Fourteenth Amendment right to due process because they unconstitutionally relieved the Commonwealth of its burden to prove every element of each offense beyond a reasonable doubt.  Trial and appellate counsel were ineffective for failing to raise this claim.

Claim 14: Romero's venire and petit jury were not representative of

> a fair cross section of the community in violation of Romero's Sixth and Fourteenth Amendment right to due process.
>
> Claim 15: Romero is entitled to relief from his conviction because of the cumulative prejudice of the constitutional errors described in his petition.

(*See generally* Doc. No. 89.)  The Commonwealth argues that nearly all of Romero's claims of trial court error and ineffective assistance of trial counsel are procedurally defaulted because the Pennsylvania Supreme Court found those claims waived as a matter of state law, and that Romero is not entitled to habeas relief on any of the remaining claims.  (*See generally* Doc. No. 91.)  Romero disagrees, arguing that the Court may consider his trial court error and ineffective assistance of trial counsel claims on their merits because when Romero filed his appeal, Pennsylvania's waiver doctrine was not an adequate and independent state court rule.  (Doc. No. 94 at 12–15.)  The Court addresses this overarching question of procedural default before turning to the specific arguments made as to each claim.

### A.      Procedural Default

As stated above, a federal court cannot review "claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 582 U.S. 521, 527 (2017).  A procedural rule is not an adequate bar unless it is 'firmly established and regularly followed.'" *See Wilson v. Beard*, 589 F.3d 651, 658 (3d Cir. 2009) (quoting *Bronshtein v. Horn*, 404 F.3d 700, 707 (3d Cir. 2005)).  That is, the procedural rule must have been "consistently and regularly applied." *Albrecht v. Horn*, 485 F.3d 103, 115 (3d Cir. 2007) (internal citation omitted).  "Whether the rule was firmly established and regularly applied is determined as of the date the default occurred, and not as of the date the state court relied on it, because a petitioner is entitled to notice of how to present a claim in state court." *Id.*

The only claims the Pennsylvania Supreme Court adjudicated on the merits on PCRA

appeal were Romero's claim about Barbosa's out of court statement to Captain Bucarey and his claims for ineffective assistance of appellate counsel. *Romero II*, 938 A.2d at 369. The court declined to consider Romero's other claims, including the underlying claims of error at trial and claims for ineffective assistance of trial counsel, because those claims were waived when Romero failed to raise them at trial or on direct appeal. *Id.* The Commonwealth contends that these claims are procedurally defaulted, and we cannot consider them. (Doc. No. 91 at 18–19.) Romero argues his claims are not procedurally defaulted because the doctrine of appellate waiver is not consistently and regularly applied, and therefore not an *adequate* state procedural rule. (Doc. No. 93 at 13–14.) He asserts that at the time of his trial and direct appeal, the Pennsylvania Supreme Court followed the doctrine of "relaxed waiver" and would occasionally "reach the merits of claims otherwise barred by waiver." (*Id.*) Because the Pennsylvania Supreme Court occasionally relaxed the appellate waiver rule, Romero argues it was not "regularly applied," so the appellate waiver rule is not an "adequate" bar, and we can consider the claims the Pennsylvania Supreme Court found waived. (*Id.*) The Court agrees with Romero.

At the time of Romero's trial and the filing of his direct appeal, the Pennsylvania Supreme Court applied the doctrine of "relaxed waiver" in capital cases and would occasionally exercise its discretion to consider claims that had been waived below. *See Commonwealth v. Albrecht*, 720 A.2d 693, 700 (Pa. 1998). When the court adopted the doctrine, it explained that "because imposition of the death penalty is irrevocable in its finality, it is imperative that the standards by which that sentence is fixed be constitutionally beyond reproach." *Commonwealth v. McKenna*, 383 A.2d 174, 181 (Pa. 1978). To that end, the court recognized it had "a duty to uphold the mandates of the constitution over the countervailing considerations of normal appellate procedure." *Id.* Although discretionary, *see Beard v. Banks*, 542 U.S. 406, 412 (2004),

the doctrine was so regularly applied that it "firmly established that a claim of constitutional error in a capital case would not be waived by a failure to preserve it," *Szuchon v. Lehman*, 273 F.3d 299, 326 (3d Cir. 2001).

In fact, the Third Circuit has time and again recognized that for Pennsylvania capital cases on trial and appeal while the relaxed waiver doctrine was still in effect, appellate waiver is not an "adequate" ground for procedural default because the Pennsylvania Supreme Court so regularly relaxed its waiver rules.  *See, e.g.*, *Wilson*, 589 F.3d at 658  ("As we have held on numerous occasions, in capital cases where the waiver occurred before the Pennsylvania Supreme Court made it clear that it would no longer apply the relaxed waiver rule, the waiver rule was not 'firmly established and regularly followed' and, therefore, the waiver is not an adequate basis for a finding of procedural default."); *Laird v. Horn*, 414 F.3d 419, 423, 425 n.7 (3d Cir. 2005) (affirming district court decision that the "'relaxed waiver rule' in effect at the time of [the petitioner's] direct appeal precluded finding a procedural default"); *Szuchon*, 273 F.3d at 326–27 (holding that the petitioner's waiver of issues at trial "was not 'adequate to support the judgment' for purposes of a procedural default under federal habeas law"); *see also Pirela v. Horn*, Civil Action No. 90–5013, 2013 WL 5468489, at *16 (E.D. Pa. Oct. 1, 2013) (recognizing that the Third Circuit has "consistently held that . . . PCRA procedural rules were inadequate to bar federal habeas review" during the period in which the Pennsylvania Supreme Court applied relaxed waiver); *cf. Bronstein*, 404 F.3d at 709 ("Bronshtein did not have fair notice that he would not be given the benefit of the 'relaxed waiver' rule and that his failure to file his PCRA petition within the one-year statutory deadline would result in the dismissal of his petition.  Moreover, holding Bronshtein strictly to the one-year deadline would have denied him the more lenient treatment that the state courts had allowed other capital defendants up to that

point.").

In assessing Romero's PCRA petition, the Pennsylvania Supreme Court declined to consider "the underlying claims of trial error" and the claims regarding ineffective assistance of trial counsel because those claims had been waived, as they were not raised at trial or on direct appeal. *Romero II*, 938 A.2d at 369. Because the Pennsylvania Supreme Court did not consistently and regularly apply the waiver doctrine, it is not an "adequate" state law ground to support a judgment, and Romero's underlying trial error and ineffective assistance of trial counsel claims are not defaulted. Accordingly, those claims may be reviewed de novo on their merits by this Court, as noted in connection with each claim below. *See Appel*, 250 F.3d at 210.

## B.     Claim 1:  Interpreter

In Claim 1, Romero, whose primary language is Spanish, argues that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated because his guilt phase proceedings were conducted in English. (Doc. No. 89 at 28–44.) Romero asserts that the trial court failed to assess his ability to understand English or ensure Romero had an interpreter to assist him, despite testimony from multiple witnesses that Romero had a limited understanding of English. (*Id*.) He claims that without an interpreter, he was unable to understand or meaningfully participate in the legal proceedings and was thus denied "his right to due process, to present a defense, and to the assistance of counsel." (*Id*. at 40.)[8] Romero also argues that his trial counsel, Attorney Clark,

---

[8] *See United States ex rel. Navarro v. Johnson*, 365 F. Supp. 676, 682 n.3 (E.D. Pa. 1973) (collecting cases and providing thorough discussion of constitutional rights implicated by the failure to provide an interpreter); *see also United States v. Lim*, 794 F.2d 469, 470 (9th Cir. 1986) ("[S]everal circuits have held that a defendant whose fluency in English is so impaired that it interferes with his right to confrontation or his capacity, as a witness, to understand or respond to questions has a constitutional right to an interpreter.") (collecting cases); *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir. 1973) ("The right to an interpreter rests most fundamentally . . . on the notion that no defendant should face the Kafkaesque spectre of an incomprehensible ritual which may terminate in punishment."); *cf. Drope v. Missouri*, 420 U.S. 162, 171 (1975) (explaining, in the context of mental competency, that a defendant who "lacks the capacity to understand the nature and object of the proceedings against him, to consult

acted deficiently when he failed to "request an interpreter during [Romero's] trial" and that direct appeal counsel was ineffective for failing to raise these issues on appeal. (*Id.* at 33–41.)

Romero did not raise his interpreter or ineffective assistance of trial counsel claims at trial or on direct appeal, so they were deemed waived by the Pennsylvania Supreme Court on collateral appeal. *See Romero II*, 938 A.2d at 369. Nonetheless, for the reasons discussed above, *see supra* Part III.A., the Court reviews Romero's interpreter and ineffective assistance of trial counsel claims on their merits. In doing so, the Court is mindful that although the Pennsylvania Supreme Court found the claims waived on collateral appeal, Romero did raise these issues in his first round of PCRA proceedings via a "layered" ineffective assistance of appellate counsel claim—i.e., he argued that his direct appeal counsel was ineffective for failing to argue that trial counsel was ineffective for failing to provide him an interpreter at trial. (*See* Doc. No. 112-3 at 41.) In evaluating the ineffective assistance of *appellate counsel* claim, the Pennsylvania Supreme Court necessarily needed to determine trial counsel's alleged ineffectiveness, and in doing so, evaluated whether Romero failed to comprehend the underlying legal proceedings, such that the trial court or trial counsel should have provided an interpreter at trial. (*See* Doc. No. 112-6 at 13); *see also Romero II*, 938 A.2d at 371–72. Accordingly, although Romero's interpreter claim and ineffective assistance of trial counsel claim were not "presented" as a trial court error or ineffective assistance of trial counsel claim to the state court, the PCRA court and Pennsylvania Supreme Court on PCRA appeal nevertheless evaluated the merits of the interpreter claim when they considered Romero's layered ineffectiveness claim. Those factual determinations and legal conclusions are binding on this Court's habeas review unless Romero shows deference is unwarranted under § 25551(d)(1) or (2). *See Cullen v. Pinholster*, 563 U.S.

---

with counsel, and to assist in preparing his defense may not be subject to a trial").

170, 181 (2011) (federal habeas court is limited in its consideration of the record that was before the state court that adjudicated the claim on the merits); 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct."); *Nara v. Frank*, 488 F.3d 187, 200–01 (3d Cir. 2007) ("[T]he § 2254(e)(1) presumption of correctness applies regardless of whether there has been an adjudication on the merits for purposes of § 2254(d).").

Of relevance, the PCRA court found that Romero was "at the time of trial, . . . able to communicate in and understand the English language," such that an interpreter was "unnecessary" and "there was no constitutional deprivation" for failing to provide one.  (Doc. No. 112-6 at 13.)  The Pennsylvania Supreme Court affirmed.  *Romero II*, 938 A.2d at 371–72. This Court is bound by that conclusion unless Romero can show that it is "contrary to, or involved an unreasonable application of clearly established Federal law," or that it is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)–(2).  Here, Romero argues that the state courts' conclusion is based on "an unreasonable determination of [ ] fact," i.e., that Romero could understand English well enough that he did not require an interpreter during the guilt phase of his trial. (Doc. No. 89 at 42 (citing 28 U.S.C. § 2254(d)(2)).)

Romero, as the petitioner, has the burden of overcoming the presumption of correctness afforded that factual finding by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness [afforded the state court's factual findings] by clear and convincing evidence."); *see also Rountree v. Balicki*, 640 F.3d 530, 537–38 (3d Cir. 2011) ("The test for § 2254(d)(2)'s 'unreasonable determination of

facts' clause is whether the petitioner has demonstrated by 'clear and convincing evidence,' § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record.").  "[T]he evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication." *Rountree*, 640 F.3d at 538.  Accordingly, we recount the evidence presented to the state court before turning to Romero's argument that the court's factual finding was unreasonable.

### 1.   State Court Record, Findings, and Conclusions

A review of the state court record shows that Romero is a native Spanish speaker, having lived most of his life in Puerto Rico.  N.T. Mar. 20, 1996, at 77:9–17 (testifying that he moved to Puerto Rico as an infant); *id.* at 80:3–9 (testifying that he completed school in Puerto Rico through the ninth grade); *id.* at 85:10–13 (testifying that he spent most of his adult life in Puerto Rico).  Romero appears to have had some command of English at the time of trial, but the evidence is mixed as to the extent of his ability to speak and understand the language.

### a.   *Pretrial and Guilt Phase Proceedings*

During pretrial hearings and guilt phase proceedings, the trial court heard numerous witnesses comment about Romero's English proficiency.

First, during a pretrial hearing in January 1996, the court considered whether the codefendants—at that time, Barbosa, Lopez, and Romero—could be tried jointly.  *See generally* N.T. Jan. 11, 1996.  In deciding that issue, the court considered transcribed statements given by the three men to the police during the criminal investigation.  *Id.* at 200:11–14, 216:15–20.  In one of those statements, Lopez confirmed that Romero spoke English.  (*See* Doc. No. 81-2 at 458, Feb. 10, 1995 Stmt. ("[Detective Joseph] Hanna: Im hm, did ah, does Edwin [Romero] speak English?  Lopez: Yeah he does.").)  In addition, Officer Jose Collazo testified at the hearing, stating that he had assisted Detective Joseph Hanna by interpreting for Romero at

Romero's initial police booking and during his preliminary arraignment. N.T. Jan. 11, 1996, at 82:1–86:8. Officer Collazo could not remember whether Romero spoke any English during those conversations. *Id.* at 91:13–18. But he did remember Romero asking him, in Spanish, to interpret something Romero wanted to say to Detective Hanna. *Id.* at 97:16–98:7. Last, although an interpreter was present to translate for Barbosa during the January 1996 pretrial hearing, Romero did not have an interpreter, nor did he request one. N.T. Jan. 11, 1996, at 4:17–23, 133:3–6.

An interpreter was also present throughout guilt phase proceedings. But during *voir dire*, Attorney Clark told the court that Romero did not require the interpreter's services. N.T. Mar. 4, 1996, at 2:1–8. And the transcripts from the ten days of *voir dire* and the rest of the guilt phase show that Romero never sought help from the interpreter or asked for clarification due to a lack of understanding. *See generally* N.T. Mar. 4–19, 1996. This is telling because two witnesses, including Barbosa, used the interpreter's services. *See e.g.*, N.T. Mar. 12, 1996, at 208:8–218:13 (Gladys Lopez); N.T. Mar. 15, 1996, at 19:12–104:15 (Barbosa).

Although Romero did not testify during the guilt phase, trial testimony from other witnesses bore on Romero's ability to understand English and his need for an interpreter. First, Moreno testified that he spoke with Romero in English and Spanish. N.T. Mar. 12, 1996, at 122:1–4. After Moreno, Paladino testified that when he first spoke to Romero about the murder, Romero asked for his help translating and revising a statement that Barbosa, Lopez, and Romero were creating in the hopes of having a unified story for their attorneys and the investigators. Throughout the proceedings, this alibi story was referred to as the "pizza shop story," because the men claimed they were eating at a pizza restaurant when the murder happened and only became involved when it was time to dispose of the body. *See* N.T. Mar. 13, 1996, at 149:3–

23

152:17; *see also id.* at 155:10–159:3 (Paladino testifying that he helped Romero write out a statement for Romero's lawyer, which said that Romero stayed in the pizza shop while the murder took place, and after the fact, helped Moreno and Lopez dispose of the body). Paladino testified that Lopez wrote the alibi statement in English and that Paladino later helped Romero translate it and compose a revised version of it in written Spanish. *Id.* at 124:2–125:3. Although Paladino initially indicated that Romero sought his help because Romero did not write, speak, or understand English well, *id.* at 149:14–150:5, he later clarified that Romero could speak and read both English and Spanish but was not comfortable writing in either language, *id.* at 170:23–171:25.

After Paladino, Officer Collazo and Detective Hanna testified. Officer Collazo reiterated his testimony from the pretrial hearing, stating again that he assisted Detective Hanna by interpreting for Romero at Romero's initial police booking and during his preliminary arraignment. *Id.* at 209:6–211:14. Detective Hanna corroborated Officer Collazo's testimony. N.T. Mar. 18, 1996, at 154:13–155:15. But he also testified that Romero spoke to him in English on at least two occasions during his investigation. *Id.* at 154:1–5 (June 28, 1995), 155:23–156:22 (July 21, 1995).

> b.     *Penalty Phase Proceedings*

Before the penalty phase of trial began, Attorney Clark again addressed Romero's ability to understand English. First, he mentioned records related to prior criminal charges that Romero had in Puerto Rico, explaining that the records for those charges were "in Spanish." N.T. Mar. 20, 1996, at 18:1–3. Clark stated that he had "review[ed] the records with [Romero] in preparation for trial," and because Romero "reads Spanish and understands Spanish," Romero was able to translate the records for counsel, speaking "back [to counsel] in English." *Id.* at 18:5–9. Clark then said:

24

[MR. CLARK:] The other issue, Judge, as it relates to Virginia, the interpreter. My client really does understand quite a bit of English and only when I speak quickly does he seem to have some difficulty. I would ask that she be allowed to stand by with him, in the event that he testifies, but it's a tricky area, because a lot of stuff he understands. And it's not an issue like I'm not putting him out there to say he doesn't understand any English—

THE COURT: I understand.

MR. CLARK: But every once in a while I will say something to him, I'll try to get a thought to him and it's a puzzlement and he will look to her.

THE COURT: That is fine. You may—

[ASSISTANT DISTRICT ATTORNEY GAVIN] HOLIHAN: My—

MR. CLARK: I don't want the jury to think we were trying to pull a fast one on them, not having an interpreter for him during the trial and then now we use an interpreter. Well, no, it's just a situation where—

MR. HOLIHAN: Now, Virginia is here to interpret, do you anticipate—like I anticipated her translating for the witnesses from Puerto Rico.

MR. CLARK: Um-hmm.

MR. HOLIHAN: Do you—my question is, do we require a second interpreter to stand by your table and translate?

MR. CLARK: No. No, I don't think so.

MR. HOLIHAN: Okay, it's to deal with the questions you may have to him?

MR. CLARK: Yeah.

THE COURT: Number one, he will be—the Puerto Rican police officer will be speaking Spanish—

MR. HOLIHAN: No, I mean the conversations between Attorney Clark and Romero about this is true, is that what happened.

MR. CLARK: Right.

> THE COURT: If there is, at any time, in fact, if you need an interpreter while that is going on, you let us know and we will stop and we will allow that to happen. So that is not a problem.
>
> MR. CLARK: Okay.

*Id.* at 18:10–20:5. Consistent with this discussion, when Romero took the stand, Clark asked him if he understood English, and Romero answered, "I understand a little—I understand English, but I need an interpreter." *Id.* at 76:4–6. Clark asked, "Your Honor, may we have—," and the trial judge answered, "Certainly," at which point it appears the interpreter began to interpret Romero's responses. *Id.* at 76:7–9. After the first three questions, the judge interrupted[9]:

> THE COURT: Let's do it this way, probably. Mr. R[o]mero, if you'd like the interpreter to interpret anything, you turn to her or nod to her, and then she will interpret. You may have to repeat the question that way, but it seems that Mr. R[o]mero is not having that much difficulty, yet, with the English language.
>
> MR. CLARK: Okay. I'll try to keep it simple, too, Judge, if I can.
>
> Q.     You understand English pretty well, don't you?
>
> A.     Not much.
>
> Q.     Okay. But you do speak English well?
>
> A.     A little bit.
>
> Q.     And we were talking earlier today about your testimony here in court, you had some difficulty understanding some of the words I was using?[10]

---

[9] The context of the judge's interruption implies that it became apparent within the first three questions (name, date of birth, and place of birth) that Romero was using English to answer questions posed to him in English and ignoring the interpreter.

[10] During the initial PCRA hearing, Clark testified that this question referred to an earlier conversation between Romero and counsel about how the penalty phase would proceed. N.T. May 31, 2000, at 684:9–686:14. At that collateral hearing, Clark explained that Romero had struggled to understand "complicated words," including nuanced legal concepts like "aggravating" and "mitigating" factors. *Id.*

     A.    Yes.

N.T. Mar. 20, 1996, at 76:17–77:8.  The only time the interpreter translated for Romero after that point was when *she* asked the court if she could translate the meaning of "GED" without Romero verbally requesting her help.  *Id.* at 80:19–21.

       *c.*    *PCRA Hearing*

     Years after the trial, in his initial PCRA petition, Romero for the first time raised the interpreter issue through his layered ineffective assistance claim.  (*See* Doc. No. 112-3 at 41; *see also* Doc. No. 112-6 at 13.)  The PCRA court held an evidentiary hearing on the issue, during which Romero and the Commonwealth called numerous witnesses, including Romero's prior attorneys, Detective Hanna, and Romero's codefendants, to discuss Romero's ability to communicate in and understand English at the time of trial.

     First, Attorney Clark testified that when he met Romero, he asked a fellow attorney, Rebeca Torres, who is fluent in Spanish, to accompany him because he thought Romero might require an interpreter and Clark does not speak Spanish.  N.T. May 31, 2000, at 639:16–640:18.  Although Torres participated in the initial interview, translating portions of their conversation, it became clear that Romero and Clark could communicate well enough in English that they did not need her to continue.  *Id.* at 640:12–18.[11]  In the approximately 14 to 19 interviews that followed, Romero and Clark spoke in English and without an interpreter present, discussing,

---

[11] Attorney Torres later corroborated the testimony of Attorney Clark, testifying that Clark called her to interpret at his first meeting with Romero because Clark does not speak Spanish.  N.T. June 1, 2000, at 950:5–951:7.  She testified that she regularly accompanied Clark to his initial meetings with Hispanic clients in prison.  *Id.* at 951:10–25.  If the client was entirely unable to communicate in English, she would interpret the entire interview.  *Id.*  If the client was somewhat able to communicate in English, she would just translate a few terms and concepts.  *Id.*  If the client was proficient in English, she would end up not being needed.  *Id.*  Due to the passage of time, she could not recall into which category Clark's initial meeting with Romero fell.  *Id.* at 952:1–5.  However, she confirmed that she did not interpret again for Romero and Clark, and her only other involvement in this case was interpreting a phone call between Clark and someone in Puerto Rico.  *Id.* at 952:6–18, 953:10–13.

among other things, Romero's version of events, trial strategy, and expected testimony from various witnesses. *Id.* at 640:19–647:19. Clark testified that it appeared that Romero understood him and responded appropriately. *Id.* at 642:1–5. On those occasions when Romero looked puzzled, indicating that he required clarification or did not understand a term, Clark simplified his language such that Romero could comprehend it. *Id.* at 642:6–16.

Clark testified that he spoke with Romero about using an interpreter at trial. *Id.* at 642:17–644:1. Clark believed that Romero understood enough English to not need one and advised that he would be there to help by simplifying terms as needed. *Id.* Clark thought having an interpreter might be disadvantageous to Romero because he believed the potential jury members could harbor racial animus against Spanish-speaking people. *Id.* It was also possible that Romero's tendency to "respond in English" might lead the jury to believe they were "getting played" if Romero also had a Spanish interpreter. *Id.* Clark emphasized to Romero, however, that "if there ever came a point . . . that he felt he needed . . . an interpreter to be with him," the court would provide one. *Id.* at 643:19–23. Romero agreed with this advice. *Id.*

Next, direct appeal counsel, Daylin Leach, testified about his interactions with Romero and his decision not to pursue the interpreter claim on direct appeal. *Id.* at 716:3–721:9. Leach could not recall if he researched whether to include the issue on appeal. *Id.* When asked if he had a tactical or strategic reason for not researching it, Leach clarified that he was not sure he had not in fact done so, but that to him, it seemed like a non-meritorious issue because "when Mr. Romero and [Leach] spoke, [Romero] spoke perfect English." *Id.* at 720:7–24. Leach added, "I think I probably would have researched it a lot more if he had—if I had difficulty communicating with him on the phone, but he used large words" and "never seemed to have any difficulty communicating with me." *Id.* On cross-examination, Leach clarified:

28

> Q.      Okay. And I think your word was he spoke perfect English?
>
> A.      Well, perfect. I don't speak perfect English, but he understood me. He never asked me what any word meant. He was articulate. He was a smart guy, and . . . I acknowledge that it may not have been the case during the trial. I have no idea. I was not present during the trial. All I'm saying is when I spoke to him on the phone, he was an articulate English-speaking guy.
>
>         He never asked for an interpreter. He never said I can't speak to you, I don't understand what you are talking about. I explained the argument to him about, you know, the uncross-examined prior statement of witnesses. He understood it. So at least he seemed to understand it, so.
>
> Q.      And he also told you information about these other people that said he didn't do it?
>
> A.      Right.
>
> Q.      He communicated information to you in English?
>
> A.      Right. And he communicated other things. He had hired a law firm, and they were going to take over the case. They were going to sue me and everyone else, you know.

*Id.* at 736:3–737:3; *see also id.* at 738:2–25 (testifying that he didn't raise the interpreter issue because he was able to communicate with Romero in English, and also because "it didn't seem to be a big issue at trial . . . [his] recollection reading the transcript [wa]s not . . . that there w[ere] frequent requests by Mr. Romero[, ']I don't understand what's going on.[']  The sort of thing that would make you think, gee, this is an injustice that there is not an interpreter").

After Romero's attorneys testified, Detective Hanna took the stand.  Hanna testified that, when they first met, Romero spoke with him in English on the drive from Newark airport to Allentown, asking Hanna about Lopez and personal belongings that were taken from him in Puerto Rico.  N.T. June 1, 2000, at 939:1–941:16.  Hanna stated that he detected no difficulty with Romero's language ability then.  *Id.* at 972:10–15.  That said, the conversation was too brief for Hanna to believe he could assess Romero's language abilities.  *Id.* at 944:6–13, 973:16–

974:20.  Instead, Hanna's initial impression, primarily from the records and from Romero being

a resident of Puerto Rico, was that Romero's English ability was probably limited, which is why

Hanna used interpreters, including Officer Collazo, in his initial interactions with Romero and

why he documented Romero's limited English in initial police records.  *Id.* at 942:11–943:2,

944:6–948:7, 972:21–975:11.

        Detective Hanna's position changed, however, in July 1995 when Romero spoke to him

in English while Hanna executed a search warrant to obtain Romero's blood and hair samples at

the Lehigh County Prison.  *Id.* at 943:23–944:5.  When Hanna first arrived at the prison, he

asked an employee to find a Spanish-speaking correctional officer to interpret for him.  *Id.* at

944:6–24, 975:16–976:3.  When the infirmary employee left and before she returned with a

Spanish-speaking correctional officer, Romero began an unsolicited conversation with Hanna in

English.  *Id.* at 944:25–948:7, 976:4–979:3.  The conversation began with mundane matters like

Romero's job, but eventually Romero turned to the Bolasky homicide.  *Id.*  At that point, Hanna

interrupted him, telling Romero in English that he should not speak with Hanna about the murder

without his attorney present.  *Id.* at 946:8–24.  Romero stated he knew that, but he continued, in

English, to give Hanna the pizza shop alibi story.  *Id.*  When the Spanish-fluent correctional

officer arrived, Hanna permitted the officer to interpret as a safeguard, despite Romero having

just demonstrated his English abilities.  *Id.* at 979:4–980:7 (noting he felt better having an

interpreter present given the invasive nature of the search, which included taking blood, hairs,

and pubic hairs).  After that conversation, Hanna was convinced that Romero understood English

well enough to have an "average conversation," i.e., a conversation similar to the back and forth

that Hanna and counsel were having while Hanna was on the stand at the PCRA hearing.  *Id.* at

978:7–22.[12]  Hanna could not, however, attest to whether Romero would have needed the assistance of an interpreter at trial.  *Id.* at 978:2–6.

Romero did not testify during the initial PCRA proceeding about his ability to speak English, but he did call co-conspirators Barbosa and Moreno, along with his sister, Minerva Rios.  Barbosa testified through an interpreter that he always spoke to Romero in Spanish.  N.T. May 26, 2000, at 204:21–23.  Moreno similarly stated that although Romero now speaks English "a little bit," Romero could not speak English at the time of trial.  *Id.* at 322:16–24.[13]  And Rios, who preferred to testify in Spanish through an interpreter even though she could speak and read English, likewise testified that her brother was not fluent in English.  N.T. May 30, 2000, at 364:13–365:10, 390:13–391:11.

In addition to this testimony, Romero also submitted the expert testimony and report of neuropsychologist, Dr. Ruth Latterner.  N.T. May 25, 2000, at 49:6–51:5.  Dr. Latterner testified to administering a series of tests designed to assess Romero's proficiency with the English language.  *Id.*  The results of those tests suggested that Romero was functioning at the "preschool to early elementary school level in terms of understanding English."  *Id.* at 50:19–24.

### d.    PCRA Court's Factual Findings and Conclusions

After the evidentiary hearing, and based on the evidence before it, the PCRA court denied

---

[12] When asked for his reasoning, Detective Hanna answered:

> I know that we had an intelligent lucid conversation, that he initiated, that he offered.  He offered specifics about his family.  And in the one question I had posed to him, his response was quick and was consistent with the question that I had asked him.

N.T. June 1, 2000, at 977:6–11.  When asked to characterize the sophistication of their conversation, Hanna added, "It's much like you and I are speaking today."  *Id.* at 978:7–15.  He later reiterated his disagreement with the notion that Romero had no understanding of English.  *Id.* at 1028:7–11.

[13] This testimony contradicted Moreno's assertion during trial that Romero spoke both English and Spanish.  N.T. Mar. 12, 1996, at 122:1–4.

Romero's claim that appellate counsel was ineffective for failing to raise concerns about trial counsel's failure to provide an interpreter during the guilt phase of trial. The court found:

> Trial counsel, Attorney Glennis Clark, provided credible testimony that he was, at all times, able to communicate with [Romero] in English, and that [Romero] never had any difficulty understanding his questions. In fact, prior to the first meeting with [Romero], counsel secured the aid of another attorney who was conversant in Spanish and who would have been available as an interpreter throughout the proceedings. However, at that first meeting with [Romero], Attorney Clark determined that an interpreter was not necessary since Romero understood, and was able to communicate with him in, English. This testimony is supported by the testimony of Detective Joseph Hanna who had spoken with [Romero] in English, without any difficulty. Moreover, during the penalty phase when [Romero] specifically asked for an interpreter to be available if he needed one, he only had her interpret one time for him. Therefore, I find that, at the time of the trial, [Romero] was able to communicate in and understand the English language and that there was no constitutional depr[i]vation by not securing an unnecessary interpreter.

PCRA Opinion at 4 (Sept. 15, 2000) (filed in this action as Doc. No. 112-6 at 10–36).

The Pennsylvania Supreme Court agreed after conducting its own review:

> Trial counsel testified [that] although he had an interpreter present during his first meeting with [Romero], it was clear to him [Romero] understood enough English to communicate with counsel; if there was a word or phrase [Romero] did not understand, counsel would explain it in simpler terms. Counsel further testified he and [Romero] discussed having an interpreter at trial, but he thought it might create a racial bias against [Romero], as there was some racial animus against Hispanics in the community; he feared if [Romero] spoke in Spanish at times and in English at others, the jury would eye this with suspicion. Counsel advised [Romero] if there ever came a point in trial that he felt he needed an interpreter, one would be provided, but counsel felt, based on his conversations with [Romero], that [Romero] would be able to proceed without one.
>
> This testimony was corroborated by Detective Joseph Hanna, who testified [that] although he initially was under the impression [Romero] did not speak English well, [Romero] initiated and sustained two conversations with him in English. Finally, appellate counsel testified his review of the transcript did not lead him to believe [Romero] had expressed he did not understand the

proceedings, and therefore he had not raised the issue. The PCRA court found all of this testimony credible, and concluded at the time of trial, [Romero] was able to communicate in English and comprehend the proceedings in English.

*Romero II*, 938 A.2d at 372 (citations and footnote omitted).

### 2.    <u>Alleged Unreasonable Finding of Fact</u>

In reviewing Romero's challenge to the state court's factual finding, the Court must review "the totality of the evidence presented in the state-court proceeding," *Eley v. Erickson*, 712 F.3d 837, 846 n.11 (3d Cir. 2013), to determine if the factual finding was so "unreasonable" that a "rational jurist could not reach the same finding on the basis of the evidence in the record," *Breighner v. Chesney*, 301 F. Supp. 2d 354, 368 (M.D. Pa. 2004), *aff'd*, 156 F. App'x 539 (3d Cir. 2005); *see also id.* at 364 ("This provision [28 U.S.C. § 2254(d)(2)] essentially requires the district court to step into the shoes of an appellate tribunal, examining the record below to ascertain whether sufficient evidence existed to support the findings of fact material to the conviction[.]"). "Mere disagreement with an inferential leap or credibility judgment of the state court is insufficient to permit relief." *Breighner*, 301 F. Supp. at 369. "Only when the finding lacks evidentiary support in the state court record or is plainly controverted by evidence therein should the federal habeas court overturn a state court's factual determination." *Id.*

Romero has failed to put forth clear and convincing evidence to rebut the presumption of correctness of the state court's findings that Romero was able to communicate in English and sufficiently comprehend the legal proceedings, which were conducted in English, as to not need an interpreter. *See* 28 U.S.C. § 2254(e)(1). The state court's finding is supported by, and is reasonable in light of, the evidence presented at trial and during the initial PCRA hearing. *Id.* § 2254(d)(2). Notably, Attorney Clark testified that during their first conversation, it became apparent that Romero understood English well enough that he did not request the presence of an

interpreter in the more than a dozen interviews that followed. Detective Hanna similarly testified that Romero initiated two conversations with him in English, and one of those went into some detail about Romero's personal life and the specifics of the Bolasky murder.

Attorney Clark and Detective Hanna's testimonies are bolstered by Romero's own actions during the trial. During pretrial and guilt phase proceedings, Romero never asked for an interpreter—even though one was present for and used by at least two Spanish-speaking witnesses—nor did Romero suggest he had trouble understanding the proceedings. And during the penalty phase, Romero bypassed the interpreter who was translating for him, responding in English to questions which were posed to him in English. Romero's assertion that he did not understand legal terms such as "aggravating" and "mitigating" does not undermine the state courts' finding that he knew enough English to ensure his due process rights were not violated. *See United States v. McMillan*, 600 F.3d 434, 454 (5th Cir. 2010) ("The Constitution does not require a perfect trial or that defendants understand the proceedings with the precision of a Rhodes Scholar; rather, the Constitution requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense." (quotation marks omitted)). Indeed, many criminal defendants come to court with little to no understanding of legal terms and concepts, and the expectation is that defense counsel will simplify and explain those concepts to their clients. The record suggests that Attorney Clark frequently did just that.

Romero argues that this Court should focus on the testimony of Romero's co-conspirators, sister, and Dr. Latterner, which suggest that Romero could not understand English at the time of trial. (Doc. No. 89 at 28, 30; Doc. No. 94 at 23.) But contrary evidence, on its own, does not rise to the level of clear and convincing evidence sufficient to undermine the state court's ultimate finding on a disputed issue of fact. *See Rountree*, 640 F.3d at 543 ("At bottom,

the question of how to read this transcript (i.e., whether or not it indicates that Rountree would have accepted the offer but for his counsel's advice) is a question of fact that can be argued either way.  That the transcript can be read in more than one way does not—by itself—rise to the level of clear and convincing evidence, that the state court must be deemed unreasonable in choosing one reading over another." (cleaned up)); *Campbell v. Vaughn*, 209 F.3d 280, 291 (3d Cir. 2000) ("At the PCHA hearing, Campbell's trial counsel testified unequivocally that he informed Campbell of his right to testify and that he assured him it was Campbell's ultimate decision, alone, whether to testify.  Campbell testified to the contrary.  A reasonable fact-finder could discount Campbell's testimony and credit his trial counsel's.  Therefore, the state PCHA court did not make an unreasonable determination of the facts in light of the evidence presented when it implicitly reached that conclusion.  Accordingly, habeas relief is unwarranted under 28 U.S.C. § 2254(d)(2)."); *Wheeler v. Rozum*, 410 F. App'x 453, 459 (3d Cir. 2010) ("While Wheeler argues that the state court should have given more weight to the factors he cites, and less weight to Attorney Konchak's testimony, such argument is insufficient to rebut the presumption of correctness.").

Moreover, a review of the evidence shows that the PCRA court implicitly found the testimony of Attorney Clark and Detective Hanna more credible than the contrary testimony provided by Romero's codefendants, sister, and Dr. Latterner; the Pennsylvania Supreme Court deferred to the lower court's credibility determinations; and this Court is similarly bound by them.  *See Weeks v. Snyder*, 219 F.3d 245, 258 (3d Cir. 2000) (federal courts may not re-determine witness credibility; "we must provide the same presumption of correctness required by § 2254(e)(1) to the state courts' implicit factual findings," including those on credibility, "as we provide to express findings of the state courts" (discussing *Marshall v. Lonberger*, 459 U.S. 422,

434-435 (1983))); *see also Parke v. Raley*, 506 U.S. 20, 35 (1992) (implicit findings of fact are tantamount to express ones); *Marshall*, 459 U.S. at 434 (inferences fairly deducible from state-court factual findings are also due deference).

Because Romero has not shown by clear and convincing evidence that the state court's factual finding is unreasonable, this Court must defer to that finding. *See Wallace*, 2013 WL 1352250, at *18 ("Here, Petitioner offers the Court no clear and convincing evidence (or no evidence of any kind) that he could not communicate in English. . . .  This Court finds it unwarranted to disturb the state courts' well-founded conclusion that Petitioner's English was fully sufficient for the purposes of his criminal prosecution."); *Petrov v. Wash*, Civil Action No. 1:CV–11–00357, 2012 WL 2308622, at *8 (M.D. Pa. May 4, 2012) (finding reasonable, and thus, deferring to, the state courts' factual determination that "appellant does, indeed, understand English"); *see also Meraz v. Davis*, No. 4:15-CV-836-A, 2017 WL 2633536, at *3–4 (N.D. Tex. June 16, 2017) (deferring to the state court's findings and conclusions, including the conclusion that the petitioner failed to show "that the appointment of an interpreter was required to assist him in his defense" because on habeas review, the petitioner "ha[d] not presented clear and convincing evidence" to rebut the presumption that the state court's findings were correct).  In other words, this Court must presume that Romero, though a native Spanish speaker, knew the English language well enough to communicate in English and to understand the legal proceedings surrounding his trial.

Accordingly, the Court finds that the trial court did not err when it failed to provide an interpreter during guilt phase proceedings.  *See Ebrahim v. LeConey*, No. 10-CV-6397, 2012 WL 6155655, at *8 (W.D.N.Y. Dec. 11, 2012) ("Ebrahim's proficiency in written and spoken English is well-documented in the record.  The trial court was justified in determining that he

possessed the ability to speak and understand English sufficiently well such that an interpreter

was not required at the plea hearing."). And trial counsel's failure to provide an interpreter for

Romero did not amount to deficient performance. *See Wallace*, 2013 WL 1352250, at *18

("[T]his Court finds that even the first prong of the *Strickland* test cannot be met by Petitioner:

indeed, it was not below objective standards of reasonableness for Fetky to omit obtaining an

interpreter for a client who already spoke sufficient English on his own."); *see also Toure v.*

*Saylor*, No. 1:20-CV-197, 2022 WL 355399, at *6–8 (D.N.D. Feb. 7, 2022) ("On the current

record, the fact that counsel did not demand assistance from and the presence of a[n] interpreter

[ ] during pretrial proceedings in general and at trial in particular, while not necessarily ideal,

does not appear to be objectively unreasonable given Toure's demonstrated proficiency in

English."). *Contra Gonzalez v. Phillips*, 195 F. Supp. 2d 893, 898–900 (E.D. Mich. Dec. 21,

2001) (finding that the "record clearly shows that *Petitioner had insufficient English language*

*abilities to understand the proceedings against him* and that his attorney was aware or should

have been aware of his English language limitations," such that the attorney "should have

requested an interpreter for his client and . . . his failure to do so fell outside the range of

professionally competent assistance" (emphasis added)).[14] Finally, because the underlying

interpreter claim lacks merit, Romero also has not shown that his appellate counsel was

ineffective for failing to raise this claim. *See Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000)

---

[14] Because the Court finds trial counsel was not deficient, we need not reach the prejudice prong
or address the parties' dispute about whether *Cronic* or *Strickland* governs that inquiry. *Compare
Gonzalez*, 195 F. Supp. 2d at 901–03 (analyzing the petitioner's ineffective assistance of trial counsel
claim under both tests and finding prejudice regardless of which one applies because the petitioner spoke
virtually no English), *with United States v. Ademaj*, 170 F.3d 58, 62 (1st Cir. 1999) (declining to presume
prejudice under *Cronic*, and instead, analyzing "whether the absence of an interpreter prior to trial
actually prejudiced Ademaj's defense" because the "Ademaj understands and speaks considerable English
and only belatedly even alleged that pretrial communications with counsel were difficult").

("Counsel cannot be deemed ineffective for failing to raise a meritless claim.").[15]

---

[15] To the extent Romero makes a separate argument that he was denied due process because the trial court failed to conduct a hearing or colloquy on his ability to understand English, that claim also fails because, again, Romero understood the proceedings sufficiently well that his due process rights were not violated. (*See* Doc. No. 89 at 39 (arguing that the "trial court was obligated to conduct a hearing or colloquy to determine his capacity to understand English").)  Although the Third Circuit has not directly addressed this issue, appellate courts in other Circuits have suggested that a criminal defendant is entitled to a hearing—or at minimum, to be told he has a right to an interpreter—when the trial court is "on notice" that the defendant has "a severe difficulty" understanding the proceeding.  *United States ex rel. Negron v. New York*, 434 F.2d 386, 390–91 (2d Cir. 1970) ("The least we can require is that a court, put on notice of a defendant's severe language difficulty, make unmistakably clear to him that he has a right to have a competent translator assist him, at state expense if need be, throughout his trial."); *see also Luna v. Black*, 772 F.2d 448, 451 (8th Cir. 1985) (considering whether the trial court "could be said to be on notice" of the defendant's language difficulties, such that it was "required to hold a hearing regarding an interpreter"); *Carrion*, 488 F.2d at 15 (explaining that a trial court has "wide discretion in determining whether an interpreter is necessary," but in using that discretion, the court "should make unmistakably clear to a defendant who may have a language difficulty that he has a right to a court-appointed interpreter if the court determines that one is needed," and if "put on notice that there may be some significant language difficulty, the court should make such a determination of need"); *cf. Gonzalez v. People of V.I.*, 109 F.2d 215, 217 (3d Cir. 1940) ("It may well be that an accused who is unfamiliar with the language would be entitled under a constitutional provision . . . to have the testimony of the People's witnesses interpreted to him in order that he may fully exercise his right to cross-examination.  This we need not decide, however, since in the case before us it does not appear from the record that the defendants were unable to speak or understand English, the language of the People's witnesses.").

There is no basis for finding that the trial court had such notice here before, at the earliest, the penalty phase of trial.  Notably, the pretrial testimony indicated that Romero communicated in Spanish *and* English.  *See supra.* Part III.A.1.a.  Romero did not ask to use the interpreter during pretrial hearings, *voir dire*, or the guilt phase of trial, even though an interpreter was available and translated for Barbosa and other witnesses.  *See generally* N.T. Mar. 4–19, 1996.  Romero's trial counsel went so far as to tell the court that Romero did not require the interpreter's services.  N.T. Mar. 4, 1996, at 2:1–8.  And although some of the testimony given at trial touched on Romero's ability to communicate in English, nothing in that testimony would have alerted the trial court that Romero had a "severe difficulty" understanding the proceedings.  For example, although Paladino testified that Romero sought his help translating the alibi statement from written English to written Spanish, he clarified that he did so because Romero did not write well in either language.  N.T. Mar. 13, 1996, at 170:23–171:25.  Similarly, although Detective Hanna testified that he used an interpreter during his initial interviews with Romero, he also testified that Romero initiated conversations with him *in English* during those interactions.  N.T. Mar. 18, 1996, at 154:1–5, 155:23–156:22..  Finally, we note that the record shows trial counsel told Romero, before the trial began, that if he desired an interpreter at any point, the court would provide one for him.  N.T. May 31, 2000, at 643:19–23; *cf.* N.T. Mar. 20, 1996, at 20:1–4 (trial judge stating during the penalty phase "[i]f there is, at any time, in fact, if you need an interpreter . . . , you let us know and we will stop and we will allow that to happen.  So that is not a problem").  Yet, Romero never requested an interpreter or suggested he needed assistance understanding the proceedings.

Even viewed collectively, we cannot say that this evidence would have notified the trial court that Romero had a "severe language difficulty."  *See Carrion*, 488 F.2d at 15 (finding no error from the trial court's failure to hold a "formal hearing on the question whether the appellant required a translator" because the trial court had established a "procedure," i.e., motion practice, "for appellant to allege and show a language difficulty before trial commenced," had asked trial counsel whether the "appellant was

*       *       *

For the above stated reasons, the Court finds that Claim 1 does not provide Romero habeas relief.

## C.      Confrontation Clause Claims

In Claims 8 and 9, Romero argues that his Sixth and Fourteenth Amendment right "to be confronted with the witnesses against him" was violated by the improper introduction of pretrial statements given by his coconspirators, Barbosa and Lopez.  The Court addresses the statements of each coconspirator in turn.

### 1.      <u>Claim 8:  Barbosa's Statement</u>

First, Romero challenges the introduction at trial of a statement that coconspirator Barbosa gave to Captain Bucarey on February 1, 1996, which implicated Romero in Bolasky's murder.  (Doc. No. 89 at 138.)  Romero raised this argument at trial and on direct appeal, *see* N.T. Mar. 18, 1996, at 4:3–50:4; *Romero I*, 722 A.2d at 1018–19, so it was properly exhausted, and we must defer to the state court's ruling on the merits of the claim unless Romero shows deference is unwarranted under § 2254(d).

#### a.      *State Court Record, Findings, and Conclusions*

As stated briefly above, at trial Barbosa testified about Lopez and Moreno's involvement in Bolasky's murder, but he refused to answer any questions about Romero, even after being threatened with contempt of court.  *See* N.T. Mar. 15, 1996, at 6:14–63:17, 67:11–68:6, 70:16–

---

able to communicate and understand English, to which appellant's counsel responded in the affirmative," and "told the appellant that if, at any point in the proceedings, there was something he did not understand, he need only raise his hand and the testimony would be repeated"); *Luna*, 772 F.2d at 451 (finding that "the court's failure to hold a hearing to determine the need for an interpreter, or to ultimately appoint one, d[id] not constitute a violation of any constitutional right warranting habeas relief" because there was nothing to suggest that the defendant "obviously neither spoke nor understood the English language, or, despite some limited ability, clearly had difficulty with the language").

19.[16]  Accordingly, ADA Holihan proposed calling Captain Bucarey to the stand to "testify about

the inconsistencies between the statement [Barbosa] gave to Captain Bucarey" during his

investigation, "and what [Barbosa] said in Court today."  *Id.* at 64:13–17.  The trial judge agreed

to this plan over the vehement objections of Attorney Clark, with the understanding that after

Barbosa's statement came in, Clark could "call Mr. Barbosa [him]self" for cross examination

related to the statement.  *Id.* at 67:11–20 (ordering that Barbosa will be kept "available for Mr.

Clark if Mr. Clark needs him").[17]  In the meantime, Barbosa was cross examined by Lopez's

attorney on the testimony he gave about Lopez's involvement, *id.* at 72:21–98:18, and in limited

respects, by Attorney Clark, *id.* at 98:19–104:15 (Barbosa testifying that the initial plan was to

rob Bolasky, not kill him, and that the men had never planned to shoot Bolasky in the alleyway).

The next day, the trial judge allowed Captain Bucarey to testify about Barbosa's prior

statement.  N.T. Mar. 18, 1996, at 4:12–63:20.  Barbosa's statement implicated Romero in

Bolasky's murder:

> [CAPTAIN BUCAREY:] I asked the question, "Okay. Would you
> please answer in a loud voice and tell me how David Bolasky died?"
> [Barbosa] responded, "Yes. . . . We left from Jersey City." I asked,
> "Who is we?" He responded, "Edwin Romero, [George] Ivan Lopez
> and Miguel Moreno and myself. . . . We left Jersey City towards
> Pennsylvania, Allentown, with the intention of robbing some drug

---

[16] As Barbosa's attorney explained, when Barbosa was called as a witness at trial, Barbosa had
already been sentenced to life for his involvement in Bolasky's murder so being held in contempt made
no difference to him. *See* N.T. Mar. 15, 1996, at 63:4–17 (Barbosa's attorney explaining that Barbosa "is
not gonna testify, period, against Mr. Romero.  And any question that's gonna be asked about Mr.
Romero, he just told me specifically that he is not going to say anything or answer anything concerning
Mr. Romero.  He doesn't have to worry about contempt of Court.  I'm sorry, your Honor.  I mean, he
can't get anything worse from this Court.  He has no fear of punishment."); *see also id.* at 6:15–8:18
(ADA Holihan explaining that Barbosa refused to testify because he "has no benefit to gain.  He has no
chips left to play"); *id.* at 10:5–9 ("[H]is main gripe . . . is that he has no more chips to play.  He's got no
consideration.  He got life.  He's gonna die in prison.  What does he care.").

[17] Attorney Clark also argued that allowing Barbosa to be called back after the fact was
insufficient because it required Romero, as the defendant, "to try to figure out some way to get him on to
clean up or to ask him questions about the statement," which improperly "shifts the burden to [the
defense] to prove something in this case."  N.T. Mar. 18, 1996, at 10:1–8.

dealers. But when we arrived to—when we arrived at Allentown, Miguel Moreno gave us the idea of robbing a man who was the one that collected the rents."

. . . .

In response to my question [about what happened inside the apartment, Barbosa] stated, "So me and Edwin [Romero] were waiting inside the bathroom of the apartment and [George] Ivan Lopez was in the living room waiting for this man, Bolasky, to arrive. . . . When he crossed from the living room towards the bathroom, me and Edwin Romero were waiting for him and Edwin Romero hit him with a .22 pistol on the head."

. . . .

Barbosa stated, "I put [a string] on his neck. And when I pulled it, it broke. So they had the weapons in their hands threatening with them from side to side telling me to then break his neck instead." I asked the question, "Who had weapons?" He answered, "Edwin [Romero] and [George] Ivan [Lopez]."

. . . .

Barbosa stated, "So they told me to break his neck. I told them no. They have the weapons in their hands and they say to me, 'No, do what we tell you. You have to do what we tell you.' . . . . So, I got him and started to bend his neck to try and break it . . . . But I couldn't. I didn't have enough strength to do it and they got pissed off at me and started to talk dirty to me. . . . [George] Ivan [Lopez] had him by one arm and Edwin [Romero] had him by the other."

. . . .

[Barbosa] stated, "[George] Ivan [Lopez] took [a towel] and ripped it and said to me, 'Put it on his neck and tighten it. Tighten it around his neck until I tell you.  Continue to tighten it.' When I saw that he was already turning purple, I said to Romero, 'That's it.  He's already dead . . .  I let go of the towel but the towel stayed all wound up, still real tight around his neck. I said to him, 'No, he's already dead.' And both of them said to me, 'No, no, no.' And Edwin [Romero] got him and continued tightening and then later [George] Ivan [Lopez]. The last one that continued tightening until he expired was Romero." . . . I said to Romero, I think he's already dead.' And he said, 'No. Let me give it two more turns and we'll let him go.'"

*Id.* at 66:9–76:12.  After this testimony, Attorney Clark cross examined Captain Bucarey about

another statement that Barbosa gave to the police, which had not implicated Romero in the murder.  *Id.* at 78:19–90:8.  But because Barbosa refused to answer any questions about Romero, Clark was unable to cross examine *Barbosa* about the veracity of his prior statement.

On direct appeal, the Pennsylvania Supreme Court found that the introduction of Barbosa's statement through Captain Bucarey violated Romero's constitutional right to confront witnesses against him because Romero was not given the opportunity to cross examine Barbosa about the prior statement.  *Romero I*, 722 A.2d at 118–19; *cf. Douglas v. Alabama*, 380 U.S. 415, 419–20 (1965) ("[P]etitioner's inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause. . . . Although the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege [against self-incrimination] created a situation in which the jury might improperly infer both that the statement had been made and that it was true.").

The Pennsylvania Supreme Court declined, however, to overturn Romero's murder conviction and order a new trial because it found Barbosa's statement was cumulative of other evidence that was properly introduced at trial, and thus, its erroneous introduction amounted to harmless error:

> Here, we find that the evidence of Appellant's involvement in the murder that was extracted from the erroneous admission of Barbosa's statements was merely cumulative of other, properly admitted evidence indicating his guilt. Moreno testified that when he brought Mr. Bolasky to his third floor apartment, George Lopez, Barbosa and [Romero], as planned, were in the apartment, waiting for Mr. Bolasky's arrival. A short time later, Moreno then saw Barbosa and [Romero] carrying Mr. Bolasky's body, wrapped in bed sheets, down from his apartment. Moreover, [Paladino], [Romero]'s cellmate, testified that [Romero] had confessed to him

> that he was waiting for Mr. Bolasky in Moreno's apartment with
> others and that, once he arrived, Mr. Bolasky was assaulted, robbed
> and strangled by ligature. Given both Moreno's and [Paladino]'s
> properly admitted testimony, which also clearly inculpated
> [Romero] in the planning and execution of the robbery and murder
> of Mr. Bolasky, the error in admitting Barbosa's statement was
> harmless.

*Romero I*, 722 A.2d at 1019 (citations omitted); *see also id.* at 1019 n.7 (rejecting Romero's

argument that Barbosa's statement was "the only evidence linking [Romero] to the crimes he had

been charged with," and finding, to the contrary, that "both Moreno's and [Paladino]'s testimony

provided evidence that [Romero] actively participated in the murder of Mr. Bolasky"). The

Pennsylvania Supreme Court also found that the "physical evidence introduced at trial

corroborated the statements made by [Paladino] and Moreno." *Id.* at 1019 n.6. Notably,

"Bolasky's body was hog-tied, with a twisted towel around his neck, and wrapped in bed sheets

as both Moreno and [Paladino]'s testimony indicated. Further, the medical examiner confirmed

that Mr. Bolasky sustained a blow to the head and that his cause of death had been strangulation

by ligature." *Id.*

Romero contends that the state court's harmless error determination was erroneous and

asks us to consider the issue de novo, find the introduction of Barbosa' statement had a

substantial and injurious effect on the verdict, and grant habeas relief on that basis. (Doc. No. 89

at 151–57.)

### b.     Deference Under § 2254(d)

Because the state court ruled on the merits of the harmless error question,[18] § 2254(d)

governs our review. *See* 28 U.S.C. § 2254(d) (setting standard of review for "any claim that was

---

[18] Neither party disputes that the Pennsylvania Supreme Court's ruling on this issue on direct
appeal was a ruling on the merits. *See Brown v. Davenport*, 596 U.S. 118, 127 (2022) ("No one questions
that a state court's harmless-error determination qualifies as an adjudication on the merits under
[§ 2254(d)].").

adjudicated on the merits in State court proceedings"). Romero argues that we should not defer to the state court's harmless error determination because that ruling rests on an unreasonable finding of fact under § 2254(d)(2) and was contrary to and an unreasonable application of the United States Supreme Court's holdings under § 2254(d)(1). (Doc. No. 89 at 151–57.) The Court addresses each issue in turn.

i.     <u>Alleged Unreasonable Findings of Fact</u>

As stated previously, a petitioner asking the court to disregard a state court's ruling under § 2254(d)(2) must show that the ruling was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). There is a presumption of correctness for factual determinations made by state court judges, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *Id.* § 2254(e)(1); *see also Rountree*, 640 F.3d at 537–38.

In this case, Romero argues that the Pennsylvania Supreme Court's harmless error conclusion rests on "several objectively unreasonable findings of fact." (Doc. No. 89 at 152.) First, he asserts that the court erred when it found that Moreno and Paladino "testified about Mr. Romero's involvement in carrying out the murder itself," because neither witness testified to seeing Romero in the apartment or participating in the murder as "anything more than a bystander." (*Id.* at 153.) But this mischaracterizes the witnesses' testimony. Although neither Moreno nor Paladino gave an eyewitness account like that given by Barbosa, they both testified to Romero's presence in the apartment at the time of the murder, and Paladino testified to Romero's participation in the murder. Moreno testified that before the murder, Romero and the others planned to rob and shoot Bolasky in the alleyway next to the apartment building, and it was only later that the plan changed to killing him in the third-floor apartment. N.T. Mar. 12, 1996, at 30:1–36:25. Moreno also testified that he let Romero into the apartment building prior

44

to the murder.  *Id.* at 39:24–40:7; *id.* at 113:1–7 (testifying that Romero and Barbosa "went in [the apartment] through the front and they went right upstairs").  And around half an hour later, Moreno saw Romero and Barbosa "carrying a bed sheet, with something in it, down the stairs." *Id.* at 41:18–23; *see also id.* at 43:22–44:6 (testifying that he "figured it was Bolasky's body" in the bedsheet).  Although Moreno never saw Romero inside the apartment unit itself, *see id.* at 40:3–7; *id.* at 112:1–6 (Moreno admitting that he did not see anyone inside the apartment except for Lopez), the jury could have inferred from this testimony that Romero was inside the apartment when Bolasky died.  At a minimum, Romero has not shown by clear and convincing evidence that the state court erred when it found that Moreno's testimony placed Romero inside the apartment.  *See* 28 U.S.C. § 2254(e)(1); *see also Rountree*, 640 F.3d at 537–38.

Paladino's testimony goes further, testifying that although Romero relied on the "pizza shop" alibi in their initial conversations, Romero later admitted to "hid[ing] in a little bathroom" in Moreno's apartment while Moreno lured Bolasky upstairs.  N.T. Mar. 13, 1996, at 161:13–25.  Once Bolasky was in the apartment, Romero left the bathroom and "grab[bed] Mr. Bolasky by one arm," while Barbosa grabbed his other arm.  *Id.* at 162:4–9.  Lopez then hit Bolasky in the head with a gun, before tightening a towel around Bolasky's neck.  *Id.* at 162:15–163:17 (testifying that "the other guy" hit Bolasky on the head with the gun and wrapped the towel around his neck).  The men then searched Bolasky before wrapping his body in bed sheets and carrying it down the stairs.  *Id.* at 163:18–165:9.  Although the accounts given by Moreno and Paladino differ from the version of events given by Barbosa, each man's testimony places Romero in the apartment at the time of the murder and suggests Romero's role went beyond that of bystander.  Accordingly, it was not "objectively unreasonable" for the state court to find, based on their testimony, that Romero participated in the murder.

45

Second, Romero asserts that "[c]ontrary to the state court's characterization, none of the physical evidence supported a finding that *Mr. Romero* intentionally killed Mr. Bolasky." (Doc. No. 89 at 153 (explaining that while the evidence "supports an intentional killing, it does not indicate that Mr. Romero helped kill Mr. Bolasky").) Romero is correct that the physical evidence does not directly link him to the crime—ADA Holihan stipulated as much during trial—but again, Romero misreads the state court's opinion as to why it relied on that evidence. The Pennsylvania Supreme Court did not say that the physical evidence directly linked Romero to the murder. Instead, it found the forensic evidence corroborated Moreno and Paladino's testimonies. *See Romero I*, 722 A.2d at 1019 n.6. In other words, the state court found the physical evidence *bolstered* the truth of Moreno and Paladino's statements as to the cause of death and the disposal of the body, suggesting the other aspects of their statements may also be true. This finding was not objectively unreasonable. The physical evidence referenced by the court—"Mr. Bolasky's body was found hog-tied, with a twisted towel around his neck, and wrapped in bed sheets," and suggested that he "sustained a blow to the head" before dying of "strangulation by ligature"—was consistent with the testimony from Moreno and Paladino. *Id.*

Accordingly, the Court rejects Romero's contention that the state court's harmless error determination is based on an unreasonable finding of fact.

ii.    Alleged Unreasonable Application of Federal Law

In the alternative, Romero argues that the state court's harmless error ruling is not entitled to deference because it "involved an unreasonable application of[ ] clearly established federal law." 28 U.S.C. § 2254(d)(1). A state court decision involves an "unreasonable application of" clearly established federal law when "[it] resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Hameen*, 212 F.3d at 890. This occurs when the state court "identifie[s] the correct governing legal rule . . . but

46

unreasonably applie[s] it to the facts of the particular . . . case." *Williams,* 529 U.S. at 407.

"For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410). Accordingly, the habeas court "must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the United States Supreme Court. *Id.* at 102. If "fairminded jurists could disagree on the correctness of the state court's decision," federal habeas relief is precluded. *Id.* at 101 (quotation marks omitted). In other words, a state court's determination is unreasonable only if it was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

In § 2254(d)(1), the phrase "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions." *Howes v. Fields*, 565 U.S. 499, 505 (2012). In this case, the relevant holdings are those reached in *Chapman v. California* and *Delaware v. Van Arsdall*. In *Chapman*, the Supreme Court held that when a court on direct appeal finds constitutional error occurred during a defendant's criminal trial, the burden is on "the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. 18, 24 (1967). In other words, "when a defendant demonstrates on direct appeal that a constitutional error occurred at his trial, his conviction cannot stand unless *the government* proves the error's harmlessness 'beyond a reasonable doubt.'" *Brown*, 596 U.S. at 133 (quoting *Chapman*, 386 U.S. at 24) (emphasis added).

Likewise, in *Van Arsdall*, the Supreme Court reiterated that the "correct inquiry" for a court analyzing harmless error under *Chapman* "is whether, assuming that the damaging potential of the cross-examination [had been] fully realized,[19] a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." 475 U.S. 673, 684 (1986). This determination, in turn, "depends on a host of factors," including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

When the state court has ruled on the merits of the harmless error question, a federal habeas court "may not award habeas relief" under § 2254(d)(1) "unless *the harmlessness determination itself* was unreasonable" under *Chapman* and *Van Arsdall*. *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (quoting *Fry*, 551 U.S. at 119); *see also Johnson v. Lamas*, 850 F.3d 119,

---

[19] This statement from *Van Arsdall* suggests that a court should continue to view the wrongly admitted prior statement as having been admitted into evidence but assume that the defendant had a full opportunity to cross examine the testimony. Here, this analysis is complicated by the fact that Barbosa testified at the trial, but only as to Lopez. Indeed, Barbosa's statements during the trial make clear that— as Attorney Clark argued—if the trials had been severed, Barbosa would have refused to testify in Romero's case. *See* N.T. Mar. 15, 1996, at 56:11–12, 58:21–59:1, 63:4–17 (Barbosa's attorney explaining that Barbosa "is not gonna testify, period, against Mr. Romero. And any question that's gonna be asked about Mr. Romero, he just told me specifically that he is not going to say anything or answer anything concerning Mr. Romero. He doesn't have to worry about contempt of Court. I'm sorry, your Honor. I mean, he can't get anything worse from this Court. He has no fear of punishment."); *see also id.* at 69:21–25 ("MR. CLARK: And am I to understand from [Barbosa's attorney] that he—if we asked him questions, there will be no response to anything, right? [BARBOSA'S ATTORNEY]: Yes."); N.T. Mar. 18, 1996, at 5:8–6:8 (Clark arguing, "If [Romero and Lopez] were tried separately, I think it would be very clear that if he got on the stand and he refused to implicate the defendant"); *id.* at 24:25–25:3 (Clark arguing that "there is no question that if these cases were severed . . . Barbosa wouldn't even have been on the stand five minutes"); *id.* at 26:24–27:1 (Clark arguing that it "clouds the issue because we have these joint trials"). And if the trials had been severed and Barbosa refused to testify against Romero, there would have been no basis for the prosecution to argue that the prior statement was admissible for impeachment purposes, and the statement would not have been entered at all. Accordingly, we analyze the *Van Arsdall* factors with the assumption that the prior statement would not have been entered at trial.

134 (3d Cir. 2017) (framing the relevant question as "whether a fair-minded jurist could agree

with the [state court's] conclusion that the introduction of Slaughter's statement was harmless").

 Here, the Pennsylvania Supreme Court, applying its own precedent, considered whether

the introduction of Barbosa's testimony "contributed to the verdict" against Romero. *Romero I*,

722 A.2d at 1019 (citing *Commonwealth v. Story*, 383 A.2d 155, 164 (1978)); *see also Story*, 383

A.2d at 164 ("We adopt the standard that an error cannot be held harmless unless the appellate

court determines that the error could not have contributed to the verdict. Whenever there is a

reasonable possibility that an error might have contributed to the conviction, the error is not

harmless." (quotation marks omitted) (referencing *Chapman*, 386 U.S. at 24))). The court, thus,

broadly identified the correct governing legal rule as outlined in *Chapman*. *See Chapman*, 386

U.S. at 24 (holding that when a court on direct appeal finds constitutional error occurred during a

defendant's criminal trial, the burden is on "the beneficiary of [the] constitutional error to prove

beyond a reasonable doubt that the error complained of did not contribute to the verdict

obtained").

 After identifying this governing standard, the state court explained that the Pennsylvania

Supreme Court has "considered an error to be harmless where the improperly admitted evidence

is merely cumulative of substantially similar, properly admitted evidence." *Romero I*, 722 A.2d

at 1019 (citing *Commonwealth v. Foy*, 612 A.2d 1349, 1352 (1992)). Because the state court

found Barbosa's testimony cumulative of Moreno and Paladino's testimonies, it concluded that

any error in admitting Barbosa's statement was harmless. *Id*. Romero argues that this

conclusion rests on "an unreasonable application of clearly established federal law as set forth"

in *Van Arsdall*, because the state court "failed to recognize that no evidence corroborated Mr.

Barbosa's statement on 'material points' related to Mr. Romero's participation[ ] and failed to

grapple with the importance of Barbosa's statement in the prosecution's case, as evidenced by the prosecutor's heavy reliance on the statement in opening and closing arguments." (Doc. No. 89 at 155 (quotation marks omitted).)[20, 21]

The state court did not cite *Van Arsdall* or discuss any of the *Van Arsdall* factors apart from cumulativeness in its opinion. This failure does not on its own mean the court unreasonably applied clearly established federal law. *See Gonzalez v. Stainer*, 507 F. App'x 704, 705–06 (9th Cir. 2013) (explaining that "the state court did not, and need not, analyze the five *Van Arsdall* factors," and finding that "the state court's [harmlessness] conclusion was not unreasonable"); *cf. Early v. Packer*, 537 U.S. 3, 8 (2002) (explaining that a state court ruling is not "contrary to clearly established federal law" merely because it fails to cite to the relevant Supreme Court authority—"indeed, [§ 2254(d)(1)] does not even require *awareness* of our cases, so long as neither the reasoning nor result of the state-court decision contradicts them"). But the court's "failure to acknowledge *Van Arsdall* or consider most of its relevant factors" does "provide[ ] evidence that the court unreasonably applied *Chapman*." *Reiner v. Woods*, 955 F.3d 549, 562 (6th Cir. 2020). Indeed, the state court's suggestion that cumulativeness alone is

---

[20] Romero also argues that the state court's ruling is contrary to and an unreasonable application of *Brecht v. Abrahamson*, but as the United States Supreme Court recently clarified, a habeas court reviewing a state court's finding of harmless error must consider whether the state court unreasonably applied *Chapman*, not *Brecht*. *See Brown*, 596 U.S. at 127.

[21] Romero asserts that the state court's conclusion was an unreasonable application of *Douglas v. Alabama*. (Doc. No. 89 at 156.) But *Douglas* did not speak to *Chapman* or whether the Confrontation Clause violation before it amounted to harmless error under that standard. *See* 380 U.S. at 419; *see also Howes v. Fields*, 565 U.S. 499, 505 (2012) (explaining that "clearly established Federal law" refers to "the *holdings*, as opposed to the dicta, of this Court's decisions" (emphasis added)). Instead, *Douglas* analyzed only the underlying question of constitutional error, i.e., whether "[i]n the circumstances of [the] case [before it], petitioner's inability to cross-examine Loyd as to the alleged confession . . . denied him the right of cross-examination secured by the Confrontation Clause." 380 U.S. at 419; *see also Turner v. Admin. N.J. State Prison*, No. 22-1668, 2023 WL 2808464, at *5 (3d Cir. Apr. 6, 2023) (expressing "some doubts about [the state court's] conclusion" that "no constitutional error occurred during trial . . . especially in light of *Douglas v. Alabama*, which held that the statements of a non-testifying codefendant cannot be introduced in trial through the testimony of law enforcement").

sufficient for purposes of harmlessness, along with its citation to *Foy*, suggests the state court did

not consider *Van Arsdall*'s remaining factors. *See Romero I*, 722 A.2d at 1019 ("[T]his Court

has considered an error to be harmless where the improperly admitted evidence is merely

cumulative of substantially similar, properly admitted evidence."); *Foy*, 612 A.2d at 1352 ("Error

is considered to be harmless where:  (1) the error did not prejudice the defendant or the prejudice

was de minimis; *or* (2) the erroneously admitted evidence was merely cumulative of other,

untainted evidence which was substantially similar to the erroneously admitted evidence; *or*

(3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the

prejudicial effect of the error was so insignificant by comparison that the error could not have

contributed to the verdict." (emphases added)).

The state court's sole focus on cumulativeness is noteworthy in this case because each of

the remaining *Van Arsdall* factors—the importance of Barbosa's statement in the prosecution's

case, the presence or absence of corroborating or contradicting evidence, the extent of cross

examination otherwise allowed, and the overall strength of the prosecution's case—weighs

against a finding of harmlessness. *See Ali v. Admin. N.J. State Prison*, 675 F. App'x 162, 164–

65 (3d Cir. 2017) (considering whether the state court's harmless-error ruling was contrary to or

an unreasonable application of federal law and "analyz[ing] this case under the Supreme Court's

rubric for determining whether Confrontation Clause violations were harmless, as set forth in

*Delaware v. Van Arsdall*").[22]  A discussion of the evidence as it affects each of these remaining

---

[22] The Court can imagine another case, with different facts, where the state court's decision to
focus solely on the cumulativeness factor would not amount to an unreasonable application of *Chapman*
and *Van Arsdall*.  For example, if the erroneously admitted evidence was identical to other, properly
admitted evidence and played only a minor role in the prosecution's case, which was otherwise strong.
*See Lamas*, 850 F.3d at 134–37 (deferring to lower court's finding of harmless error where the improperly
admitted statement "was cumulative of Bowens's and Williams's largely consistent identifications"; it
"added very little, if any, new substance to [the other witnesses'] consistent narratives"; and the other
witnesses, though impeached, were rehabilitated and credible eye witnesses); *Brooks v. Admin. N.J. State*

*Van Arsdall* factors is helpful.

### The Importance of Barbosa's Statement in the Prosecution's Case

The first *Van Arsdall* factor considers the "importance of the witness' testimony to the prosecution's case." *Van Arsdall*, 475 U.S. at 684.  To understand the challenged testimony's importance, courts consider the prosecution's statements at trial.  *See Kyles v. Whitley*, 514 U.S. 419, 444 (1995) ("The likely damage [of admitting the suppressed, contradictory statements] is best understood by taking the word of the prosecutor, who contended during closing arguments that Smallwood and Williams were the State's two best witnesses."); *Reiner*, 955 F.3d at 557 ("[T]he prosecution's prominent treatment of Lewandowski's statements at trial highlights their importance to its case."); *cf. Lambert*, 861 F.3d at 472  ("As for the prejudice prong of *Strickland*, without Dr. Kessel's testimony about Tillman's statements to her, there would be no direct evidence to establish more than Lambert's mere presence at, and failure to leave, the scene of the crime . . . .   The prosecutor likely recognized this gap, and thus inferred in her closing argument that Lambert encouraged Tillman to seek vengeance against the residents of the Thomas-Freeman household when the two were in the car together.").

Throughout Romero's trial, ADA Holihan repeatedly emphasized the importance of Barbosa's testimony.  In his opening statement, Holihan told the jury that Barbosa's testimony was the "smoking gun" that would explain "what happened inside the apartment" the night Bolasky died and that would "fill in what Miguel Moreno did not know."  N.T. Mar. 11, 1996, at 45:4–51:24.  Additionally, Holihan explained to the jury that Barbosa's testimony would be the "leg up," for the lack of this forensic evidence in the case:

---

*Prison*, 722 F. App'x 180, 184 (3d Cir. 2018) ("[I]n light of the overall strength of the prosecution's case, we are not convinced that the New Jersey Appellate Division's harmlessness determination was unreasonable." (cleaned up)).  But those are not the facts of this case.

> Barbosa will tell you all of this because he has firsthand knowledge. Because he knows what happened. The testimony of George Luis Ortiz Barbosa will remove from your mind any doubt that George Ivan Lopez and Edwin Rios Romero are guilty of First Degree Murder. He will do for you what [he] did for the prosecution, convince you that George Ortiz[ ] Barbosa is one of the killers. When you hear that testimony, you will be convinced that Romero and Lopez are the other two. . . . That testimony will give you a smoking gun in this case. The leg up for the lack of forensic evidence, the lack of hair, the lack of blood, the lack of a smoking gun.

*See id.* at 50:25–51:20.

During closing argument, ADA Holihan reiterated the importance of Barbosa's testimony, to be considered for the truth, and recounted in vivid detail the facts as told by Barbosa to Captain Bucarey:

> You take what [Barbosa] told [Captain] Bucarey for the truth. You are entitled to do that. And what he told you, all four were involved in the murder. All four made a trip to Allentown. Romero and Barbosa hid in the bathroom. Romero hit him on the head. Romero and [George] Ivan [Lopez] had guns. Romero and [George] Ivan [Lopez] held David Bolasky. Romero and [George] Ivan [Lopez] told Barbosa what to do. Romero and [George] Ivan [Lopez] restrained David Bolasky while Barbosa tried to break his neck. Romero took turns twisting the towel around David Bolasky's neck. . . . Romero said, "No, he's not. He's not dead yet. Let's give it a few more twists." And then he did so. Romero's the last man to have that towel around David Bolasky's neck. To have this towel around David Bolasky's neck tightening it, squeezing the life out of David Bolasky.

N.T. Mar. 19, 1996, at 99:20–100:17; *id.* at 111:18–22 ("What's true is, [George Lopez] was here on the 3rd floor.  He was in the apartment with Romero and Barbosa waiting for David Bolasky to walk through the door so they can rob and murder him.  That's what the truth is.").

And significantly, as ADA Holihan's arguments suggest—and the Court's later jury instructions confirm—the jury was told that it could view Barbosa's statements to Captain Bucarey as substantive evidence against Romero:

> Barbosa's statements to [Captain] Bucarey should be considered by
> you as part and parcel of Barbosa's testimony here in Court. What
> he's told Captain Bucarey in New Jersey, I submit to you, it's part
> and parcel of what Barbosa's testimony is. You take what he told
> [Captain] Bucarey for the truth. You are entitled to do that.

*Id.* at 99:15–22; *see also id.* at 166:14–20 (the trial judge instructing the jury that "you have

heard evidence that both Barbosa and Moreno made statements on earlier occasions that were

inconsistent with testimony at trial.  You may, if you choose, regard this evidence as proof of

anything that the witness said in the earlier statement").  In other words, the prosecution was able

to rely on Barbosa's erroneously admitted statement not only as impeachment evidence in

connection with Barbosa's trial testimony, but also as *substantive evidence of Romero's guilt*.

As such, the statement held a place of greater importance to the prosecution's case and resulted

in greater harm to Romero.

### The Presence or Absence of Corroborating or Contradicting Evidence

The next *Van Arsdall* factor considers whether the erroneously admitted testimony is

corroborated or contradicted by other, properly admitted evidence.  *Van Arsdall*, 475 U.S. at 684.

This factor is closely related to the cumulativeness factor, on which the state court relied

in its harmless error ruling.  As the state court noted, Barbosa's statement is, in some respects,

cumulative of the testimonies of Moreno and Paladino.  Notably, all three testified that the initial

plan was to rob Bolasky.  They each placed Barbosa, Lopez, and Romero in the apartment while

Moreno lured Bolasky upstairs.  Finally, Barbosa's statement, Paladino's testimony, and the

forensic evidence confirmed that Bolasky was hit on the head before being strangled to death

with a towel, after which, his body was tied up and wrapped in bed sheets.  As the state court

found, *Romero I*, 722 A.2d at 1018–19 & n.6, on these points, Barbosa's statement was

cumulative of other, properly admitted evidence and corroborated by that other evidence.

Nevertheless, the state court at no point grappled with the ways in which Barbosa's

testimony went uncorroborated and was even contradicted on multiple material points.  *See*

*Arizona v. Fulimante*, 499 U.S. 279, 299 (1991) ("Although some of the details in the confession

to Donna Sarivola were corroborated by circumstantial evidence, many, including details that

Jeneane was choked and sexually assaulted, were not.").  Importantly, none of the physical

evidence directly tied *Romero* to the crime or showed that *Romero* took part in strangling

Bolasky.  *See Romero I*, 722 A.2d at 1019 n.6 (considering only the extent to which Moreno and

Paladino's statements were partially corroborated by the forensic evidence).  In addition,

Barbosa's statement differed in multiple, material respects from the testimony given by Moreno

and Paladino.  Unlike Moreno, who admitted that he never saw Romero inside the apartment,

N.T. Mar. 12, 1996, at 40:3–7; *id.* at 112:1–6, Barbosa's statement is an eyewitness account that

Romero was in the apartment when Bolasky died, N.T. Mar. 18, 1996, at 70:20–78:11.  And

unlike Paladino, who testified that Romero admitted only to grabbing Bolasky, N.T. Mar. 13,

1996, at 159:14–165:25, Barbosa's statement has Romero hitting Bolasky in the head with the

pistol and graphically described Romero twisting the towel around Bolasky's neck while saying,

"No, [he's not dead].  Let me give it two more turns," N.T. Mar. 18, 1996, at 76:5–6.[23]

    Despite these material differences, the state court did not discuss the lack of direct

---

[23] Although it appears in a separate portion of the Pennsylvania Supreme Court's opinion, the
state court recognized that the differences between Barbosa's statement and the accounts given by
Moreno and Paladino might have affected the theory on which the Commonwealth could rest its charge of
first degree murder (an issue that also implicates this Court's analysis on Claim 13):

> Even though, as [Romero] argues, [Paladino]'s and Moreno's statements,
> unlike Barbosa's, did not explicitly state that [Romero] had been the one
> to actually strangle Mr. Bolasky, the evidence was clearly sufficient to
> support a conviction for first degree murder *as an accomplice*.

*Romero I*, 722 A.2d at 1020 (emphasis added).  But there is no indication that the state court considered
the differences in the witnesses' testimony in its harmlessness analysis, nor did it consider the extent to
which the prosecution relied on Barbosa's testimony throughout the guilt phase of trial to prove beyond a
reasonable doubt that Romero was guilty of first degree murder.

physical evidence or the lack of corroborating evidence as to these points when it analyzed the potential harm of Barbosa's statement.

### The Extent of Cross Examination Otherwise Allowed

Third, *Van Arsdall* calls for consideration of the extent to which cross examination was otherwise allowed. *Van Arsdall*, 475 U.S. at 684. Here, Romero was unable to cross examine Barbosa at all about his prior statement to Captain Bolasky. And although Romero was able to cross examine Barbosa to a limited extent as to his trial testimony, including the fact that the plan turned from robbing to killing only after they were inside the apartment, N.T. Mar. 15, 1996, at 98:22–102:9, Barbosa flatly refused to answer *any* questions about Romero or his role in the crime, even after the state court threatened to hold him in contempt, *see id.* at 67:11–20. Accordingly, this factor weighs against a finding of harmless error, but the state court nevertheless failed to consider it in its harmless error ruling. *See Reiner*, 955 F.3d at 559 ("Courts have frequently found that this factor favors the petitioner even where some cross-examination of a witness did occur."); *cf. Davis v. Alaska*, 415 U.S. 308, 318 (1974) (reversing conviction and finding the petitioner was "denied the right of effective cross-examination" because although "counsel was permitted to ask Green whether he was biased, counsel was unable to make a record from which to argue why Green might have been biased or otherwise lacked the degree of impartiality expected of a witness at trial").

### The Overall Strength of the Prosecution's Case

The final *Van Arsdall* factor considers the overall strength of the prosecution's case. *Van Arsdall*, 475 U.S. at 684. As noted previously, ADA Holihan stipulated that there was no forensic evidence tying Romero to the crime. That means that without Barbosa's prior statement, the prosecution's first degree murder case against Romero rested on Moreno's testimony, Paladino's testimony, and an inference that Romero was guilty because he created a

56

false alibi (i.e., the "pizza shop story"). Although this evidence may have been sufficient to

make a plausible case of first degree murder as against Romero, its strength was severely

undermined by the fact that Moreno and Paladino were extensively impeached at trial.

Beginning with Moreno, he was a cooperating codefendant who was offered a more

lenient sentence in exchange for his testimony. *See* N.T. Mar. 12, 1996, at 107:10–108:4

(Moreno admits that by cooperating with police, he believes he will get life in prison instead of

the death penalty); N.T. Mar. 19, 1996, at 146:1–8 (ADA Holihan explaining that the

prosecution has agreed not to pursue the death penalty against Moreno in exchange for his

cooperation and testimony).

Moreover, ADA Holihan described Moreno in his opening statement as making "[a]lmost

an incalculable number of lies and deceptions" to law enforcement during the investigation.

N.T. Mar. 11, 1996, at 38:22–39:1. Defense counsel for Lopez cross examined Moreno about

each of his prior statements to police, emphasizing that at every turn, Moreno changed his story.

N.T. Mar. 12, 1996, at 56:17–94:15; *see also id.* at 61:25–63:7 (Moreno admitting that in

connection with one of his "lies" he helped law enforcement create a fake sketch); *id.* at 49:14–

19 ("Q. You spoke with the police how many times, do you know? A. Five, six times. Q. And

in those conversations, did you tell the police the truth about the murder? A. No."); *id.* at 50:1–

12 ("Q. Even after your arrest, did you tell the police the total truth about the death of David

Bolasky? A. I lied a couple of times."); *id.* at 50:23–51:4 ("Q. Do you know . . . how many

times you spoke with the Allentown Police Department and did not tell them the truth about this

murder? A. It was a whole week that I kept going to the police department, to the police station,

and I never told the truth."); *Id.* at 83:23–84:1 ("Q. Well this was about your eighth or ninth

statement that you had given the police counting the ones you had given prior to being arrested,

wasn't it, sir?  A. Yes."); *cf.* N.T. Mar. 18, 1996, at 112:24–121:2 (Detective Hanna testifying about numerous statements given by Moreno).

Indeed, Romero was not implicated in any of Moreno's statements until the last one. N.T. Mar. 12, 1996, at 117:7–16 (Moreno testifying that in earlier statements to police, he admitted only to letting Lopez into his apartment).  And even at trial, Moreno gave a slightly revised version of the events leading up to the murder, testifying, for the first time, that Barbosa, Lopez, and Romero initially proposed robbing and shooting Bolasky in the alleyway next to the apartment building.  *See id.* at 29:13–22 (testifying that once Bolasky came "in through the alleyway, they were gonna close the door, rob him and then shoot him in the head"); N.T. Mar. 18, 1996, at 222:24–223:23 (Detective Hanna testifying that he did not remember Moreno giving that account in any of the at least eight statements that Moreno made to law enforcement and noting that in court was the first time he had heard about a plan to rob and shoot Bolasky in the alleyway).

Moreno's cross examination also highlighted that many of his prior statements reflected his desire to avoid punishment.  Notably, in the interview just before Moreno gave a "true" account to law enforcement, the District Attorney closed out the interview by telling Moreno the police were beginning to think he did the murder by himself:  "If there are three other people involved, we want to get those three people.  Those three people are the ones who did this but the way it sounds . . . I'm not sure that there are three people.  I'm beginning to think maybe you [Moreno] did this yourself."  N.T. Mar. 12, 1996, at 83:2–17; *see also id.* at 84:7–15 (conceding that the "DA left [Moreno] with the idea that if there's not gonna be testimony and there's not gonna be evidence given by [Moreno] about these three other men, [the prosecution was] beginning to think [Moreno] did it [him]self").  Moreno implicated Lopez and Romero the next

time he spoke with the police. *Id.* at 106:6–14; *cf. id.* at 73:22–25 (Moreno stating that he was helping law enforcement so that he wouldn't "have to go to jail"); *id.* at 106:25–107:9 ("Q: Now, as I understand it, when you decided to implicate [Romero] and Mr. Lopez, you were under the impression, were you not, that you were gonna be punished for this crime. Is that right? A. That's what I thought, yes. Q. And because you had it in your mind that you weren't [sic] gonna be punished, you would have said anything, wouldn't you? A. Figure, yes.").

Finally, on cross examination, Lopez's counsel attacked Moreno's memory, showing that Moreno had previously admitted to being high on heroin when the murder occurred. *Id.* at 84:20–24 (Moreno admitting that he told police in his "true" statement that he was "high right before Mr. Bolasky came to the apartment to pick up rent"); *see also id.* at 85:16–87:13 (agreeing that he told the police he was high the day Bolasky was murdered but testifying that as he sat in court he could not remember whether he was high on heroin that day).

Paladino, in turn, was a serial jailhouse informant, who, like Moreno, had a penchant for lying to law enforcement, especially if doing so would help him to avoid punishment. On cross examination, Paladino admitted that he consistently used aliases when arrested by police to avoid harsher punishment. *See* N.T. Mar. 13, 1996, at 134:25–135:4 (testifying that while he was in jail with Lopez and Romero, he was being held on an alias); *id.* at 136:22–137:7 ("Q. Okay. So, what you did is, you told the prison you were somebody else, right? A. Yes. Q. Lied to them, right? A. Yes. Q: Lied to the police when they arrested you, right? A. Yes. Q. And you did that so that your past record, the Dan Lopez record, wouldn't catch up with you? A. Yes."); *id.* at 180:10–18 (attesting that he used various names to avoid getting harsher punishments). In addition, Paladino testified that when he was cellmates with Romero, he was being held on multiple charges, including lying to police. *Id.* at 167:4–7.

In addition to frequently using multiple aliases to avoid harsher punishment, Paladino also admitted to being a serial informant who often gave information to the police in the hopes of receiving lighter punishments.  *Id.* at 184:6–21 ("Q. [T]his is something you had done frequently in the past to get . . . breaks on sentencings isn't it?  A. Yes.").  And consistent with that practice, Paladino conceded that he was testifying against Lopez and Romero in the hopes that his testimony would result in a more lenient sentence on his own pending criminal charges.  *Id.* at 172:8–173:16 ("Q: Okay. . . you're hopeful that by testifying here today, you can curry favor of have some—have the judge look upon you favorably, right?  A: Yes.").

In short, Moreno and Paladino were thoroughly impeached at trial on their significant histories of lying to the police and their incentive to lie in connection with this case.  Although their testimonies, when combined with an inference of guilt arising out of the false alibi that Romero gave to Paladino, may have been sufficient to find Romero guilty of first degree murder, given the highly impeached nature of that evidence and the lack of any direct physical evidence tying Romero to the crime, we cannot say that the prosecution's case was sufficiently strong that Barbosa's statement was immaterial.  *See Reiner*, 955 F.3d at 561 ("Ultimately, this factor favors Reiner, but less so than the others.  The various other pieces of circumstantial evidence build a relatively weak but plausible case of Reiner's guilt.  The critical problem, however, is that none of it shows that Reiner actually possessed Eisenhardt's jewelry.  In a case without direct evidence of Reiner's presence at Eisenhardt's house, connection to those fruits of the crime was crucial in placing him there.  This aspect of Lewandowski's statements made the case against Reiner far more compelling than it otherwise was."); *cf. Vazquez v. Wilson*, 550 F.3d 270, 282–83 (3d Cir. 2008) ("Here, Vazquez never confessed to being a shooter, and there was no witness at the trial who said that he saw Vazquez fire a weapon.  In a narrative or descriptive sense,

laying aside ballistic evidence, only Santiago's statement directly identified Vazquez as the
shooter, and, of course, the use of the statement is the problem in this case rather than its
solution.  Moreover, although there was evidence at the trial incriminating Vazquez beyond
Santiago's statement, it was not so compelling that it overcame the *Bruton* error under the
'substantial and injurious effect' standard."). *Contra Ali*, 675 F. App'x at 166 ("[T]he fifth *Van
Arsdall* factor weighs in favor of harmless error here, for the case against [the petitioner] was
formidable and was supported by the testimony of multiple witnesses and several pieces of
physical evidence.").

*     *     *

Because the state court limited its review to only a consideration of cumulativeness and
failed to grapple with significant likelihood that Barbosa's testimony impacted the verdict under
the remaining *Van Arsdall* factors, this Court finds that the state court unreasonably applied the
principles outlined in *Chapman* and *Van Arsdall*.  Fairminded jurists would agree that the state
court could not have found the Commonwealth met its burden to show the introduction of
Barbosa's statement was harmless beyond a reasonable doubt given the prosecution's substantial
reliance on the version of events outlined in Barbosa's improperly admitted statement as
substantive evidence, the lack of any direct physical evidence tying Romero to the crime, and the
likelihood that the jury viewed Barbosa's statement as "the truth"[24] and not merely as
corroborating the stringently impeached testimonies given by Moreno and Paladino.[25]  *See*

---

[24] As stated earlier, this is exactly what ADA Holihan directed the jury to do:  "You take what he
told [Captain] Bucarey for the truth. You are entitled to do that."  N.T. Mar. 19, 1996, at 99:15–22.

[25] Indeed, on direct appeal, Pennsylvania Supreme Court Justice Saylor filed a concurring
opinion, in which Justice Flaherty joined, which stated, "I would not reach the difficult question of
whether, for purposes of a harmless error analysis, evidence of an inculpatory eyewitness statement is
merely cumulative of the testimony of others, none of whom was an eyewitness to the crime, particularly
where such testimony is that of a co-conspirator and jailhouse informant."  *Romero I*, 722 A.2d at 1021

*Harrington*, 562 U.S. at 102 (explaining that the habeas court "must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the United States Supreme Court); *see also Reiner*, 955 F.3d at 562 ("Given the weakness of the prosecution's case and the high burden the state was required to satisfy, we would hold that the Michigan Court of Appeals unreasonably applied *Chapman* when it determined that the admission of Lewandowski's statements was harmless beyond a reasonable doubt."); *cf. Brooks*, 722 F. App'x at 184 ("Here, insofar as [the improperly admitted testimony] suggested that authorities knew . . . that Brooks had been involved in the murder of Arenas, there was strong evidence corroborating that testimony, namely Brooks's confession and his trial testimony, in which despite the recantation of his confession, Brooks admitted that he was at the scene of the crime holding a gun.  The jury also heard Brooks's taped confession, in which he admitted to shooting Arenas four times.  In sum, in light of the overall strength of the prosecution's case, we are not convinced that the New Jersey Appellate Division's harmlessness determination was unreasonable." (cleaned up)).

Because the Pennsylvania Supreme Court's harmlessness determination is based on an unreasonable application of *Chapman* and *Van Arsdall*, it is not entitled to deference under § 2254(d)(1), and we must now consider de novo whether the introduction of Barbosa's statement was harmless.

### c.    *De Novo Review*

A habeas court considering harmless error de novo employs the standard outlined in *Brecht v. Abrahamson*, not that given in *Chapman*.  *Brecht*, 507 U.S. at 636 (finding that the

---

(Saylor, J., concurring).

"costs of applying the *Chapman* standard on federal habeas outweigh the additional deterrent

effect, if any, that would be derived from its application on collateral review); *see also id.* at

633–34 ("The principle that collateral review is different from direct review resounds throughout

our habeas jurisprudence. . . .  Recognizing the distinction between direct and collateral review,

we have applied different standards on habeas than would be applied on direct review with

respect to matters other than harmless-error analysis.").  Given the "extraordinary" nature of

federal habeas relief, the *Brecht* Court reasoned that a state prisoner could not receive such

"relief based on trial error unless" he showed that the constitutional error had "a substantial and

injurious effect or influence" on the jury's verdict.  *Id.* at 637.  "*Brecht* effectively inverted

*Chapman*'s burden," so that instead of "the prosecution [having] to prove that a constitutional

trial error is harmless, . . . a state prisoner seeking to challenge his conviction in collateral federal

proceedings must show that the error had a 'substantial and injurious effect or influence' on the

outcome of his trial."  *Brown*, 596 U.S. at 126.[26]

Under this standard, "[o]ur role is to ask whether we think the constitutional error

substantially influenced the jury's decision."  *Adamson v. Cathel*, 633 F.3d 248, 259–60 (3d Cir.

---

[26] After *Brecht*, there was some confusion as to whether a federal habeas court should continue to apply § 2254(d)/*Chapman* when reviewing a state court's harmless error ruling, or instead, focus solely on the test outlined in *Brecht*.  *See, e.g.*, *Fry v. Pliler*, 551 U.S. 112, 120 (2007) ("[I]t certainly makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former.").  However, the Supreme Court recently clarified that a habeas petitioner must satisfy *both* tests, § 2254(d)/*Chapman* and *Brecht*, to receive relief when the state court previously found a trial constitutional error harmless.  *Brown*, 596 U.S. at 127 ("[I]n cases like ours satisfying *Brecht* is only a necessary, not a sufficient, condition to relief.  [Section 2254(d)] too must be satisfied.").  Although the parties' briefing, which was submitted before the Supreme Court's opinion in *Brown*, sometimes conflates the § 2254(d)/*Chapman* test and the *Brecht* standard (*see, e.g.*, Doc. No. 89 at 155 (Romero applying *Brecht* standard to determine whether the state court's harmless error determinations were unreasonable under 28 U.S.C. § 2254(d)(1))), there is no denying that Romero clearly argues *both* that (1) the state court's harmless error ruling was unreasonable and not entitled to deference under § 2254(d) (*id.* at 151–57), and (2) the introduction of Barbosa's statement was not harmless under *Brecht* (*id.* at 145–49).

2011) (quotation marks omitted).  If the Court has "'grave doubt' about whether the error had substantial and injurious effect or influence in determining the jury's verdict, we must conclude that the error was not harmless."  *Id.* at 260 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).  The *Van Arsdall* factors again guide our analysis under *Brecht*, just as they do on direct appeal under *Chapman*.  *See, e.g.*, *Brooks*, 722 F. App'x at 184 (applying *Van Arsdall* factors to harmless error analysis under *Brecht*).  And, once more those factors weigh in favor of finding the introduction of Barbosa's statement was harmful to Romero.

As outlined in more detail above, Barbosa's statement was pivotal to the prosecution's case and the prosecution urged the jury to accept it as "the truth."  It was the only eyewitness account of what occurred in the apartment during the murder and, to that end, was the prosecution's "smoking gun"—a descriptor given by ADA Holihan during his opening statement.  N.T. Mar. 11, 1996, at 51:17–20.  Without Barbosa's statement the Commonwealth had no evidence that Romero took an active role in killing Bolasky or took part in strangling him.  *See Ali*, 675 F. App'x at 165 (finding first factor weighed toward harmful error when the improperly admitted "testimony was certainly important, for only [that witness] provided a cohesive story for the home invasion and homicide," and with one minor exception, his "testimony was the only direct evidence that [the defendant] was involved"); *cf. Douglas*, 380 U.S. at 419–20 (finding the erroneously introduced statement was prejudicial where it "constituted the only direct evidence" that the defendant "fired the shotgun," and thus, "formed a crucial link in the proof both of petitioner's act and of the requisite intent to murder" and represented a "fundamental part of the State's case against petitioner").  Additionally, the prosecution argued Barbosa's statement overcame the lack of physical evidence in the case.

And, although Moreno and Paladino gave testimony that corroborated limited portions of

Barbosa's statement—both testimonies place Romero inside the apartment and Paladino's jailhouse account has Romero holding Bolasky while the killing occurred—neither witness had Romero directing the murder and strangling Bolasky as Barbosa's statement did.  *See Ali*, 675 F. App'x at 165 ("As to the second factor, Terrell's testimony for the most part was not cumulative, given that Terrell's account of [the petitioner's] motivation, of how [petitioner] planned his entry into the victims' home, and of what occurred inside the home did not duplicate any other witness's testimony."); *cf. Bond v. Beard*, 539 F.3d 256, 276 (3d Cir. 2008) (finding introduction of coconspirator's confession implicating defendant harmless where an independent witness testified that he was "absolutely certain" the defendant had shot the victim and the defendant "himself confessed to the crime" even if at trial he claimed the confession was coerced).

Moreover, as discussed above, Moreno and Paladino were stringently impeached at trial—Moreno for "[a]lmost an incalculable number of lies and deceptions" to law enforcement, N.T. Mar. 11, 1996, at 38:22–39:1, and Paladino for being a serial jailhouse informant, who hoped to once again gain a more lenient sentence for his own pending criminal charges in exchange for testifying, N.T. Mar. 13, 1996, at 172:8–173:16 ("Q: Okay. . . you're hopeful that by testifying here today, you can curry favor of have some—have the judge look upon you favorably, right?  A: Yes.").  *See Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 803 (3d Cir. 2020) ("The Commonwealth argues that Wright's confession could not have affected the jury because it was cumulative of other overwhelming evidence.  We find this argument unavailing, as the prosecution's two key witnesses were substantially impeached and their testimony was contradicted through other witness testimony.  Far from duplicative, Wright's confession served to improperly corroborate their less-than-credible testimony, making it more likely that the jury would set aside their doubts in favor of a conviction."); *Brown v.*

*Superintendent Greene SCI*, 834 F.3d 506, 519–20 (3rd Cir. 2016) (finding *Bruton* violation harmful where the only remaining evidence the jury could have properly considered was a coconspirator's testimony and the coconspirator "had substantial flaws as a witness":  he was "impaired from marijuana and Xanax at the time of the crime," "never claimed to witness the robbery or the murder as they took place," "added key details to his narrative between when he gave a statement to the police and when he testified," and "had a powerful motive to implicate" the defendant).

Finally, we again note that although the physical evidence was consistent with the manner and cause of death described by Barbosa, Moreno, and Paladino, there was no direct physical evidence that placed Romero in the apartment or otherwise corroborated the account *about Romero* specified in Barbosa's improperly admitted statement.  *See Reiner*, 955 F.3d at 561.  *Contra Ali*, 675 F. App'x at 165–66 ("Evidence connecting [the petitioner] to the scene of the crimes included the homicide victim's car keys, along with [the petitioner's] car keys, wallet, and DNA on a sweatshirt, all found in the getaway car, which itself belonged to [the petitioner's] wife.  And Terrell's testimony about [the petitioner's] principal role in the homicide accords with the victim's wife's testimony . . . .[T]he fifth *Van Arsdall* factor weighs in favor of harmless error here, for the case against [the petitioner] was formidable and was supported by the testimony of multiple witnesses and several pieces of physical evidence.").

In sum, this Court has "grave doubt" about whether the prosecution's improper admission of Barbosa statement for "the truth," "had substantial and injurious effect or influence in determining the jury's verdict" of guilt against Romero.  *See Adamson*, 633 F.3d at 260–61 ("Nevertheless, given the strong potential for an accomplice's confession that implicates the defendant to unfairly infect the trial if considered as substantive evidence of guilt, and given the

lack of otherwise overwhelming evidence of guilt, we have serious concerns that the verdict was substantially influenced by the constitutional error.  It is only natural that a juror, upon hearing the out-of-court statements from two admitted participants in the robbery saying that Adamson was involved, would consider those statements in assessing guilt, unless instructed otherwise."); *see also Brown*, 834 F.3d at 522 ("[G]iven the significance of [the erroneously admitted] confession to the Commonwealth's case, [the remaining codefendant's] potential unreliability [as a witness], and the absence of other evidence identifying [the defendant] as a shooter, we believe that the [*Bruton*] violation had a 'substantial and injurious effect' and that relief is therefore warranted." (citation omitted)).

*d.     Conclusion*

In sum, Romero has shown that the state court's finding of harmless error was based on an unreasonable application of *Chapman* and *Van Arsdall*.  Reviewing the harmless error question de novo under the test outlined in *Brecht*, the Court has "grave doubts" about whether admitting Barbosa's inadmissible statement had a "substantial and injurious effect" upon the guilty verdict obtained on Romero's first degree murder conviction.  Habeas relief is thus granted on Claim 8.

**2.      Claim 9:  Lopez's Statement**

Romero next contends that the trial court's admission of improperly redacted confessions made by his non-testifying codefendant, Lopez, which were introduced into the record by Paladino and Detective Hanna, violated Romero's Sixth Amendment right to confront all witnesses against him under the Supreme Court's holding in *Bruton v. United States*.  (Doc. No. 89 at 157.)  In *Bruton*, the Court held that a defendant's right to confrontation is violated when a non-testifying codefendant's confession implicates the defendant's guilt, even if a limiting instruction is given by the trial court to consider the confession against only the codefendant.

67

*391 U.S. at 126; see also Johnson*, 949 F.3d at 795 ("In *Bruton*, the Supreme Court held that a defendant's right to confrontation is violated when a non-testifying codefendant's confession is introduced in a joint trial, and that confession implicates the other defendant.").  Both Paladino and Detective Hanna testified to confessions by Lopez, but any time Lopez's statement mentioned Romero, the witness would instead say, "the other guy."  *See* N.T. Mar. 13, 1996, at 125:15–127:1 (Paladino's testimony); N.T. Mar. 18, 1996, at 140:22–141:8 (Detective Hanna's testimony), 193:15–194:2 (same), 200:7–13(same), 216:20–220:15 (same).  Romero claims that this substitution "did nothing to obscure Mr. Romero's identity as the person referred to in the statements," and was therefore constitutionally deficient.  (Doc. No. 89 at 157.)  Romero also argues that his trial counsel and his appellate counsel were ineffective for failing to raise these arguments at trial and on appeal.  (*Id.* at 164–66.)

Romero did not raise a standalone *Bruton* claim or an ineffective assistance of trial counsel claim at trial[27] or on direct appeal, and so those claims were deemed waived by the Pennsylvania Supreme Court on collateral appeal.  *See Romero II*, 938 A.2d at 369. Nonetheless, for the reasons discussed above, *see supra* Part III.A., the Court reviews those claims on their merits.  Although the Pennsylvania Supreme Court found the underlying claims waived, Romero did raise the *Bruton* issue in his first round of PCRA proceedings, again via his "layered" ineffective assistance of appellate counsel claim, in which he argued that his direct appeal counsel was ineffective for failing to argue that his trial counsel was ineffective for failing to challenge the redaction of Lopez's statement as introduced through Paladino and Detective

---

[27] During pretrial proceedings, Attorney Clark moved to sever Romero's trial from Lopez's trial on the grounds that a joint trial would raise potential *Bruton* issues.  *See* N.T. Jan. 11, 1996, at 172:16– 192:11.  But after that motion was denied, it does not appear that Attorney Clark raised a separate *Bruton* objection challenging the introduction of Lopez's prior statements at trial.

Hanna.  *See Romero II*, 938 A.2d at 377–78.  In evaluating the ineffective assistance of appellate counsel claim, the Pennsylvania Supreme Court necessarily needed to determine trial counsel's alleged ineffectiveness, and in doing so, evaluated whether the underlying claim itself had merit, such that trial counsel should have objected on this basis or otherwise raised the *Bruton* claim.  *See id.*  Accordingly, although Romero's *Bruton* claim and ineffective assistance of trial counsel claim were never directly considered by a state court, the Court is nonetheless required to review these claims in accordance with the factual findings and legal conclusions made by the Pennsylvania Supreme Court.[28]

a.    State Court Record, Findings, and Conclusions

On PCRA appeal, the Pennsylvania Supreme Court recounted Paladino's testimony about what he was allegedly told by Lopez and explained how that testimony was entered in the context of Lopez and Romero's joint trial:

> Lopez said he and [Romero] were in a pizza shop when Moreno committed the murder, and Lopez and [Romero] merely helped dispose of the body.[[29]]  The statement supported the Commonwealth's argument that [Romero] and Lopez conspired to fabricate a false inculpatory statement while they were in prison, minimizing their involvement in the crime; it was introduced first

_____

[28] Although this claim was not "presented" as a trial court error or ineffective assistance of trial counsel claim to the state court, the PCRA court and Pennsylvania Supreme Court nevertheless evaluated the merits of the *Bruton* challenge in their evaluation of Romero's layered ineffectiveness claim.  It is those factual determinations about the claim which are now binding on the Court's habeas review.  *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct."); *Cullen*, 563 U.S. at 181 (federal habeas court is limited in its consideration of the record that was before the state court that adjudicated the claim on the merits).  So, while the *Bruton* claim itself is technically before the Court de novo, having not been considered on its own in any state court, the Court is still bound by state court factual findings underlying this claim.  *See Nara*, 488 F.3d at 200–01 ("[T]he § 2254(e)(1) presumption of correctness applies regardless of whether there has been an adjudication on the merits for purposes of § 2254(d).").  For these reasons, the Court reviews the state court's factual findings in accordance with § 2254(e)(2)'s deference.  Similarly, because the state court has already ruled on the legal merits of the *Bruton* challenge, which is now raised here as the central claim, the Court defers to the state court's legal conclusions in accordance with § 2254(d)(1)'s deference.

[29] Paladino testified from memory about the contents of a written statement shown to him in prison by George Lopez.  *See* N.T. Mar. 13, 1996, at 125–26.

> against Lopez, then against [Romero]. When read against Lopez, [Romero's] name was redacted and replaced with "the other guy"; when read against [Romero], Lopez's name was redacted and replaced with "the other guy."

*Id.* (internal citations omitted).

Romero argued before the state court that the substitution of his name with "the other guy," was insufficient, and that by presenting both versions of the statement, first as to Lopez and again as to Romero, it was obvious to the jury that Paladino was referring to both defendants. *Id.* The Pennsylvania Supreme Court disagreed. It acknowledged that, according to *Bruton v. United States*, a non-testifying codefendant's confession that implicates another codefendant is inadmissible at a joint trial. *See id.* at 377 (citing 391 U.S. 123 (1968)). But the Pennsylvania Supreme Court found that Paladino's testimony did not trigger Confrontation Clause concerns because Lopez's statement "was not introduced for its truth." *Id.* at 378 ("A defendant's right to confrontation is not implicated when the prosecution introduces a codefendant's incriminating statement for a non-hearsay purpose; the truth of the statement is not implicated." (citing *Tennessee v. Street*, 471 U.S. 409 (1985))). Instead, it was used to show "Lopez's consciousness of guilt, *i.e.*, [Lopez] would not have fabricated [the pizza shop] story to minimize [his] involvement had [he] not been guilty." *Id.* Because the statement was not hearsay, the Court reasoned that Romero's right to confrontation was not violated. *Id.*

The Pennsylvania Supreme Court also recounted Detective Hanna's testimony as follows: "The detective read portions of a February 10, 1995 police interview with Lopez, in which [Romero's] name was redacted and replaced with 'the other guy.'" *Id.* The court found that, as was the case with Paladino's testimony, this statement was not introduced for its truth but to show "Lopez's deviation from his initial version of events in earlier interviews and his inconsistency in relating the 'facts' of the murder to the police." *Id.* Accordingly, the

Pennsylvania Supreme Court again held that Romero's Sixth Amendment rights were not implicated where Lopez's statement was introduced only "to show he fabricated the stories because he was guilty." *Id.*

Romero argues that this Court should not defer to the Pennsylvania Supreme Court's findings as to these *Bruton* issues they are based on unreasonable findings of fact. (*See* Doc. No. 89 at 166.)

> b.    *Alleged Unreasonable Findings of Fact*

As previously stated, a petitioner asking the court to disregard a state court's ruling under § 2254(d)(2) must show that the ruling was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). There is a presumption of correctness for factual determinations made by state court judges, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *Id.* § 2254(e)(1); *see also Rountree*, 640 F.3d at 537–38.

Romero asserts that "[a]t no point during the pretrial litigation regarding the defense's *Bruton* concerns did the Commonwealth argue that these statements were not being admitted for their truth, which would have resolved the redaction issue entirely." (Doc. No. 89 at 166–67 ("In other words, if George Lopez's statements were not being admitted as hearsay, the right to confrontation would not have been implicated.").) Romero argues that the Commonwealth never represented that they intended to use Lopez's statements for a non-hearsay purpose, which he claims is supported by the Commonwealth's opposition to Romero's pre-trial motion for severance and its continued redaction of statements during the trial. (*Id.*) According to Romero, "these efforts were taken in an attempt to comply with *Bruton*, which would have not been necessary if the statements were not being offered for their truth." (*Id.* at 167.) That is, "the record belies the state court's finding that Lopez's statements were not offered for their truth:

the Commonwealth forcefully litigated the admission and redaction of these statements, never once indicating such litigation was in vain because they were not being offered for their truth." (*Id.*)

In deciding that Lopez's statement to Paladino was not being offered for its truth, the Pennsylvania Supreme Court relied entirely upon statements made in the prosecution's closing argument. *See Romero II*, 938 A.2d at 377–78 (citing ADA Holihan's closing argument as record evidence that Lopez's statements were not hearsay).  At the close of the guilt phase of trial, ADA Holihan told the jury:

> Do you recall [Paladino] when he testified about the pizza shop story? He was not testifying that this story is true. He was testifying, 'This is what they had me write out for them. This is what Romero asked me to write down for him.' He was not saying that that's true. But his testimony, which is, 'This is what they wanted as their version of events because it removed them from criminal responsibility.' We call it the pizza shop story. . . . There's a reason to remove oneself from criminal responsibility and faults. There's a reason to fabricate evidence to minimize my involvement. And the reason is the same reason we talked about before. Because they're guilty. Because there is criminal involvement.

N.T. Mar. 19, 1996, at 92:8–96:18.  And in finding that Lopez's statement to Detective Hanna was also not being offered for its truth, the Pennsylvania Supreme Court again relied solely on comments made by Holihan in his closing statement.  *See Romero II*, 938 A.2d at 377–78 (quoting N.T. Mar. 19, 1996, at 110:17–21 ("I submit to you, you also know why George Ivan Lopez is lying.  Because he's guilty and he doesn't want to be found out.  George Ivan Lopez's lies are indications of his guilt.")); *see also* N.T. Mar. 19, 1996, at 106:25–110:3 (ADA Holihan recounting various inconsistent statements Lopez made to police).

The Court agrees with Romero that the Pennsylvania Supreme Court's sole reliance on Holihan's one-sided representation of the evidence was unreasonable, especially when we consider that the trial court explicitly instructed the jury at the outset of closing arguments that

72

whatever counsel said to them did not "constitute evidence" and that "the lawyers will call to your attention the evidence that they believe is material and will ask you to draw certain inferences from that evidence . . . you are not bound by their recollection of the evidence." N.T. Mar. 19, 1996, at 2:19–3:13.  The trial court also informed the jury that it was "not bound by any principles of law which the lawyers mention." *Id.* at 3:16–18.  And during Holihan's closing argument, the court again reminded the jury that counsel's "statements and recollections of the facts are theirs alone." *Id.* at 83:12–19.  Thus, in deciding how evidence was admitted at trial and in what manner it was considered by the jury, the Court believes that it was unreasonable for the Pennsylvania Supreme Court to rest its decision exclusively on statements made during the prosecution's closing argument[30]—these statements are not, as the trial court explained, evidence or instructions, nor are they evidentiary rulings.  *See Christine v. Davis*, 600 F. App'x 47, 50 (3d Cir. 2015) (finding the jury was "properly told that opening and closing arguments do not constitute evidence"); *Commonwealth v. Page*, 965 A.2d 1212, 1223 (Pa. Super. Ct. 2009) ("Closing argument is not evidence." (quotation marks omitted)).

Moreover, the trial court's pretrial proceedings, the admission of the statements themselves during direct examination, and the trial court's instructions bely any finding that Lopez's prior statements were not admitted for their truth.  As noted previously, prior to trial, Romero's counsel filed a motion to sever his trial from those of his codefendants, Barbosa[31] and

---

[30] This ruling is not inconsistent with this Court's consideration of ADA Holihan's arguments in connection with Claim 8.  *See supra* Part III.C.1.  In Claim 8, the Court considers Holihan's opening and closing arguments to determine what importance the prosecution ascribed the wrongly admitted evidence at the time of trial, as we are required to do under binding Supreme Court precedent.  *See Kyles*, 514 U.S. at 444; *Reiner*, 955 F.3d at 557.  Claim 9 presents a different question.  In this claim, the Court analyzes whether stray comments in ADA Holihan's closing argument should be considered for purposes of determining how evidence was introduced and considered by the jury at trial.  On this point, as explained above, the Court finds counsel's arguments are not properly considered because the trial court appropriately instructed the jury otherwise.

[31] As explained previously, Barbosa entered a plea of guilty after this hearing but before trial.

73

Lopez.  *See* N.T. Jan. 11, 1996, at 172:16–192:11.  At a pretrial hearing on the motion, ADA

Holihan acknowledged that Romero's motion to sever was "based on the issue that there are

essentially *Bruton* issues about codefendants, incriminatory statements, or statements that may

be incriminatory, as well as an issue—obviously, that's the *Bruton* issue." *Id.* at 173:25–174:4.[32]

Holihan articulated the Commonwealth's position on the *Bruton* challenge as follows:

> Regarding the *Bruton* issue, there are a number of different
> statements made by the different defendants and the Commonwealth
> feels that, through a proper redaction, as is approved by the United
> States Supreme Court, after *Bruton*, and *Richardson v. Mar[s]h* [and
> several Pennsylvania state cases] that a redaction of any possible
> statements is the appropriate remedy rather than severance if the
> statements can be redacted so as to eliminate reference to the
> codefendant.

*Id.* at 174:19–175:14.  In turn, Lopez's counsel acknowledged that "all three defendants'

position—is that the statements of all three defendants cannot properly be redacted so as to

provide a fair trial if they're all tried together."  *Id.* at 182:15–19; *see also id.* at 192:10–11

(Attorney Clark agreeing with arguments made by Lopez's counsel in support of the motion to

sever).  Without ruling either way, the trial court instructed counsel to submit proposed

redactions of statements for its review before trial.  *See id.* at 196:15–17, 199:19–201:15.  At *no*

*point* in this hearing did the Commonwealth argue that *Bruton* was inapplicable because the

---

(*See* Doc. No. 89 at 158 n.25.)

[32] The Commonwealth argues that the prosecution's original position on the use of Lopez's statements at the pretrial hearing on January 11, 1996 is "legally irrelevant" because "[w]hatever the prosecution supposedly seemed to believe prior to trial, the evidence was clearly introduced for a non-hearsay purpose, and so did not implicate the Confrontation Clause."  (Doc. No. 91 at 83 n.18.)  To the contrary, the Court believes that it is highly relevant.  As we will explain, the matters that were discussed and the decisions that were made at the pretrial hearing carried into the trial proceedings, particularly on the *Bruton* issue.  This is why the prosecution went through the effort of redacting and presenting Paladino's testimony twice—first against Lopez and then against Romero.  Moreover, nothing in the Court's research indicates that it must ignore pretrial proceedings in its comprehensive review of the state court record; habeas petitioners may raise constitutional challenges arising out of pretrial proceedings in the leadup to their conviction.

statements it sought to offer were not being introduced for their truth.

At trial, Paladino testified twice; first he was directed and crossed about testimony against Lopez, and then he was directed and crossed about testimony against Romero.  In the first portion of his testimony, his direct examination about the statement made to him by Lopez went as follows:

> Q: Can you tell the jury what that statement said specifically about the murder of David Bolasky?
>
> A: What I recall is that [Lopez] came to Allentown in January 2 to, um, to have some business with his brother, Angel. And by that time, he couldn't reach his brother and that he went to the pizza shop with *the other guys*. And in the pizza shop, he met Moreno and, um, after—after a few minutes, he saw Moreno argue with somebody across the street and then Moreno came back with a set of key [sic] and gave it to him.
>
> \*   \*   \*
>
> Q: What else did the statement say?
>
> A: After that, he [Moreno] asked Lopez to—to get some white van that was around the block and bring it to front of the building and, um, after that, *the other guy* followed him and when Lopez was front of the building with the van, um, *the other guy* tell him that—that your nephew had a body in the apartment.
>
> Q: *The other guy* told Lopez that it's Lopez's nephew, Miguel Moreno, had a body in the apartment?
>
> A: Yes.
>
> Q: What else did the statement say?
>
> A: So, um, *the other guy* decide [sic] to help him out when dump [sic] the body and they finally get the body and open the white van door and, um, put him in the back seat.  They notice was wrap [sic] around with some sheets, some bed sheets and, um, Lopez was driving and *the other guy* was in the passenger side and two guy was in the back of the van and they drive up some place and dump the body.
>
> \*   \*   \*

Q: Did you speak about this case [with Lopez] again?

A: Yes.

Q: What did he tell you at that time about this case?

A: I tell him that—that his friend changed the statement.

Q: What did he say?

A: He said I tell him not to place in the apartment.

\* \* \*

Q: Did he [Lopez] tell you anything else regarding the murder[?]

A: Yes.

Q: What did he tell you?

A: He told me that he cannot—he can get away with that because he's very knowledgeable in the law and stuff like that.

N.T. Mar. 13, 1996, at 125:15–127:18, 129:20–130:1 (emphases added).  There was no discussion among counsel or with the trial court about *Bruton* before the introduction of this testimony, which clearly included redactions of Romero's name as "the other guy."

At the close of Paladino's direct examination as to Lopez, ADA Holihan asked for a side bar conference, in which he suggested that Lopez's attorney immediately cross examine Paladino, because "it will help the redaction if we deal with just Lopez and then maybe cross examine on Lopez and then switch to Romero."  *Id.* at 131:13–18.  Holihan acknowledged that although he had "surprised" the trial court with this suggestion, he wanted to "keep it clean" for the redactions.  *Id.* at 131:21–25.  Holihan also clarified that he had instructed Paladino not to mention Romero in his testimony about Lopez:  "I've told [Paladino] that when he talked about Lopez, not to mention the name of Romero.  When he talks about Romero, not to mention the name Lopez.  I told him Miguel Moreno and George Barbosa's names are fair play."  *Id.* at 132:6–11.  The Court agreed with proceeding on a bifurcated basis, using these redactions.  *See*

*id.* at 133:23–134:7.  Again, the Commonwealth did not indicate at this conference that

Paladino's statements were not offered for their truth and thus not subject to *Bruton*—in fact, this

sidebar indicates the exact opposite position.

Detective Hanna also testified at trial about statements made to him by Lopez.  He

testified that in a February 10, 1995 interview, Lopez told Detective Hanna that he was having

dinner at a pizza shop with Barbosa and "the other guy" when Moreno walked in and asked them

if they wanted to assist him in a robbery, to which Barbosa and "the other guy" agreed.  *See* N.T.

Mar. 18, 1996, at 193:9–195:6, 214:18–220:15.  Lopez told Detective Hanna that, after the

murder, Barbosa and "the other guy" told him that they had killed Moreno's landlord in

Moreno's apartment.  *See id.* at 202:1–204:17; *see also id.* at 204:2–7 ("Hanna: Okay. Did the

other guy ever deny that [he had killed Bolasky]?  Lopez: No, not at all.  Hanna: All right.  Did

he confirm it?  Lopez: Yeah.").  Apparently, the conversation between Lopez, Barbosa, and "the

other guy" went as follows:

> Next day, *the other guy* was telling Barbosa, "Don't tell nobody
> what happened." And Barbosa said, "Nobody needs to know
> anything." Ahh, and I said, ahh, but they did not get any money
> 'cause they had the same amount of money when they left as when
> they got back with a big old smile on their face. *The other guy*, "you
> know, we had to kill him. We had to kill that asshole. What we had
> to—We had to do what we had to do."

*Id.* at 218:16–24 (emphases added).  Detective Hanna's testimony concluded shortly thereafter.

As with Paladino's testimony, these statements by Lopez, as read into the record by Detective

Hanna, refer to Romero as "the other guy."  There is no conversation on the record, among

counsel, or with the trial court, about whether the Commonwealth's position on the *Bruton* issue

had changed since Paladino's testimony was elicited a few days prior.

Finally, after ADA Holihan's closing argument—the first time that the Commonwealth

ever suggested that Lopez's statements to Paladino and Detective Hanna were not being offered

for their truth—the trial court provided the jury with the following *Bruton* limiting instruction,

which directed the jury to consider out-of-court statements by one defendant as evidence only

against that defendant:

> The Commonwealth has introduced evidence of a—of statements
> which it claims were made by each Defendant.
>
> . . . .
>
> Now, there is a rule which restricts the use by you of the evidence
> offered to show that a particular defendant made a statement
> concerning the crime charged. A statement made before trial may be
> considered as evidence only against the defendant who made that
> statement. Thus, you may consider the statement as evidence against
> the defendant who made the statement. You must not, however,
> consider the statement as evidence against the other defendant. You
> must not use the statement in anyway against him.

*Id.* at 163:1–164:24.[33]  The trial court's reference to "a rule" in this jury instruction is a direct

reference to *Bruton* and illustrates the trial court's continued adherence to *Bruton*, even after

ADA Holihan's closing argument.[34]  The only reason this instruction was necessary was because

Lopez's statements were being offered for their truth.

Having reviewed the totality of the evidence on this issue, and examining the record

---

[33] The trial court also issued this instruction:

> Now, there was evidence tending to show that one or both of the
> Defendants made contradictory statements when questioned by police or
> to others such as [Paladino]. If you believe this evidence, you may
> consider it as tending to prove the defendant's consciousness of guilt. You
> are not required to do so. You should consider and weigh this testimony
> along with all other evidence in this case.

*Id.* at 171:3–12.  But this instruction does not obviate the *Bruton* issue—just because the jury was
instructed that it could interpret Paladino's and Detective Hanna's testimony about Lopez's prior
inconsistent statements as evidence of his consciousness of guilt, does not also mean that some portions
of Lopez's prior inconsistent statements were not considered by the jury for their truth.

[34] There is also nothing in the record to suggest ADA Holihan objected to this instruction.

below, the Court cannot accept that the state court's factual finding on this issue was reasonable. In concluding so, the Court does not "merely disagree" with the state court, but rather, it finds that witness testimony, counsel's representations, and the trial court's evidentiary instructions "plainly controvert" the state court's findings.  Clearly, based on the conversations that occurred among counsel and with the trial court both before and during the trial proceedings—specifically during the pretrial hearing on the *Bruton* issue and during the admission of Paladino's testimony—all parties believed that Lopez's statements were being offered for their truth.  The death knell for the Commonwealth is that ADA Holihan *himself* insisted that Paladino's testimony be redacted and bifurcated; which begs the question that Romero has raised here:  if the statements were not being offered for their truth, then why were the redactions necessary?  Indeed, why would the trial court have felt that a *Bruton* instruction should be given to the jury if it was the Commonwealth's position, as well as the trial court and defense's understanding, that there was no danger of a *Bruton* violation?  Holihan's representations about the purpose of the evidence during closing argument not only ran afoul of the trial court and defense counsel's understanding of the *Bruton* issue but contradicted the position he had otherwise maintained until the last day of trial.  For this reason, the Court finds that the Pennsylvania Supreme Court's factual findings run contrary to both the agreed-upon evidentiary admissions by counsel, and the evidentiary rulings and instructions issued by the trial court.

Because we find that the state court's findings of fact on this claim were unreasonable in light of the record, we do not defer to those findings.

### c.    *De Novo Review*

In the years since *Bruton*, the Supreme Court has clarified that not all out of court confessions by a codefendant trigger the protections of the Confrontation Clause.  *See Crawford v. Washington*, 541 U.S. 36, 51 (2004) ("The constitutional text, like the history underlying the

common-law right of confrontation, thus reflects an especially acute concern with a specific type

of out-of-court statement.").  In *Crawford*, the Court held that the Confrontation Clause reaches

only those statements that are "testimonial."  *Id.* ("An accuser who makes a formal statement to

government officers bears testimony in a sense that a person who makes a casual remark to an

acquaintance does not.").  Accordingly, in this case we must consider whether Lopez's

statements to Paladino[35] and Detective Hanna were testimonial before addressing the substance

of Romero's *Bruton* claim.  *See Waller v. Varano*, 562 F. App'x 91, 94 (3d Cir. 2014)

(recognizing that analysis of a *Bruton* claim involves a two step inquiry:  (1) the court must

determine whether "the contested statement by an out-of-court declarant qualifies as

testimonial," and (2) if the statement is testimonial, "then the Confrontation Clause requires

unavailability and a prior opportunity for cross-examination," but "if the statement is

nontestimonial, then admissibility is governed *solely* by the rules of evidence" (quoting *United

States v. Berrios*, 676 F.3d 118, 127 (3d Cir. 2014))).

      The term "testimonial" typically refers to "a solemn declaration or affirmation made for

the purpose of establishing or proving some fact."  *Crawford*, 541 U.S. at 51.  Although the

Court in *Crawford* left "for another day any effort to spell out a comprehensive definition of

'testimonial,'" it nevertheless found that the term "applies at a minimum to prior testimony at a

preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  *Id.* at

68.  Lopez's confession[36] to Paladino does not fit into any of these categories.  Indeed, there is

---

[35] During oral argument before this Court, the Commonwealth argued that Lopez's confession to Paladino was nontestimonial, and therefore, did not trigger the protections of the Confrontation Clause or *Bruton*.  *See* Draft N.T. Sept. 5, 2023 at 140:3–22.  Romero does not directly contest that argument.  *See id.* at 139:14–19 (Romero's habeas counsel stating that she's "not sure frankly whether [the statements by Lopez to Paladino] are actually testimonial or not.  I am not sure, so I'm—that portion of the claim I think has some problems").

[36] In using the term "confession," the Court intends to encapsulate any statements where "the conduct 'confessed to' would be sufficient to establish a defendant's criminality."  *Riggins v. McGinley*,

nothing to suggest that Lopez spoke to Paladino with "the objective of incriminating any of the

defendants at trial," nor is there anything to indicate that the "conversation consisted of anything

but casual remarks to an acquaintance."  *Waller*, 562 F. App'x at 94–95 (finding, for those

reasons, that the defendant's statement to his cousin that "he had recently been involved in a

crime" was "plainly nontestimonial under *Crawford*"); *see also Mitchell v. Superintendent*

*Dallas SCI*, 902 F.3d 156, 164–65 (3d Cir. 2018) (finding testimony by jailhouse informants,

which set forth a codefendant's out-of-court statements implicating the defendant, were

nontestimonial under *Crawford*); *United States v. Saget*, 377 F.3d 223, 229 (2d Cir. 2004)

("[W]e conclude that a declarant's statements to a confidential informant, whose true status is

unknown to the declarant, do not constitute testimony within the meaning of *Crawford*."); *Carter*

*v. Larose*, Case No. 4:19CV208, 2020 WL 9889894, at *16 (N.D. Ohio Sept. 30, 2020) ("Here

the relationship between the declarant, Thomas, and the witness, Queener, was that of 'old

friends,' and both were incarcerated when Thomas made the statements that incriminated both

himself and his nephew, Carter, in the robbery and homicide.  There is no evidence that Thomas

anticipated his old friend would report his statements to law enforcement, and no basis for an

objective witness reasonably to believe that the statement would be available for a later trial.").

Accordingly, the introduction of Lopez's statement to Paladino is nontestimonial and did not

violate Romero's Sixth Amendment right.

---

No. CV 18-4429, 2022 WL 943739, at *8 n.8 (E.D. Pa. Jan. 4, 2022), *report and recommendation*
*adopted as modified*, No. CV 18-4429, 2022 WL 911142 (E.D. Pa. Mar. 29, 2022) ("Here, Rosario did
not 'confess' to shooting Pough, but he was, by his own statement, complicit in Pough's murder as he
provided the gun, drove with Riggins to the victim's residence, and stole the victim's car.").  Although
Lopez did not "confess" to murdering David Bolasky, he was, according to his statement to Paladino,
responsible for disposing of Bolasky's body, and according to his statement to Detective Hanna, aware of
the circumstances of Bolasky's murder and repeatedly withheld that information from police.  The Court
is satisfied that Lopez's statements, despite not being true "confessions" to the murder itself (and perhaps,
in Lopez's mind, somehow exculpatory), were nonetheless of an inculpatory nature.

By contrast, Lopez's statement to Detective Hanna was testimonial.  *See Davis v. Washington*, 547 U.S. 813, 826 (2006) ("When we said in *Crawford* that 'interrogations by law enforcement officers fall squarely within the class' of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator.  The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial." (internal citations omitted)); *Crawford*, 541 U.S. at 65–69 (witness's statement, which implicated the defendant in the stabbing, was testimonial where she "made her statement while in police custody, herself a potential suspect in the case").  Therefore, we must analyze whether that statement violated Romero's Sixth Amendment rights under *Bruton* and its progeny.

In *Bruton*, the Supreme Court held that a defendant's constitutional right "to be confronted with the witnesses against him" is violated when a nontestifying codefendant's confession directly implicates the defendant's guilt, even if a limiting instruction is given by the trial court to consider the confession against only the codefendant.  *See* 391 U.S. at 126.  A few years later, in *Richardson v. Marsh*, the Supreme Court created a "narrow exception" to *Bruton*, where it held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  481 U.S. 200, 208, 211 (1987) (cleaned up).  That said, the Supreme Court clarified in *Gray v. Maryland*, that a redacted statement may still violate *Bruton* where the redaction is so "obvious" that it is equivalent to leaving the defendant's name in the statement.  523 U.S. 185, 193 (1998).  In other words, if "the confession refers directly to the 'existence' of the nonconfessing defendant," then

a redaction may "notify the jury that a name has been deleted" and therefore, signal the defendant's involvement in the crime.  *Id.* at 192, 195.

Last year, in *Samia v. United States*, the Supreme Court reiterated the narrow scope of its holdings in *Bruton*, *Richardson*, and *Gray*.  *See* 599 U.S. 635, 647 (2023) (recognizing *Bruton* and its progeny as a "narrow exception" to "the presumption that juries follow their instructions," including limiting instructions to view a codefendant's confession as evidence against only that codefendant).  In *Samia*, a local crime lord tasked Samia and two other men with killing a local real estate broker who had stolen money from the crime lord.  *Id.* at 640.  The three men were later arrested for the killing, and one of the codefendants gave a confession to police.  *Id.*  The codefendant admitted to being in the van when the broker was killed but claimed that he was only the driver and that it was Samia who fired the fatal shots.  *Id.*  The three men were tried jointly, and during that trial, the law enforcement agent who received the codefendant's confession testified that the codefendant had "described a time when the *other person* he was with pulled the trigger on [the real estate broker] in a van that he and [the codefendant] w[ere] driving."  *Id.* at 643.  Other evidence introduced at trial allowed the jury to infer that Samia was the "other person" referred to in the confession.  *See id.*  The lower federal courts rejected Samia's *Bruton* claim, and the Supreme Court affirmed.  *Id.* at 643, 655.

The Court began by emphasizing that "neither *Bruton*, *Richardson*, nor *Gray* provides license to flyspeck trial transcripts in search of evidence that could give rise to a collateral inference that the defendant had been named in an altered confession."  *Id.* at 653.  Instead, the relevant question is whether the redacted portions of a codefendant's confession "*directly implicate* a defendant."  *Id.* at 652 (emphasis added).  Reviewing the challenged confession through this lens, the Court concluded that "the neutral references to some 'other person' were

not akin to" using the defendant's name or "an obvious blank or the word 'deleted.'"  *Id.* at 653; *see also Gray*, 523 U.S. at 193 (holding that the use of a blank or the word "deleted," is hardly better than using the defendant's name because a "juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to [the other defendant], sitting at counsel table, to find what will seem the obvious answer, at least if the juror hears the judge's instruction not to consider the confession as evidence against [the other defendant], for that instruction will provide an obvious reason for the blank").  In addition, the Supreme Court found the use of "other person" was the best possible option in *Samia* because "it would not have been feasible to further modify [the codefendant's] confession to make it appear, as in *Richardson*, that he had acted alone."  599 U.S. at 653.

Here, as in *Samia*, Romero's name was replaced with the neutral phrase, "the other guy," in Lopez's statement as recounted by Detective Hanna, and the trial court issued a limiting instruction, which directed the jury to view Lopez's statement as evidence only against Lopez. *See, e.g.*, *United States v. Deare*, CASE NO. 6:21-CR-00212-01, 2023 WL 4757158, at *2 (W.D. La. July 25, 2023) ("In *Samia*, the Supreme Court held that a redacted confession of a co-defendant, which replaced the Defendant's name with neutral references, coupled with a limiting instruction, sufficed to avoid any *Bruton* problem, even where there was evidence that linked the Defendant to the co-defendant's confession.").  Lopez's confession, as given, did not refer to Romero by name or use a term like "deleted" or "redacted," which would have made it clear to the jury that a specific name was intentionally removed.  Romero argues that it was nevertheless clear to the jury that "the other guy" referred to Romero because "Lopez's statement as testified to by Paladino had substantial factual overlap with [ ] Lopez's statement as testified to by Detective Hanna," and because Paladino testified about the exact same statement as against

Romero, this time using Romero's name and referring to Lopez as "the other guy."  (Doc. No. 89 at 160–61.)  But *Samia* is clear that the Court cannot "flyspeck trial transcripts in search of evidence that could give rise to a collateral inference that the defendant had been named in an altered confession."  *Samia*, 599 U.S. at 653; *see also id.* ("[T]he *Bruton* rule applies only to 'directly accusatory' incriminating statements, as distinct from those that do 'not refer directly to the defendant' and 'become incriminating only when linked with evidence introduced later at trial.'" (quoting *Gray*, 523 U.S. at 194, 196)); *United States v. Hinojosa*, No. 22-10584, 2024 WL 841088, at *6 (5th Cir. Feb. 28, 2024) ("Direct implication can occur when a statement is redacted to remove a defendant's name, yet still obviously refers to the defendant.  By contrast, if a redacted statement only implicates the co-defendant in conjunction with other evidence, there is no Confrontation Clause violation." (citation omitted)).

Because the use of "the other guy" in Lopez's statement to Hanna does not directly implicate Romero, and the trial court gave a limiting instruction to the jury, Romero's *Bruton* claim also fails as to these statements.[37]  And because the Court finds no *Bruton* violation, we need not address Romero's arguments as to ineffective assistance of trial or appellate counsel. *See Werts*, 228 F.3d at 203 ("Counsel cannot be deemed ineffective for failing to raise a

---

[37] Before *Samia*, this Court might have been inclined to agree with Romero that using the phrase, "the other guy," was insufficient because the Third Circuit has repeatedly held that redactions containing generic terms in place of a defendant's name violates *Bruton*.  *See Eley v. Erickson*, 712 F.3d 837, 860 (3d Cir. 2013) (finding that *Bruton* was unreasonably applied where the redacted statement replaced the names of two defendants with the words "the other two"); *Washington v. Sec'y Pa. Dep't. of Corrs.*, 726 F.3d 471, 473 (3d Cir. 2013) (finding a Confrontation Clause violation where the redacted statement had substituted the defendant's name with "someone I know," "the driver," and "the other guy"); *United States v. Hardwick*, 544 F.3d 565, 573 (3d Cir. 2008) (finding the substitution of defendants' names to "the others in the van" was improper under *Bruton*); *Vazquez*, 550 F.3d at 281–82 (holding that a redacted statement which replaced the defendant's name with "my boy" and "the other guy" in a two-person murder trial violated the Confrontation Clause).  The continued viability of these cases is unclear given *Samia*'s more recent, seemingly contrary holding.

meritless claim.").  Accordingly, the Court finds that Claim 9 does not provide Romero with a basis for habeas relief.

### D.    *Brady* Claims

In Claims 10, 11, and 12, Romero contends that the Commonwealth failed to disclose favorable evidence in violation of *Brady v. Maryland*.  In *Brady*, the United States Supreme Court held that the government bears an affirmative duty to disclose evidence that is favorable to a defendant.  373 U.S. at 87; *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.  The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.") (internal citations omitted).  The Supreme Court has since clarified that, "[t]here are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (emphasis added).  All three prongs of the *Brady* test must be satisfied to establish a constitutional violation.  *See id.*  And as the three-prong test suggests, merely "showing that the prosecution knew of an item of favorable evidence unknown to the defense, does not amount to a *Brady* violation without more."  *Kyles*, 514 U.S. at 437–38.

#### 1.    Claim 10:  Photo Array

In Claim 10, Romero contends that the Commonwealth violated its obligations under *Brady* when it "failed to disclose that on three separate occasions, law enforcement (and prosecutors) showed Moreno a photo array [labeled the 'C-array'] containing Romero's photograph, that Moreno did not identify Romero from [the C-array], and that Moreno only

identified Romero weeks later" when the array was shown to him a fourth time but had been

relabeled as the "R-array." (Doc. No. 89 at 168.) Romero also claims that the prosecution

violated its obligations under *Napue* when it erroneously failed to elicit testimony from Detective

Hanna that Moreno had repeatedly failed to identify Romero in the C-array, and that the

prosecution also failed to correct Detective Hanna's testimony about the timing and manner by

which police first located, and then placed, the photo of Romero in an array presented to

Moreno. (*Id.*)

This claim is in large part responsible for the protracted nature of this case. As the Court

explains below, in 2015, the Commonwealth mistakenly represented to Romero's counsel that

the C-array and the R-array were identical, which led to the conclusion that Moreno had thrice

failed to identify Romero's photo. This mistaken representation—which was made after Romero

filed his initial habeas petition in this case—led to Romero's successive PCRA petition, an

evidentiary hearing before the state court, and a state court appeal, along with the filing of an

amended habeas petition and an evidentiary hearing before this Court. Then, in August 2023—

after more than *eight years* of proceedings on this issue and despite numerous representations to

the contrary—this Court ordered an evidentiary hearing and demanded the original arrays be

produced. (Doc. No. 121.) Only then did the Commonwealth take the time to research and find

the original arrays in the physical evidence stored in a warehouse, at which point the

Commonwealth realized that the C-array and R-array *are not the same.* Indeed, Romero is not

included in the C-array *at all.* As the Court will explain, the Commonwealth's failure to take its

obligations in this case seriously resulted in a significant waste of time and resources for all

parties involved. If only the Commonwealth had searched for the original arrays in 2015 when

discovery was first ordered, this issue could have been resolved years ago.

Before bringing Claim 10 to a close, the Court must dive into the procedural history surrounding this claim, a history which often centered on the mistaken belief that the C-array and R-array are the same.

<em>a.     Procedural History</em>

As noted above, in his Amended Petition, Romero argues that the Commonwealth erroneously failed to disclose that Moreno did not identify Romero when presented with the C-array.  (Doc. No. 89 at 168–77.)  Romero did not raise this claim at the time of his direct or collateral appeal because he had no basis to believe such a claim existed.  Following his state appeals, Romero proceeded to file a habeas petition in this Court on June 18, 2008, which did not include this claim.  (Doc. No. 3.)  Romero later filed a motion for federal habeas discovery. (Doc. No. 20.)  On August 31, 2011, Judge Tucker granted in part Romero's request for discovery, specifically permitting access to materials related to Moreno's interrogations by police.  *See Romero v. Beard*, No. CIV.A. 08-0528, 2011 WL 3862317, at *12 (E.D. Pa. Aug. 31, 2011) ("Petitioner's request for discovery of any and all statements, reports, notes, memoranda, writings, transcripts or recordings regarding Moreno's interrogation is granted.").

In May 2015, in response to Romero's discovery requests, the Commonwealth mistakenly represented to Romero for the first time that before Moreno identified Romero in the R-array, he had reviewed the same photo array under a different label (the C-array) and had failed to pick out Romero's photo.  (Doc. No. 81-3 at 623–25.)  Following this revelation, Romero filed a successor PCRA petition in state court, claiming that both the newly discovered evidence and governmental interference exceptions to the PCRA time-bar excused the lateness of the petition.  (*Id.* at 626–39.)  He also sought leave to amend his federal habeas petition and to stay federal habeas proceedings while he pursued exhaustion of the state claim in PCRA proceedings, which the Court granted.  (Doc. No. 56.)

88

On June 28, 2016, the PCRA court[38] held an evidentiary hearing on the timeliness of Romero's claim, at which Attorney Clark was the only witness.  (Doc. No. 112-35.)  Following the hearing, on October 25, 2016, the PCRA court denied Romero's successive PCRA petition as untimely and dismissed his *Brady* and *Napue* claims without reaching the merits.  *See* PCRA Opinion (Oct. 25, 2016).  Specifically, the PCRA court found that the C-array (according to the state court, the identifier "C" was in reference to Romero's alias, "Rafael Cajigas") was presented to Moreno on three separate dates:  January 30, January 31, and February 1, 1995.  *Id.* at 8.  Moreno did not identify Romero on any of those dates.  *Id.*[39]  On February 13, 1995, Moreno was presented with the array a fourth time (the R-array, allegedly now using the identifier "R" to refer to Romero's actual name) and positively identified Romero.  *Id.*  Based on incorrect representations made during the evidentiary hearing, the state court erroneously found that the "two photo arrays at issue, C and R, were completely identical to one another with the sole exception of the letter in the identifier."  *Id.*; *see also id.* ("There is not any question that the images in both arrays, the layout of the images, and every other aspect of the arrays other than

---

[38] The Honorable Douglas G. Reichley presided over Romero's second round of PCRA proceedings, including the evidentiary hearing.  Romero learned before the hearing that Detective Hanna had been the best man at Judge Reichley's wedding and is the godfather of Judge Reichley's daughter.  Concerned about personal bias affecting the PCRA court's ability to make credibility determinations, Romero moved to recuse Judge Reichley.  *See* N.T. June 28, 2016, at 7:12–29:4.  Judge Reichley denied the motion for recusal "because I view this as a timeliness issue and your ability to meet the exceptions to the timeliness bar . . . .  [I]f I find that you've met an exception, [then] the case will have to be reassigned because then it becomes a matter of Attorney Clark and Detective, then-Detective Hanna probably being called as witnesses to describe the nature of the information conveyed to trial counsel."  *Id.* at 28:17–29:4.  Romero had argued that even if the PCRA court were to limit its consideration to the time-bar exceptions, the retrospective question of Detective Hanna's credibility was at issue, and even a time-barred *Brady* claim is inherently intertwined with the merits of that claim; thus, he argued, that the personal connection between Judge Reichley and Detective Hanna created an appearance of impropriety.  *Id.* at 8:24–9:12, 11:25–13:7, 14:19–16:23.  This Court agrees.  The appropriate action would have been for Judge Reichley to recuse himself given the extent of his relationship with Detective Hanna.

[39] The record shows that although Detective Hanna tried to show Moreno the array on January 31, Moreno refused to speak with law enforcement on that date.

their names were the same.").  This representation was based on a March 27, 2015 meeting

between Romero's counsel, the Commonwealth, and Detective Hanna, who incorrectly "clarified

the information in the reports and recordings referring to two arrays," and "explain[ed] that they

were identical in all respects other than their labels." *Id.* at 9.

 Under the assumption that the C-array and the R-array were identical and both included

Romero's photograph, the PCRA court found that the R-array had been shown to Attorney Clark

on July 17, 1995 and that "all of the police reports, audio recordings, and video records turned

over to Petitioner's counsel in the discovery process referenced 'both' photo arrays." *Id.* at 8.

Further, the court found that although Clark had testified that he was unaware that Moreno had

previously failed to identify Romero from the C- array and although he did not know his client's

photograph was included in the C-array, Clark nevertheless "indicated he was provided a copy of

the C-array." *Id.* at 9 (citing N.T. June 28, 2016, at 44).  The court found that, on cross-

examination, Clark admitted that he did not ask about the identities of the individuals in the C-

array, and that "he could have asked [ADA Holihan] about whether [Romero] was in the array at

the time of the original preparation for the case, but he did not do so." *Id.* (citing N.T. June 28,

2016, at 54).  Neither did Clark ask Detective Hanna about the arrays at trial. *Id.* (citing N.T.

June 28, 2016, at 54–55).  Based on this evidence, the PCRA court found that Romero failed to

satisfy his timeliness burden because information regarding the names of both the C-array and

the R-array, and the contents of those arrays, could have been discovered with reasonable due

diligence by Romero's trial counsel in 1995. *See id.* at 10–11.  Romero appealed to the

Pennsylvania Supreme Court, which affirmed the lower court's decision in a one-paragraph per

curiam order simply citing the PCRA time-bar statute. *See Commonwealth v. Romero*, 181 A.3d

283 (Pa. July 18, 2017) (table).

b.    *Alleged Unreasonable Finding of Fact*

Back on habeas review, Romero argued that this Court should not defer to the PCRA court's timeliness conclusion because it is based on an unreasonable finding of fact, i.e., that Clark received the R-array and could have discovered, with reasonable due diligence, that the C-array contained Romero and/or that the C-array and the R-array were the same.  (Doc. No. 89 at 175–77.)  (Remembering again, the two arrays were *not* actually the same.)  Romero asserts that he can show that the PCRA court's fact findings were unreasonable in light of the evidence that was presented at the June 28, 2016 evidentiary hearing before that court.  (*Id.*)  As this Court stated in its August 10, 2023 Order scheduling a federal evidentiary hearing on the issue (at the time the parties believed the C-array and R-array were identical), the Court agrees that the claim is timely.  (*See* Doc. No. 121 at 1 n.1.)  We explain the basis for that finding below.  (*See id.* (noting that the basis for the timeliness ruling would be explained in this forthcoming Memorandum).)

At the evidentiary hearing before the PCRA court, Attorney Clark testified that at the time of trial, he was unaware that Moreno had failed to identify Romero from a photo array on three occasions prior to the positive identification he made on February 13, 1995.  *See* N.T. June 28, 2016, at 39:24–40:3.  Clark also testified that he was not aware that his client's photo was included in the C-array.  *Id.* at 43:17–20.  Clark then testified that, had he known that Moreno failed to identify Romero from the C-array, he would have asked the prosecutor for more specific information about that array, and that he would have cross-examined Moreno extensively on the times he failed to identify Romero, and questioned Detective Hanna on the same.  *See id.* at 43:21–49:15.  This Court cannot discern how this evidence supports the PCRA court's finding that Clark possessed a copy of the C-array, or could have possessed it with reasonable diligence.  In fact, when reading Clark's testimony in its entirety, Clark clearly stated that he did *not* have

91

the C-array in his possession and did not request the C-array despite it being listed in police reports, because he did not know Romero was included in the C-array. *See id.* In other words, Clark did not believe there was any reason to request any array aside from the R-array, which included his client and which he had already been given. Contrary to the PCRA court's opinion, PCRA Opinion at 11 (Oct. 25, 2016) ("Attorney Clark acknowledged that the arrays were turned over."), there is no support in the record for finding that Clark received *more than one* array or that he was given any array other than the R-array. Neither is there any evidence that Clark was told that the R-array and C-array were the same. N.T. June 28, 2016, at 63:6–15.

Thus, the PCRA court's findings as to Attorney Clark are contradicted by the hearing record. Counsel made clear that he was shown the R-array before trial, not the C-array, and that the prosecution never represented to him that the R-array he was shown was the same as the C-array referred to in Moreno's earlier interviews. The record also shows Clark received only the R-array. *See* N.T. June 28, 2016, at 44:11–15 (Clark testifying that he "received *a* copy of *the* array" (emphases added)). Accordingly, the PCRA court's timeliness ruling[40] is based on an unreasonable finding of fact and not entitled to deference under § 2254(d)(2).[41]

---

[40] Based on its erroneous factual finding that the C-array was turned over, the PCRA court also mistakenly concluded, as to the first *Brady* prong, that the Commonwealth did not suppress or withhold the fact that Moreno had failed to identify Romero three times before being presented with the R-array. PCRA Opinion at 11 (Oct. 25, 2016). Although the PCRA court viewed this as a purely procedural ruling based on the time-bar, this finding was based on and, in fact, synonymous with its inaccurate findings of fact. Given the overlap between procedure and substance, and in the interest of precaution, the Court concludes that this PCRA court finding, too, is contradicted by the already reviewed clear and convincing evidence on the record elicited at the PCRA hearing. The Commonwealth did not, before trial, represent to the defense that Romero was in the C-array. It did not represent that the C-array and R-array were identical. Had it done either of those things, Romero and his counsel would have believed that Moreno had not identified Romero on three prior occasions before identifying him from an allegedly identical array with a new identifier.

[41] The Commonwealth argues that Romero's federal habeas claim on this same ground for relief is, as it was in state court, untimely. The Court disagrees. The habeas statute of limitations may be calculated as one year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Here,

c.      *De Novo Review*

Having found the PCRA court's timeliness ruling was not entitled to deference—and still believing that the C-array and R-array were identical as represented by the Commonwealth since 2015—this Court scheduled an evidentiary hearing for September 5, 2023, to conduct its de novo review of the *Brady* claim.  (*See* Doc. No. 121.)  But approximately one week before the scheduled hearing, the Commonwealth filed an Offer of Proof and Supplemental Evidence (Doc. No. 127), explaining that the Commonwealth had located additional evidence (the original C-array and R-array introduced during trial) and recanted its previous representation[42] that the two arrays were the same.

The Court ordered the Commonwealth to produce the original C-array and R-array at the upcoming evidentiary hearing and to be prepared to explain the circumstances surrounding this new disclosure.[43]  Upon reviewing the two arrays, not only are the images different in each

---

Romero discovered the factual predicate of the claim via email from Senior Deputy Attorney General Kelly Sekula dated May 21, 2015.  (*See* Doc. No. 81-3, at 625 ("It's our belief that the two arrays are the same array simply referenced differently depending on the timing of use (pre or post 'Rafael Cajigas' alias).").)  Romero filed his Motion to Amend on May 20, 2016, satisfying the one-year statute of limitations.  (*See* Doc. No. 54.)

[42] Although on August 31, 2011, Judge Tucker ordered the Commonwealth to produce certain discovery, it was not until August 2014 that the attorneys for the Commonwealth and Romero exchanged emails related to the issue of which photo arrays were shown to Moreno.  (Doc. No. 81-3 at 621.)  It was a few months later, and only after seeking clarification from Detective Hanna, that the Commonwealth mistakenly represented its belief that the C-array and R-array were the same photo array.  (*Id.* at 623, 625.)  Until August 2023, the Commonwealth maintained this position, including during the second round of PCRA hearings before Judge Reichley on June 28, 2016.  *See, e.g.*, N.T. June 28, 2016, at 73:13–20.

[43] According to the Commonwealth, the arrays were located "in the police physical evidence file."  Draft N.T. Sept. 5, 2023, at 4:15–18; *see also id.* at 53:18–21 (Detective Hanna confirming that "all of the photo arrays in this case were eventually found in in [sic] the warehouse where the physical evidence is kept").  Detective Hanna testified that he did not initially look in the physical evidence file because he believed the arrays, along with any other relevant evidence, would have been introduced as an exhibit at trial and maintained by the courthouse.  *Id.* at 60:25–63:25.  This case serves as a valuable lesson that even when an evidentiary hearing is held years after a defendant's conviction, prosecutors should take the time to research and find the original evidence instead of relying on memories that may have faded in the intervening decades.

array, but the R-array includes black and white photos, while the C-array includes color photos. (*Compare* Doc. No. 132-1 at 14 (R-array), *with id.* at 15 (C-array).)  Most importantly, Romero appears nowhere in the C-array.  (*See id.* at 16 (labeling C-Array as, "Photo Array—Jose Rafael Cuevas Dezgado C-1 thru C-8 Plus other Photos").)  *See also* Draft N.T. Sept. 5, 2023, at 10:18–19 ("I understand my client was not in that array . . . ."); *id.* at 14:11–14 ("The Court: This is the C array and we all agree [Romero] is not in the C array.  Ms. Affronti: Correct.  Ms. Ulstad: Correct.").

The Commonwealth now argues that because the C-array is different from the R-array, and it did not contain Romero's picture, the Commonwealth did not need to turn it over and at a minimum, the C-array is not material for purposes of *Brady*'s third prong.  Draft N.T. Sept. 5, 2023, at 65:21–66:3; *see also United States v. Bagley*, 473 U.S. 667, 682 (1985) (explaining that the third prong of the *Brady* test (prejudice) is satisfied when the suppressed evidence is considered "material," meaning that there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").  The Court agrees.

Before turning to the third prong, however, the Court questions whether the C-array can be described as favorable to Romero for purposes of *Brady*'s first prong.  Although a witness's failure to identify a defendant in a photo array is impeachment evidence under *Brady*, *see Simmons v. Beard*, 590 F.3d 223, 237–38 (3d Cir. 2009), all parties now agree that Romero's photo was *not* included in the C-array.  That means Moreno did not, as Romero claims, "repeated[ly] fail[ ] to identify Mr. Romero" when he was shown the C-array in February 1995. (Doc. No. 89 at 168.)

That said, even if the Court were to find that the C-array is favorable to Romero because

94

it identified an alternate suspect, Jose Rafael Cuevas Delgado, Romero's *Brady* claim

nevertheless fails because, as the Commonwealth argues, the Court cannot find that the C-array

was material as required under the third *Brady* prong.  At the September 5, 2023 evidentiary

hearing before this Court, Detective Hanna testified that Cuevas Delgado (the person of interest

included in the C-array) became a suspect when the police found his photograph during a search

of Lopez's residence in Orlando, Florida on January 22, 1995.  Draft N.T. Sept. 5, 2023, at

58:19–59:3.  Before conducting the search, the police had interviewed George Lopez's sister

(Moreno's mother) in New Jersey, and she identified two individuals as being involved in the

murder:  a man named "Tito"—Barbosa's alias—and a man named "Rafae."  *Id.* at 59:7–15.

Because Cuevas Delgado's photo was in Lopez's residence, and the man in the photo was

identified as "Jose *Rafael* Cuevas Delgado," Detective Hanna investigated whether Cuevas

Delgado was the "Rafae" to whom Lopez's sister referred.  *Id.* at 59:7–24.  At the time, the

police had not identified Romero, and it was only later that they learned Romero also went by the

alias "Rafae" and that he matched the physical description of the third man involved in the

murder.  *Id.*; *see also id.* at 60:4–11 (testifying that Romero had a driver's license in Puerto Rico

under the alias "Rafael Cajigas").

        The fact that the police, in the early stages of the investigation, considered Cuevas

Delgado a suspect, does not undermine confidence in the result of Romero's trial.  *See Strickler*,

527 U.S. at 289 (explaining that evidence is material under *Brady* when "there is a reasonable

probability that the result of the trial would have been different if the suppressed [evidence] had

been disclosed to the defendant" (quotation marks omitted)).  The Court might hold differently if

Moreno had identified Cuevas Delgado as a participant in the robbery and murder.  But he did

not.  Indeed, Moreno's repeated failure to identify anyone in the C-array as a conspirator

buttressed Detective Hanna's conclusion that Cuevas Delgado was *not* a viable suspect. *See Canales v. Stephens*, 765 F.3d 551, 576 (5th Cir. 2014) ("But there is not a *Brady* violation every time the government does not disclose an alternative suspect, especially when the other suspect was not a particularly plausible one."); *Appanovitch v. Houk*, 466 F.3d 460, 484 (6th Cir. 2006) (holding evidence about other suspects "which does not even indirectly link any of the suspects to the murder" was "too remote to have been exculpatory or to undermine confidence in the verdict"); *see also Pursell v. Horn*, 187 F. Supp. 2d 260, 326–29 (W.D. Pa. 2002) (rejecting argument that "*Brady* establishes a *per se* rule concerning other suspect evidence," and finding evidence that police initially considered a different suspect was not material where the "withheld evidence was remarkably weak, . . . pertaining to a man who, at best, sought to commit a different crime at a different time"); *cf. Lazar v. Att'y Gen. of Pa.*, 659 F. Supp. 3d 599, 615–16 (E.D. Pa. Mar. 6, 2023) (finding exculpatory and material evidence that the investigators failed to rule out viable, alternative suspects, both of whom had a motive to commit the crime).

In sum, even if the prosecution had disclosed the C-array in the months leading up to Romero's trial, it is not reasonably probable "that the result of the trial would have been different," especially given Moreno's repeated failure to identify Cuevas Delgado as a conspirator during any of the three occasions when he was shown that array. *See Strickler*, 527 U.S. at 289 (quotation marks omitted).[44]  Accordingly, Romero's petition is denied as to Claim 10.

---

[44] Similarly, because Romero's photo was not included in the C-array, the Court must reject Romero's argument that Detective Hanna gave "false and misleading testimony" in violation of *Napue*. (*See* Doc. No. 89 at 174 (arguing that the prosecution violated *Napue* when Detective Hanna failed to disclose at trial "that Mr. Moreno was also shown a photo array containing Mr. Romero on February 1, 1995, and Attorney Racines never corrected that false and inaccurate (by omission) testimony").)

2.        **Claim 11:  Promises Made to Moreno**

In Claim 11, Romero raises a second *Brady* and *Napue* claim, arguing that the

prosecution violated his due process rights when it failed to disclose an implicit promise to grant

Moreno a lighter sentence in exchange for his testimony against Romero.[45]  (Doc. No. 89 at 178–

91.)  Romero concedes that this claim is procedurally defaulted because it was never raised in

state court.  (*Id.* at 189.)  But he argues that he can overcome the default by showing cause and

prejudice.  (*Id.*)  For a defaulted *Brady* claim, cause and prejudice mirror the second and third

elements of the substantive claim—suppression and materiality.  *See Banks v. Dretke*, 540 U.S.

668, 691 (2004) ("Corresponding to the second *Brady* component (evidence suppressed by the

State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court

proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady*

component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement

exists when the suppressed evidence is 'material' for *Brady* purposes.").  Here, Romero has not

satisfied the materiality prong, so we need not consider the suppression prong.

In 2020, the Honorable R. Barclay Surrick addressed the same claim in a habeas

proceeding initiated by Romero's codefendant, George Lopez.  *See Lopez v. Beard*, Civil Action

No. 04-4181, 2020 WL 4201507 (E.D. Pa. July 21, 2020).  In that case, Judge Surrick granted

Lopez's request to conduct discovery on whether the Commonwealth suppressed evidence of an

additional agreement between the prosecution and Moreno, but those discovery efforts proved

"largely fruitless."  *Id.* at *1 (quotation marks omitted).  Because Lopez was unable to point to

---

[45] Unlike coconspirator Barbosa, who was sentenced prior to being called as a witness at trial, *see supra* n.16, coconspirator Moreno testified at trial despite the fact he had not yet entered a guilty plea in the case.  Moreno entered a plea on May 8, 1996 and was sentenced on July 19, 1996.  (Doc. No. 81-3 at 216.)

any evidence that the Commonwealth suppressed evidence favorable to Lopez, Judge Surrick found his claim failed at the first *Brady* factor.  *Id.* at *1–2.  Judge Surrick also found that Lopez failed as to the third *Brady* prong because "[t]here [wa]s no dispute that the jury knew that Moreno was being spared the death penalty in exchange for his testimony."  *Id.* at *2. Accordingly, even assuming Lopez could point to additional impeachment evidence showing that Moreno was promised a lighter sentence, that evidence "would be cumulative and immaterial."  *Id.* ("Lopez has failed to meet *Brady*'s prejudice requirement.").

Judge Surrick's analysis as to *Brady*'s third prong is equally applicable here.  Finding it persuasive, the Court adopts it and rejects Romero's claim that the Commonwealth violated *Brady* when it failed to disclose alleged implicit promises made to Moreno in exchange for Moreno's testimony against Romero.  Even assuming that Romero could point to evidence of an additional agreement between Moreno and the prosecution, that evidence is not material for purposes of *Brady*.  Accordingly, Romero has failed to show the prejudice necessary to overcome the procedural default of this claim.  Romero's petition is denied as to Claim 11.

### 3.   Claim 12:  Lopez's Prior Conviction

In Claim 12, Romero raises a third *Brady* claim, arguing that his due process rights were violated because the Lehigh County District Attorney's Office and the Allentown Police Department allegedly had documents "indicating that Mr. Romero's codefendant, George Lopez, had previously attempted to commit a crime that was virtually identical to the Bolasky killing," which they failed to turn over during the trial.  (Doc. No. 89 at 191–92.)  Romero directs the Court's attention to a newspaper article published on March 25, 1996 in *The Morning Call*, which chillingly described how, in 1978, Lopez attacked a landlord who was collecting rent by grabbing him from behind and using a towel in an attempt to suffocate and strangulate him.  (*See* Doc. No. 81-3 at 212–13.)  Lopez eventually pleaded no contest to simple assault, a

98

misdemeanor, and received 18 months' probation.  (*Id.*)  Romero argues that the evidence of Lopez's prior crime is "exculpatory and material . . . because it supports the theory that Mr. Lopez—and not Mr. Romero—was the primary instigator of the Bolasky murder."  (*Id.* at 192.) Romero also asserts that his trial and appellate counsel were ineffective for failing "to investigate and discover this exculpatory evidence."  (*Id.*)

Romero did not raise this *Brady* claim as a standalone claim or an ineffective assistance of trial counsel claim on direct appeal, and so the claims were deemed waived by the Pennsylvania Supreme Court on collateral appeal.  *See Romero II*, 938 A.2d at 369. Nonetheless, for the reasons discussed above, *see supra* Part III.A., the Court reviews these claims on their merits.  Although the Pennsylvania Supreme Court found these claims waived on collateral appeal, Romero did raise the *Brady* issue in his first round of PCRA proceedings via a "layered" ineffective assistance of counsel claim, in which he argued that his direct appeal counsel was ineffective for failing to argue that his trial counsel was ineffective for failing to investigate Lopez's prior crimes.  *See Romero II*, 938 A.2d at 389.  In evaluating the ineffective assistance of appellate counsel claim, the Pennsylvania Supreme Court necessarily needed to determine trial counsel's alleged ineffectiveness, and in doing so, evaluated whether the underlying claim itself had merit, specifically, as to whether trial counsel failed to investigate, develop, and present the evidence surrounding Lopez's prior crime.  *See id.*  Accordingly, although the standalone *Brady* and trial counsel ineffectiveness claims were never considered by a state court, this Court is nonetheless required to review these claims in accordance with the factual findings and legal conclusions made by the Pennsylvania Supreme Court.[46]

---

[46] As before, although these claims were not "presented" to the state court, the PCRA court and Pennsylvania Supreme Court nevertheless evaluated the merits of the *Brady* challenge in their evaluation of Romero's layered ineffectiveness claims.  Those factual determinations are binding on the Court's habeas review.  *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court

On PCRA appeal, the Pennsylvania Supreme Court found that "contrary to" Romero's assertions before it, "Lopez was not previously convicted of robbery or attempted murder; instead, he pled *nolo contendre* to simple assault." *Id.*[47] Moreover, Attorney Clark testified at the PCRA hearing that even if he had known about this prior crime evidence, "he would not have wanted this evidence before the jury, [because] 'if he blackened Lopez's eyes then he blackened Romero's eyes,' this being a joint trial." *Id.* (quoting N.T. May 31, 2000, at 673) (cleaned up); *see also id.* ("Thus, counsel would not have wanted to show Lopez was capable of such crime, because [Romero] was associated with Lopez."). For this reason, the state court found that Romero's *Brady* argument failed under the first element, "as Lopez's prior history would have made [Romero] look worse rather than exculpating him." *Id.*[48]

Romero argues that the Pennsylvania Supreme Court's decision as to this claim was contrary to, and an unreasonable application of, clearly established federal law as set out by *Brady* and its progeny. (*See* Doc. No. 89 at 192.) As stated previously in this Memorandum, for a state court decision to be "contrary to" clearly established federal law, "the state court [must]

---

shall be presumed to be correct."); *Cullen*, 563 U.S. at 181 (federal habeas court is limited in its consideration of the record that was before the state court that adjudicated the claim on the merits). So, while the *Brady* claim itself is technically before the court de novo, having not been considered on its own in any state court, the Court is still bound by state court factual findings underlying this claim. *See Nara*, 488 F.3d at 200–01 ("[T]he § 2254(e)(1) presumption of correctness applies regardless of whether there has been an adjudication on the merits for purposes of § 2254(d)."). For these reasons, the Court reviews the state court's factual findings in accordance with § 2254(d)(2)'s deference. Similarly, because the state court has already ruled on the legal merits of the *Brady* challenge, which is now raised here as the central claim, the Court defers to the state court's legal conclusions in accordance with § 2254(d)(1)'s deference.

[47] In arguing that the state court was unreasonable in its application of *Brady*, Romero claims that it does not matter whether Lopez ultimately pleaded *nolo contendere* to simple assault, because "it is the factual basis underlying the plea that is exculpatory and material." (Doc. No. 89 at 199.) The Court agrees that the technical fact that Lopez was not convicted of robbery or attempted murder does not bear on whether evidence of the crime itself was favorable under *Brady*—though it is certainly relevant to the second prong of the *Brady* analysis, as discussed below.

[48] It was also for this reason that the state court found that trial counsel was not unreasonable in failing to investigate and present this evidence. *See Romero II*, 938 A.2d at 389.

arrive at a conclusion opposite to that reached by the Supreme Court on a question of law or . . . decide[ ] a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Hameen*, 212 F.3d at 235 (cleaned up). A state court decision involves an "unreasonable application of" clearly established federal law when "[it] resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Matteo*, 171 F.3d at 890.

Considering the established record before the PCRA court,[49] the Court reviews the reasonableness of the state court's resolution of Romero's *Brady* claim, which it disposed of on the first prong: favorability. Generally, the United States Supreme Court has said that evidence is "favorable" in accordance with *Brady* "because it is exculpatory, or because it is impeaching." *Strickler*, 527 U.S. at 281–82; *see also Bagley*, 473 U.S. at 676 ("Impeachment evidence, as well

---

[49] Romero directs the Court's attention to *The Morning Call* article, mentioned above. (*See* Doc. No. 81-3 at 212–13.) He notes that ADA Holihan was interviewed for the article; in that interview, ADA Holihan explained that the evidence, although damning on Lopez's character, would not have been admissible at trial. (*See id.*) But as the Commonwealth correctly points out, the Court's consideration of this newspaper article in federal habeas proceedings is not proper. (*See* Doc. No. 91 at 113.) Despite raising this claim in his petition and questioning both Attorney Clark and ADA Holihan as to their knowledge of the underlying facts of Lopez's prior crime—of which they stated that they had none—Romero did not admit the newspaper article into evidence during initial PCRA proceedings, nor did he call any witnesses to verify its contents or request any actual documentation from the Allentown Police Department or Lehigh County District Attorney's Office regarding Lopez's 1978 crime.

Indeed, it was on this original basis that the PCRA court dismissed Romero's claim. *See* PCRA Opinion at 20–21 (Sept. 21, 2000) (filed in this action as Doc. No. 112-6 at 9–34) ("Defendant simply presented no competent evidence to support this claim . . . . [T]here were no witnesses presented at the PCRA hearing that established such relevant evidence exists and could have been produced at trial."). Romero argues that the newspaper article is not offered "to establish the truth of the matter asserted (i.e. that Mr. Lopez was guilty of the prior crime)" but that it "establishes that law enforcement would have had within its possession evidence related to these earlier charges against Mr. Lopez." (Doc. No. 94 at 82.) But by the Court's plain reading of the article, at no point did ADA Holihan tell the interviewer when or how he learned of this information. And the article's existence does not automatically prove the existence of any records in the Allentown Police Department or Lehigh District Attorney's custody; as it happens, the writer of the article did not disclose how he came to learn of this information in the first place. In any event, these open-ended questions needed to be answered at the PCRA evidentiary hearing, when Romero's counsel was offered the opportunity to develop a factual record in support of this claim. Thus, in deciding if the state court acted reasonably, the Court emphasizes that it is limited to the record that was *before the state court* that adjudicated the claim on the merits—and that record does not include *The Morning Call* article. *See Cullen*, 563 U.S. at 181.

as exculpatory evidence, falls within the *Brady* rule." (cleaned up)).  The Court cannot discern

how information about Lopez's prior crime would have been "impeaching" on anyone but

Lopez, who did not testify.  We therefore proceed under the assumption that Romero views the

evidence as potentially exculpatory.  Under *Brady*, "exculpatory evidence need not show [a]

defendant's innocence conclusively," rather, "exculpatory evidence includes material that goes to

the heart of the defendant's guilt or innocence as well as that which may well alter the jury's

judgment of the credibility of a crucial prosecution witness."  *Dennis*, 834 F.3d at 287 (citing

*Giglio v. United States*, 405 U.S. 150, 154 (1972)).

In light of this standard, the Court finds that the Pennsylvania Supreme Court reasonably

concluded that evidence of Lopez's past, similar, criminal activity likely would not have altered

the jury's judgment of Romero's own criminality.  Lopez and Romero were tried together as co-

conspirators for the same crime, and the prosecution put on evidence showing that both men

were in the apartment and that it may have even been Romero's idea to kill Bolasky by shooting

him.  *See* N.T. Mar. 12, 1996, at 34–35.  As the state court found, it would not have helped

Romero's defense to say that Lopez merely chose the manner of Bolasky's death based on his

past criminal exploits.  *See Gibson v. Beard*, CIVIL ACTION NO. 10–445, 2015 WL 10381753,

at *18 (E.D. Pa. July 28, 2015), *report and recommendation adopted*, 165 F. Supp. 3d 286 (E.D.

Pa. 2016), *aff'd sub nom. Gibson v. Sec'y Pa. Dep't of Corr.*, 718 F. App'x 126 (3d Cir. 2017)

(evidence that showed the petitioner had participated in a previous drug crime, and police notes

which might have corroborated the prosecution's theory of the crime, were not exculpatory

evidence under *Brady*); *see also Hutchison v. Bell*, 303 F.3d 720, 746 (6th Cir. 2002) ("The

prosecution's theory already posited that [the co-conspirator] was involved in the murder, so

evidence inculpating [the co-conspirator] would not tend to show [petitioner's] innocence.").

The Court agrees with the state court that Romero is not rendered innocent simply because his co-conspirator's preferred method of killing was chosen—and we do not think it likely the jury would have changed their mind about Romero's guilt if they had known that it was Lopez who devised the specific form of Mr. Bolasky's execution.[50]  Accordingly, the Court finds the state court's determination—that this evidence was not exculpatory or otherwise favorable under *Brady*'s first prong—was a reasonable application of federal law.[51]  And the

---

[50] Romero also argues that the nature of Lopez's prior crime was "plainly relevant to trial counsel's penalty phase presentation because the prior involvement of Mr. Lopez in a very similar crime with a very similar modus operandi was relevant to showing that Mr. Romero was a minor participant (the (e)(7) mitigator) and that he was not Mr. Bolasky's killer, which would have effectively rebutted the (d)(6) aggravating circumstance. (Doc. No. 81-1 at 151–52.)  Although the Court agrees that this information likely would have been relevant mitigation evidence, because the Commonwealth has stipulated to relief on Claim 2, the Court does not reach any additional arguments as to penalty stage relief.

[51] Although the Court need not reach the second *Brady* prong, we note there is some ambiguity as to whether the Commonwealth knew of the specific facts that Romero believes were material to his defense, and whether it could be said to have "possessed" the evidence it allegedly "suppressed" in the first instance.  At the PCRA evidentiary hearing, ADA Holihan testified about his knowledge of the facts underlying Lopez's 1978 misdemeanor assault charge:

> Q: [Romero contends that] the Commonwealth failed to provide exculpatory evidence specifically relating to George Ivan Lopez's participation in another virtually identical robbery and attempted murder of a landlord. Those are the words used by the petition. Were you aware of those facts prior to trial?
>
> A: The detailed facts that were recorded in the newspaper after the trial, no, I wasn't aware of prior to trial or during the trial. I was aware that George Ivan Lopez has a prior record, a criminal history, which was compiled and was released to counsel in discovery.
>
> Q: Okay. And do you recall when you learned of the facts that were related in the newspaper article?
>
> A: It was shortly after the verdicts. The exact date and time, I don't remember. My recollection it was probably within days after the case was concluded, meaning the penalty phase was concluded, but the exact date, I don't recall.

N.T. June 1, 2000, at 1045:15–1046:2.  Holihan reiterated on cross examination that although he saw the misdemeanor assault charge on Lopez's "rap sheet," which was "distributed to all counsel," the crime wasn't a felony or a *crimen falsi* conviction, and so he did not look up the facts underlying the conviction because he did not believe that the misdemeanor would have been of any use at trial.  *Id.* at 1048:10–1049:12.  As the Commonwealth notes, Holihan's testimony is "uncontradicted" by Romero.  (Doc. No. 91 at 113 n.27.)  Attorney Clark confirmed in his PCRA testimony that he was provided with Lopez's

Court defers to the state court's conclusion that Romero's underlying *Brady* claim fails.[52]

\* \* \*

For the above-stated reasons, the Court finds that Claim 12 does not provide Romero with habeas relief.

### E.     Claim 13: Jury Instructions

In Claim 13, Romero contends that the jury instructions given at his trial "omitted and inaccurately described essential elements of the offenses and therefore violated Mr. Romero's due process rights."  (Doc. No. 89 at 200.)  Specifically, Romero objects to two jury instructions: (1) "The trial court instructed the jury that Mr. Barbosa's prior statement to Captain Bucarey could be regarded 'as proof of anything that the witness said in the earlier statement'" (*id.* at 201–02); and (2) "The trial court's instructions on accomplice and co-conspirator liability violated due process because they never specified that the jury had to find beyond a reasonable

---

criminal record by the Commonwealth, and like ADA Holihan, noted that "the substantive facts pertaining to that event would not be on a rap sheet, so I wouldn't have any way of knowing what those circumstances were."  N.T. May 31, 2000, at 677:20–678:8.  *See Johnson v. Kerestes*, No. CV 13-03197, 2023 WL 4697311, at \*9 (E.D. Pa. July 24, 2023) ("At the time of Petitioner's trial [in 1988], there could be no *Brady* violation where defense counsel, with reasonable diligence, could have obtained the information); *see also Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 289–90 & 290 n.14 (3d Cir. 2021) (noting that the "due diligence exception to *Brady*" remained valid Third Circuit precedent up until the en banc opinion in *Dennis v. Sec'y Pa. Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016)); *Gibson*, 2015 WL 10381753, at \*18 (prosecutor who was not aware of previous crime at the time of trial, who was not part of the previous prosecution team, and who testified he knew no facts about the previous crime, did not suppress evidence.  Romero asserts that because Lopez's previous crime occurred in Allentown, the Allentown Police Department, and by extension the Lehigh County District Attorney's Office, "possessed the criminal Complaint against George Lopez, the Information, and the police report describing the crime."  (Doc. No. 89 at 194.)  But Romero failed to produce evidence during PCRA evidentiary proceedings that any of these documents from back in 1978 actually existed at the time of his trial in 1996, such that Holihan would have been capable of obtaining this information even if he had searched for it in Allentown Police Department or Lehigh County records.  In any event, the state court did not even reach the second prong of *Brady*, and so we need not consider it further.

[52] Because the Court finds no *Brady* violation, it need not address Romero's arguments as to ineffective assistance of trial or appellate counsel.  *See Werts*, 228 F.3d at 203 ("Counsel cannot be deemed ineffective for failing to raise a meritless claim.").

doubt that Mr. Romero had specific intent to kill in order to find him culpable as an accomplice or co-conspirator to first-degree murder" (*id.* at 204).  Romero also contends that his trial counsel was ineffective for failing to object to the instructions, and his appellate counsel was ineffective for failing to raise and litigate these claims on direct appeal.  (*See id.* at 200.)

Romero did not raise either the instruction claims or his ineffective assistance of trial counsel claims on direct appeal, and so these grounds for relief were deemed waived by the Pennsylvania Supreme Court on collateral appeal.  *See Romero II*, 938 A.2d at 369. Nonetheless, for the reasons discussed above in connection with the relaxed waiver doctrine, *see supra* Part III.A., the Court reviews these claims on their merits.  Despite not raising the claims on direct appeal, Romero did raise the instructional issues in his first round of PCRA proceedings via a "layered" ineffective assistance of counsel claim, in which he argued that his direct appeal counsel was ineffective for failing to argue that his trial counsel was ineffective for failing to challenge the jury instructions.  *See id.* at 379–80.  In evaluating this ineffective assistance of *appellate* counsel claim, the Pennsylvania Supreme Court necessarily had to consider trial counsel's alleged ineffectiveness, and in doing so, evaluated whether the underlying jury instruction claims had merit, such that trial counsel should have objected on this basis or otherwise raised these claims.  *See id.*  Accordingly, although the standalone jury instruction and trial counsel ineffectiveness claims were never considered by a state court, this Court is nonetheless required to review these claims in accordance with the factual findings and legal conclusions made by the Pennsylvania Supreme Court.[53]

---

[53] As before, although these claims were not "presented" to the state court, the PCRA court and Pennsylvania Supreme Court nevertheless evaluated the merits of the jury instruction and ineffective assistance of trial counsel claims in their evaluation of Romero's layered ineffectiveness claims.  Those factual determinations are binding on the Court's habeas review.  *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.");  *Cullen*, 563 U.S. at 181 (federal habeas court is limited in its consideration of the record that was before the state court that

### 1.    Barbosa Prior Statement Instruction

First, Romero argues that the Pennsylvania Supreme Court's approval of the instruction given for Barbosa's prior statement to Captain Bucarey was contrary to the United States Supreme Court's holding in *Sandstrom v. Montana*, and thus, not entitled to deference under § 2254(d)(1).  (*See* Doc. No. 89 at 213 (citing *Romero II*, 983 A.2d at 380).)

To fully understand *Sandstrom*'s holding and potential effect in this case, the Court begins by reviewing an earlier Supreme Court case, *In re Winship*, and its progeny.  In *Winship*, the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  397 U.S. 358, 364 (1970).  The Supreme Court has since interpreted this holding to mean that when a jury instruction relieves or reduces the prosecution's burden of proof, a constitutional violation has occurred.  *See Francis v. Franklin*, 471 U.S. 307, 316–18 (1985) ("The portion of the jury charge challenged in this case directs the jury to presume an essential element of the offense—intent to kill—upon proof of other elements of the offense—the act of slaying another.  In this way the instructions undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt. . . .  [T]he challenged language undeniably created an unconstitutional burden-shifting presumption with respect to the element of intent."); *Sandstrom*

---

adjudicated the claim on the merits).  So, while the claims are technically before the court de novo, having not been considered on their own merits in any state court, the Court is still bound by state court factual findings underlying these claims.  *See Nara*, 488 F.3d at 200–01 ("[T]he § 2254(e)(1) presumption of correctness applies regardless of whether there has been an adjudication on the merits for purposes of § 2254(d).").  For these reasons, the Court reviews the state court's factual findings in accordance with § 2254(d)(2)'s deference.  Similarly, because the state court has already ruled on the legal merits of the jury instructions and ineffective assistance of trial counsel challenges, which are now raised here as central claims, the Court defers to the state court's legal conclusions in accordance with § 2254(d)(1)'s deference.

*v. Montana*, 442 U.S. 510, 513, 521 (1979) (finding that a trial court's instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts" relieved the prosecution from its burden of proof as to intent); *see also Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 285 (3d Cir. 2018) ("If the instruction contains 'some ambiguity, inconsistency, or deficiency,' such that it creates a 'reasonable likelihood' the jury misapplied the law and relieved the government of its burden of proving each element beyond a reasonable doubt, the resulting criminal conviction violates the defendant's Constitutional right to due process." (quoting *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009))).

In reviewing challenged jury instructions, "the only question for [a federal habeas court] is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("It must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some constitutional right." (cleaned up)). Moreover, "the instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quotation marks omitted). Specifically, the court must inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

In *Sandstrom*, the Supreme Court applied *Winship* to invalidate a jury instruction that stated, "the law presumes that a person intends the ordinary consequences of his voluntary acts." *See* 442 U.S. at 517. The Court found that this instruction violated the defendant's due process rights because a reasonable juror could have interpreted the instruction either as "an irrebuttable

direction by the court to find intent once convinced of the facts triggering the presumption" or

"as a direction to find intent upon proof of the defendant's voluntary actions." *Id.*  Either way,

the instruction had the "conclusive or persuasion-shifting effect" of "relieving the State of the

burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind."  *Id.*

at 519, 521.

Romero contends that the Pennsylvania Supreme Court's approval of the Barbosa

statement jury instruction was contrary to the clearly established law outlined in *Sandstrom*.

(*See* Doc. No. 89 at 213 (citing *Romero II*, 983 A.2d at 380).)  The entirety of the trial court's

jury instruction as to Barbosa's prior statement is as follows:

> Now, you have heard evidence that [Barbosa[54]] made statements on
> earlier occasions that were inconsistent with testimony at trial. You
> *may*, *if you choose*, regard this evidence as proof of anything that
> the witness said in the earlier statement. You may also consider this
> evidence to help you judge the credibility and weight of the
> testimony given by the witness at this trial. When you judge the
> credibility and weight of testimony, you are deciding whether you
> believe the testimony and how important you think it is.

N.T. Mar. 19, 1996, at 166:14–25 (emphasis added).  Romero argues that "by inviting the jurors

to consider Mr. Barbosa's prior statement as *proof* of Mr. Romero's guilt, the court put its thumb

on the scale in favor of the Commonwealth and lessened the Commonwealth's burden of proof,

thereby invading the fact-finding function which in a criminal case the law assigns solely to the

jury." (Doc. No. 89 at 213 (emphasis in original).)  Moreover, because the Pennsylvania

Supreme Court concluded on Romero's direct appeal that it was error for the trial court to admit

Barbosa's prior statement,[55] Romero argues that the Pennsylvania Supreme Court's approval, on

---

[54] The Court also instructed the jury on how to consider Moreno's prior inconsistent statements in this instruction.

[55] As noted previously, although the state court found the introduction of Barbosa's prior statement erroneous, it also found that error harmless, such that Romero's conviction stood.  *See supra*

PCRA appeal, of the "the trial court's instruction inviting and allowing the jury to consider the prior statement as substantive evidence was erroneous." (*Id.* at 202.)

The Court disagrees with Romero that the Pennsylvania Supreme Court's decision in his PCRA appeal was contrary to *Sandstrom*. The key language in the instruction, as emphasized above and as relied upon by the Pennsylvania Supreme Court, is the trial court's clarification that the contents of Barbosa's statement *may* be considered as proof of Romero's involvement in the crime at the discretion of the jury. Indeed, a comprehensive review of this instruction reveals that the trial court did not direct the jury to automatically accept Barbosa's statement as presumptive evidence of Romero's guilt—in fact, the trial court did the very opposite.

For this reason, *Sandstrom* is not applicable; the instruction given in Romero's trial allowed for the jury to make a permissive inference, whereas *Sandstrom* addresses "the situation where a jury was presented with a *mandatory* presumption concerning criminal liability." *Johnson v. Folino*, 735 F. Supp. 2d 225, 235 (E.D. Pa. 2010) (emphasis added); *Wallace v. Garman*, No. 18-CV-03509-NIQA, 2020 WL 13120589, at *13 n.5 (E.D. Pa. Oct. 2, 2020), *report and recommendation adopted in part*, No. CV 18-3509, 2022 WL 866679 (E.D. Pa. Mar. 23, 2022), *aff'd sub nom.*, *Wallace v. Superintendent Rockview SCI*, No. 22-1737, 2023 WL 3773671 (3d Cir. June 2, 2023) ("In *Sandstrom*, the Court held that a *conclusive evidentiary presumption* removed the government's burden of proof on an essential element, which was a denial of due process, while a presumption that shifted the burden of persuasion to the defendant also denied due process." (emphasis added)).

In *Francis v. Franklin*, decided after *Sandstrom*, the United States Supreme Court explained the difference between a mandatory presumption and a permissive inference: "A

---

Part III.C.1.

mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts [and a] permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion."  471 U.S. at 314.  "A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved."  *Id.*  The Court further clarified that "[permissive] inferences do not necessarily implicate the concerns of *Sandstrom*" and that "a permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury."  *Id.* at 314–15; *cf. Gray v. Delbiaso*, No. CV 14-4902, 2017 WL 2834361, at *7 (E.D. Pa. June 30, 2017) ("Mandatory presumptions typically violate due process because they relieve the Commonwealth of its burden of persuasion on an essential element of an offense.").

Here, the trial court invited, but did not require, the jury to consider Barbosa's statement as evidence of Romero's guilt.  *See* N.T. Mar. 19, 1996, at 166:17–20 ("You may, if you choose, regard this evidence as proof of anything that the witness said in the earlier statement.").  This is not the same scenario encountered by the Supreme Court in *Sandstrom*.  *See* 442 U.S. at 515 ("[The jurors] were not told that they had a choice, or that they might infer that conclusion; they were told only that the law presumed it.  It is clear that a reasonable juror could easily have viewed such an instruction as mandatory.").  And Romero makes no argument that the trial court's permissive instruction to the jury—that the jury could infer his guilt from Barbosa's statement—was "one that reason and common sense" could not justify in light of the presented evidence.[56]  Accordingly, the Court does not accept the argument that the Pennsylvania Supreme

_____

[56] Nevertheless, as this Court previously explained, *see supra* Part III.C.b., the instruction did increase the likely harm resulting from the erroneous admission of Barbosa's statement to Captain

Court's reasoning as to this specific instruction was contrary to clearly established federal law.[57] We defer to the state court's ruling on this issue and deny habeas relief under this portion of Claim 13.

### 2.    <u>Vicarious Liability Instructions</u>

Next, Romero challenges the vicarious liability instructions, arguing that the instructions on accomplice and coconspirator liability impermissibly allowed the jury to convict Romero of first degree murder without finding that he had the specific intent to kill.  (Doc. No. 89 at 204.) Romero argues that the Pennsylvania Supreme Court only addressed Romero's *state law* instructional challenge on this issue and never reached the federal due process claim, such that there are no state law conclusions to which this Court can defer.  *See* Draft N.T. Sept. 11, 2023, at 3:9–4:3.  In the alternative, he argues that if we view the state court's ruling as addressing Romero's federal claim, that ruling is contrary to clearly established federal law, and thus, not entitled to deference under § 2254(d)(1).  *Id.* at 4:20–5:23.  The Court addresses each issue in turn.

### a.    *Ruling on the Merits*

To determine whether the Pennsylvania Supreme Court ruled on the merits of Romero's federal due process claim, the Court must first analyze whether Romero fairly presented the instructional claim as one resting in federal constitutional law.  If he did, the Court then looks to the Pennsylvania Supreme Court's opinion to determine whether and to what extent that court reached conclusions on that claim.  This, in turn, requires some discussion about the divergence

---

Bucarey.

[57] Because the Court finds no error here, it need not address Romero's arguments as to ineffective assistance of trial or appellate counsel as to this specific jury instruction.  *See Werts*, 228 F.3d at 203 ("Counsel cannot be deemed ineffective for failing to raise a meritless claim.").

in state and federal law on Pennsylvania's standard vicarious liability instructions when those are given at the trial of a defendant charged with first degree murder and other crimes committed as part of a multi-defendant, multi-object conspiracy.

i.  <u>Fair Presentation</u>

Initially, the Court has no problem finding that Romero fairly presented a federal due process violation as the basis for his instructional claim and his claims of trial and appellate counsel ineffectiveness.  "To be 'fairly presented,' the federal claim must be the substantial equivalent of that presented to the state courts," meaning "that *both* the legal theory and the facts on which a federal clam rests must have been presented to the state courts."  *Landano v. Rafferty*, 897 F.2d 661, 669 (3d Cir. 1990).

In his PCRA petition, Romero argued that the trial court's "instructions on accomplice and co-conspirator liability violated due process because they relieved the prosecution of its burden of proving that [Romero] possessed the specific intent to kill, which is one of the elements of the offense of first degree murder."  (Doc. No. 112-4 at 11; *see also id.* at 12 (ending this section of his petition by arguing that the instructional errors "violated Petitioner's Sixth and Fourteenth Amendment rights").)  Romero also argued in his petition that "[t]o the extent that prior counsel failed to investigate, make proper objections and arguments, raise and/or properly litigate the issues discussed in this Petition, they were ineffective, in violation of the Sixth and Fourteenth Amendments."  (*Id.* at 54–55.)  The PCRA court rejected Romero's instructional argument, finding "the charge, when taken in context and as a whole, properly instructed the jury on accomplice liability as well as conspiracy."  PCRA Opinion at 20 (Sept. 15, 2000) (citing only *Commonwealth v. Person*, 498 A.2d 432, 434 (1985)).)

Romero appealed this decision to the Pennsylvania Supreme Court; in his notice of errors complained of on appeal, Romero argued that the PCRA court "unconstitutionally den[ied] all of

112

Petitioner's claims, each of which describes violations of his rights under the . . . United States

Constitution and the corresponding provisions of the Pennsylvania Constitution," framing the

relevant questions as:

> Did the jury instructions unconstitutionally relieve the Commonwealth of its burden of proving every element of each offense beyond a reasonable doubt? Was trial counsel ineffective for failing to object to these erroneous instructions? Was appellate counsel ineffective for failing to raise and litigate this issue on direct appeal?

(Doc. No. 112-6 at 86.)

Romero's opening brief to the Pennsylvania Supreme Court similarly argued that his

"rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution

and the corresponding provisions of the Pennsylvania Constitution were violated" because the

jury instructions "relieved the Commonwealth of its burden of proving every element of each

offense beyond a reasonable doubt" and both trial counsel and appellate counsel were ineffective

for failing to raise and litigate this issue.  (Doc. No. 89-2 at 47–48.)  Within this broader

argument, Romero identified three specific instructional errors, one of which is the vicarious

liability instructions that he references here.  (*Id.* at 48.)  Specifically, Romero argued that the

"accomplice and co-conspirator liability instructions relieved the prosecution of its burden of

proving that [he]—and not just his alleged co-conspirators—possessed the specific intent to kill."

(*Id.* (citing *Smith v. Horn*, 120 F.3d 400, 410 (3d Cir. 1997) and *Sandstrom*, 442 U.S. at 523).)

Given this discussion, which includes reference to the Due Process Clause of the United

States Constitution and citation to authority discussing that Clause, we find the federal claim was

fairly presented to the Pennsylvania courts.  *See, e.g.*, *Evans v. Ct. of Comm. Pl.*, 959 F.2d 1227,

1232 (3d Cir. 1992) (finding instructive the Second Circuit's ruling that a petitioner fairly

presents to the state courts the constitutional nature of his claim when he, among other things,

113

"reli[es] on pertinent federal cases employing constitutional analysis"); *Fuller v. Wetzel*, Civil

Action 18-cv-05328-GAM, 2021 WL 2004114, at *5 (E.D. Pa. Apr. 26, 2021) (finding the

petitioner fairly presented identical issue because "[o]n PCRA appeal Mr. Fuller cited to a Third

Circuit case, *Laird*, that dealt with the instructional error as a due process problem[,] . . .

discussed *Laird*[,] and made it clear that he was preserving a federal constitutional due process

argument for federal habeas review").

     Because Romero fairly presented the federal due process claim, we must now consider

whether and to what extent the Pennsylvania Supreme Court decided that claim on the merits

when it reviewed Romero's overarching argument that appellate counsel was ineffective for

failing to raise the issue of trial counsel's ineffectiveness, who in turn failed to object to the

vicarious liability instructions.  Before turning to the Pennsylvania Supreme Court's opinion,

however, it is helpful to understand how federal and state courts have ruled on this question in

the past.

     ii.    <u>Review of Authority</u>

     As stated previously, the Due Process Clause of the United States Constitution "protects

the accused against conviction except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. at 364.

"Under Pennsylvania law, first degree murder requires the specific intent to kill," and that *mens*

*rea* is required even when the defendant did not actually commit the killing and is being charged

as an accomplice or co-conspirator.  *Laird*, 414 F.3d at 425  (citing 18 Pa. Stat. & Cons. Stat.

§ 2502(a)); *see also Smith*, 120 F.3d at 411 ("[S]pecific intent to commit a killing, not simply

intent to commit some other crime from which a killing results, is a prerequisite to a conviction

for first-degree murder in Pennsylvania."); *Baker v. Horn*, 383 F. Supp. 2d 720, 763 (E.D. Pa.

2005) ("[I]n the case of first degree murder, where intentionally causing the death of another

human being is an element of the offense, a person may be guilty as an accomplice only if he or she shared with the primary actor the intent to cause the result of death.").  This *mens rea* requirement differs from the general rule on vicarious liability that "each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy." *Bronshtein*, 404 F.3d at 710; *accord Commonwealth v. Simpson*, 754 A.2d 1264, 1274 (Pa. 2000) ("[U]nder general principles of conspiratorial liability a defendant can be held criminally responsible for the entirety of the acts of his co-conspirators performed in furtherance of the conspiracy, regardless of whether the defendant intended that certain acts be undertaken."); *cf. Simpson v. Wetzel*, 485 F. Supp. 3d 545, 560 (E.D. Pa. 2020) (recognizing related rule that a defendant can be convicted of a crime as an accomplice or coconspirator so long as "one of his or her co-conspirators possessed the requisite *mens rea*" for the underlying crime).  Indeed, the Pennsylvania Supreme Court has recognized the "patent incongruity between conspiratorial liability, where a defendant can be held criminally responsible for acts he or she did not specifically intend to take place, and first-degree murder, where a defendant must maintain the specific intent to kill." *Simpson*, 754 A.2d at 274 (citing *Commonwealth v. Wayne*, 720 A.2d 456 (1998)).

Despite the discrepancy between first degree murder's specific intent requirement and the general rules on vicarious liability, many Pennsylvania courts give only the standard definition of each concept in their jury instructions without clarifying that a defendant must have the specific intent to kill to be guilty of first degree murder even when his conviction is premised on accomplice or coconspirator liability.  *See Simpson*, 485 F. Supp. 3d at 560.  "When the instructions are ambiguous on this point, the vagueness can potentially relieve the Commonwealth of its burden of proving an element of first-degree murder, to wit, the specific

intent to kill, beyond a reasonable doubt." *Id.*  The discrepancy is most troublesome in the context of a multi-defendant, multi-object conspiracy, where an ambiguous instruction may allow a jury to convict a defendant of first degree murder based solely on a finding that he intended to be an accomplice to an underlying crime, such as robbery, during which the killing occurred.

As to this issue, the Third Circuit has counseled that "accomplice and co-conspirator liability instructions in a case charging both first degree murder and a multiple object conspiracy violate[ ] due process" when ambiguity in the instructions makes it "reasonabl[y] likel[y] that the jury understood the charge as imposing upon the Commonwealth no burden of proving" the defendant had a specific intent to kill "to convict [the defendant] of first-degree murder."  *Smith*, 120 F.3d at 413–14; *see also Bronshtein*, 404 F.3d at 710; *Laird*, 414 F.3d at 427.  To determine whether jury instructions are unconstitutionally ambiguous, the Third Circuit focuses "initially on the language that is claimed to be erroneous," and then "view[s] this portion of the instructions 'in the context of the charge as a whole.'"  *Bronshtein*, 404 F.3d at 710 (quoting *Smith*, 120 F.3d at 411).  Within this framework, a reviewing court considers "whether there is a *reasonable likelihood* that the jury has applied the challenged instructions in a way that violates the Constitution."  *Laird*, 414 F.3d at 425–26 (quoting *Smith*, 120 F.3d at 411).

Contrary to the Third Circuit's holdings in *Smith*, *Bronshtein*, and *Laird*, when reviewing this alleged error on appeal, the Pennsylvania Supreme Court considers only whether, "when read as a whole," the jury instructions "properly defined" "specific intent for first-degree murder . . . somewhere in the instructions and conspiracy or accomplice liability . . . elsewhere," even if the ambiguity between the instructions is never clarified.  *Simpson*, 485 F. Supp. 3d at 565 (collecting cases); *accord Bowers*, 2016 WL 9306253, at *24 (citing *Thompson* for the rule

116

that "the specific intent requirement for first degree murder need not be reiterated in the accomplice liability instruction, if the 'specific intent' language was included somewhere else in the instruction"); *see also Commonwealth v. Bennett*, 57 A.3d 1185, 1199 (Pa. 2012) (looking to the "entire jury charge" and finding the jury was given the "clear direction . . . that it must find that each individual defendant had the specific intent to kill before that defendant could be convicted of first-degree murder"); *Commonwealth v. Speight*, 854 A.2d 450, 460 (Pa. 2004) ("The trial court charged the jury on accomplice and co-conspirator liability with jury instructions, taken verbatim, from . . . the Pennsylvania Suggested Standard Criminal Jury Instructions . . . . Read as a whole, the charge given sufficiently instructed the jury regarding the requirement that an individual must have specific intent to kill in order to be found guilty of first degree murder as an accomplice."); *Commonwealth v. Simpson*, 754 A.2d at 1275("After the trial court gave its instructions as to first-degree murder, the trial court then charged the jury pertaining to accomplice and conspiratorial liability.  When examined as a whole, the jury instructions given in the present case coherently and unambiguously informed the jury that the Commonwealth needed to prove beyond a reasonable doubt that Appellant maintained the individual specific intent to kill the victim to support a finding of first-degree murder."); *Commonwealth v. Thompson*, 674 A.2d 217, 223 (Pa. 1996) (finding charge sufficient where the standard instruction on accomplice liability was "preceded by the definitions of the different degrees of murder and the definition of specific intent which is required to find a person guilty of first degree murder"); *Commonwealth v. Chester*, 587 A.2d 1367, 1384–85 (Pa. 1991) ("This instruction mirrors the language of the statute defining accomplice liability.  Moreover, the trial court, when explaining the requirements for first degree murder instructed the jury that specific intent to kill must be found.  Clearly the jury was guided as to the mental state required for

accomplice liability. An objection to the instructions would not have been justified; therefore, trial counsel was not ineffective for failing to make one.").

In short, the Third Circuit and Pennsylvania "standards are linguistically and materially different, and they have consistently resulted in different outcomes when applied to identical jury instructions." *Bowers*, 2016 WL 9306253, at *31; *see also Bennett*, 886 F.3d at 286 n.17 ("In contrast [to Third Circuit cases], Pennsylvania state law construes the instructions 'as a whole' in a particular way—one highly permissive of instructional errors regarding the specific intent to kill of conspirators or accomplices. Its permissive approach is this: under the state standard, the instructions as a whole survive review, so long as an erroneous charge on the specific intent to kill is paired with standard definitions—such as the standard definitions of accomplice liability and conspiracy. Put more critically, state law relies on the inclusion of standard definitions to obviate the grant of relief on misleading instructions regarding the specific intent to kill. State law thus rejects the argument that the inclusion of standard definitions only creates inconsistency and does not cure the error. The problem is that, even with standard definitions, the instructions as a whole could lead a jury to believe that an accomplice or conspirator to a lesser crime is guilty of first degree murder despite having no specific intent to kill.").[58]

With this split of authority in mind, we take a closer look at the Pennsylvania Supreme Court's ruling on the alleged instructional error in this case.

---

[58] Other judges in this District have provided an exhaustive discussion of the split between the Third Circuit and the Pennsylvania Supreme Court. *See, e.g.*, *Simpson*, 485 F. Supp. 3d at 560–70; *Bowers v. Wenerowicz*, Civil Action No. 13-05550, 2016 WL 9306253, at *22–30 (E.D. Pa. Sept. 30, 2016), *report and recommendation adopted*, 2017 WL 2981226, at *1 (E.D. Pa. July 12, 2017). Although we do not parrot their discussion here, we find it persuasive and reject the Commonwealth's suggestion, *see* Draft N.T. Sept. 11, 2023 at 11:6–8, that the State and federal standards are the same in this context. *See Bowers*, 2016 WL 9306253, at *31 ("[T]he state law standard by which the adequacy of the jury instructions was measured diverges from the federal Due Process standard applied by the Third Circuit. . . ."); *Fuller*, 2021 WL 2004114, at *6 ("The state instructional analysis and due process analysis are not the same, as the state courts and the Third Circuit have repeatedly recognized.") (collecting cases).

iii.        Ruling on the Merits

In analyzing Romero's appellate counsel ineffectiveness claim, the Pennsylvania

Supreme Court considered the appropriateness of the vicarious liability instruction.  The court

began this section of its opinion by citing *Commonwealth v. Gibson* for the general proposition

that a "trial court has broad discretion in phrasing its instructions to the jury and can choose its

own wording so long as the law is clearly, adequately and accurately presented to the jury for

consideration." *Romero II*, 938 A.2d at 380 (quoting 720 A.2d 473, 481 (Pa. 1998)).  The court

then noted that when reviewing a challenge to jury instructions, it "must consider the entire

charge as a whole, not merely isolated fragments, in order to ascertain whether the instruction

fairly conveys the legal principles at issue." *Id.* (quoting *Gibson*, 720 A.2d at 481).  After this

discussion, the court rejected each of Romero's arguments on the vicarious liability instructions:

> Appellant's claim that the conspirator and accomplice liability
> instructions negated the requirement the Commonwealth prove he
> possessed specific intent to kill is also meritless. A review of the
> instructions in their entirety reveals the court told the jury "each
> defendant is entitled to have the question of his guilt determined
> individually and on the basis of the evidence that is admissible
> against him" and "the defendant is not guilty unless he and the others
> had an agreement or a common understanding *and shared the*
> *intention* to commit these crimes." N.T. Trial, 3/19/96, at 191, 192
> (emphasis added). The court stated, "a defendant is an accomplice
> if *with the intent* of promotion or facilitating commission of the
> crime he solicits, commands, encourages or requests the other
> person to commit or aides, agrees to aide, or attempts to aide the
> other person in planning or committing it." *Id.* at 184–85 (emphasis
> added). Thus, the instruction properly reflected the element of
> specific intent the Commonwealth had to prove.

*Id.*  The state court cites neither state nor federal law in support of its conclusion.  Nevertheless,

Romero argues that its ruling is limited to a determination under state law and does not reach the

merits of his federal due process claim.  *See* Draft N.T. Sept. 11, 2023, at 3:16–4:18.  The

Commonwealth disagrees. *Id.* at 9:15–10:9.[59]  Although the lack of citation to any relevant authority makes it difficult to determine the scope of the state court's ruling, the substance of its analysis shows that the Pennsylvania Supreme Court considered the appropriateness of the instruction only under the state standard.

First, the court's only citation is to state law, and it relies on the general principle that it should "consider the entire charge as a whole" and determine whether the instruction properly defined the relevant legal concepts—a principle that governs each of the state court cases, but not the federal cases, cited in the previous section.  *See, e.g.*, *Thompson*, 674 A.2d at 219; *Chester*, 587 A.2d 1367, 1384–85.  Second, the state court's analysis appears to be a straightforward application of that general principle.  The court looked to the trial court's instruction on criminal conspiracy—a separate count which was not challenged—and found that because shared intent was referenced in connection with that count, the trial court properly instructed the jury on the intent required to find Romero an accomplice[60] to first degree murder.  *Romero II*, 938 A.2d at 380 (quoting N.T. Mar. 19, 1996, at 184–85, 191–92).  Finally, the Court finds it telling that nowhere in the state court's opinion did the court discuss due process, analyze the potential ambiguity between the first degree murder charge and the vicarious liability instructions, or

---

[59] The state court's opinion included a header above its discussion on the alleged instructional errors.  That header reads: "Whether the jury instructions unconstitutionally relieved the Commonwealth of its burden of proving every element of each offense beyond a reasonable doubt."  *Romero II*, 938 A.2d at 379.  The Commonwealth argues that the use of the term "unconstitutional[ ]" makes it "entirely clear" that the Pennsylvania Supreme Court was considering and ruling on the federal due process claim.  Draft N.T. Sept. 11, 2023, at 9:15–10:9.  This Court is not convinced.  For one, the header appears to mimic the phrasing used by Romero in his notice of errors complained of on appeal, as opposed to signaling a conclusion by the state court.  (*See* Doc. No. 112-6 at 86.)  Second, Romero's brief to the state court stated that he was bringing multiple instructional errors, each of which allegedly violated the United States and *Pennsylvania* Constitutions.  (*See* Doc. No. 89-2 at 47–48.)  Accordingly, we do not find dispositive the court's stray use of the term "unconstitutional" in a section header.

[60] The state court did not discuss the coconspirator liability instruction.

mention the federal and state cases that discuss that issue.[61]  *See Simpson*, 485 F.3d at 577 ("The

Court similarly determines here that the [state court] failed to address the federal due process

claim on the merits.  On balance, the state court relied only on state case law and state law

principles . . . ."); *Fuller*, 2021 WL 2004114, at *6 (finding the state court did not rule on the

merits of the federal due process claim where it cited only Pennsylvania cases, determined the

instruction was erroneous, but not prejudicial, under state law, and failed to "mention or discuss

a due process problem with the instructions" despite the fact that the "state instructional analysis

and due process analysis are not the same"); *Bowers*, 2016 WL 9306253, at *21 ("Despite a

federal due process argument expressly having been raised, it was not directly addressed by

either the PCRA court or the Superior Court on PCRA appeal.  No mention is made, nor analysis

given, of the two Third Circuit Court of Appeals opinions on this subject, published prior to the

PCRA appeal, which grappled with similar jury instructions, and found that they violate the due

process clause of the Fourteenth Amendment.").  For those reasons, the Court finds that the

Pennsylvania Supreme Court did not explicitly rule on the merits of the federal due process

question.  *See Fuller*, 2021 WL 2004114, at *6; *Bowers*, 2016 WL 9306253, at *33.

       That does not end the inquiry, however, because when the state court's opinion fails to

discuss a federal claim that was fairly presented, this Court must generally presume that the

claim was nevertheless considered and denied on the merits.  *See Johnson v. Williams*, 568 U.S.

289, 293 (2013) ("[W]hen a state court issues an order that summarily rejects without discussion

*all* the claims raised by a defendant, including a federal claim that the defendant subsequently

---

[61] The Commonwealth argues this fact is immaterial because a state court is not required to cite
federal case law when ruling on federal issues.  *See* Draft N.T. Sept. 11, 2023, at 10:2–6.  That is true, but
nevertheless, the lack of any citation to or discussion of federal cases certainly suggests the state court
may not have reached the federal question.

presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits.  We see no reason why this same rule should not apply when the state court addresses some of the claims raised by a defendant but not a claim that is later raised in a federal habeas proceeding.").

This presumption is based on three general observations.  First, "there are circumstances in which a line of state precedent is viewed as fully incorporating a related federal constitutional right."  *Id.* at 298–99.  "In this situation, a state appellate court may regard its discussion of state precedent as sufficient to cover a claim based on the related federal right."  *Id.* at 299.  Second, when a petitioner makes only "fleeting reference to a provision of the Federal Constitution or federal precedent," the state court may view that as insufficient to raise a separate federal claim that it needs to address.  *Id.*  Third, "there are instances in which a state court may simply regard a claim as too insubstantial to merit discussion."  *Id.*  For those reasons, the Court in *Williams* found it is "by no means uncommon for a state court to fail to address separately a federal claim that the court has not simply overlooked."  *Id.* at 301.

The presumption that a state court has considered and rejected a federal claim is not, however, absolute, and a petitioner may argue that it has been rebutted in their case.  *Id.* at 301. For example, although it is reasonable to presume that a federal claim was adjudicated on the merits when the state court analyzed the claim under a state standard that is as protective as the federal standard, such a presumption may be unreasonable if "the state standard is *less* protective" or "quite different" from the federal standard.  *Id.* at 302.  Romero argues that is the case here.  *See* Draft N.T. Sept. 11, 2023, at 3:16–4:3.  The Court agrees.

Although "the state and federal standards for evaluating ineffectiveness of counsel are the same, the state standard for evaluating jury instructions, which is the issue imbedded in the

ineffectiveness claim here, is '*less* protective' than the federal due process standard." *Fuller*,
2021 WL 2004114, at *6; *Bowers*, 2016 WL 9306253, at *34 (same); *see also Simpson*, 485 F.
Supp. 3d at 560 ("Jury instructions in cases involving first-degree murder and a conspiracy or
accomplice liability can meet Pennsylvania state standards but fail to meet federal due process
standards."); *cf. Commonwealth v. Sepulveda*, 55 A.3d 1108, 1158 (Pa. 2012) (Saylor, C.J.,
concurring) ("I recognize that, as a matter of state law, . . . instructions such as those given in this
case are now deemed by [the Pennsylvania Supreme Court] to be entirely proper ones.  The
difficulty, however, is that the Third Circuit Court of Appeals appears to take an entirely
different view as a matter of federal due process law.").  And neither of the remaining
justifications for the *Williams* presumption are present in this case.  Romero's brief to the
Pennsylvania Supreme Court included a thorough discussion of the federal claim and federal
case law (*see* Doc. No. 89-2 at 47–49), and there is no reason to presume the Pennsylvania
Supreme Court viewed the due process "claim as too insubstantial to merit discussion" given the
significant discussion given by that court to this issue in past cases.  *See Bowers*, 2016 WL
9306253, at *35 ("[I]t is difficult to credit the idea that the state courts would view the
ineffectiveness argument, based on the failure to raise a federal due process violation, as 'too
insubstantial to merit discussion,' in light of the time and attention spent describing and
considering the difference between the state and federal standards.") (collecting cases); *accord*
*Fuller*, 2021 WL 2004114, at *6.

        In short, the record leads to only one conclusion:  the federal due process issue was
overlooked.  *See Bowers*, 2016 WL 9306253, at *35.  Accordingly, Romero is entitled "to an
unencumbered opportunity to make his case before a federal judge," and the Court considers de
novo his claims that the vicarious liability instructions violated his federal due process rights and

that trial and appellate counsel were ineffective for failing to properly raise and litigate that issue. *Johnson*, 568 U.S. at 303 ("When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge."); *Fuller*, 2021 WL 2004114, at *5 ("I find that Mr. Fuller fairly presented the issue in the PCRA proceeding, and the state courts did not address the issue: they did not make a determination on the merits of the precise *Strickland* claim raised on habeas. This means I must review the issue *de novo*.").

> b.     *Alleged Contrary to or Unreasonable Application of Federal Law*

In the alternative, Romero is entitled to de novo review even if the Court viewed the Pennsylvania Supreme Court's ruling as an adjudication on the merits of Romero's federal due process claim because it was contrary to and an unreasonable application of Supreme Court precedent.

Romero contends that the Pennsylvania Supreme Court's decision is "contrary to" or an "unreasonable application of" the Supreme Court's holdings in *Winship*, *Sandstrom*, and *Franklin.* In *Winship*, the Court "explicitly h[e]ld that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. *Sandstrom* and *Franklin* reiterated *Winship*'s holding and outlined how a court should analyze a challenged jury instruction. First, in *Sandstrom*, the Supreme Court explained that "whether a defendant has been accorded his constitutional rights depends on the way in which a reasonable juror could have interpreted the [challenged] instruction." 442 U.S. at 514; *id.* at 519, 523; *see also Franklin*, 471 U.S. at 326 ("*Sandstrom v. Montana* made clear that the Due Process Clause of the Fourteenth Amendment prohibits the State from making use of jury instructions that have the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question

of intent in a criminal prosecution.").  And a few years later, in *Franklin*, the Court explained that a court's analysis "must focus initially on the specific language challenged," and if "a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole."  471 U.S. at 315; *id.* at 315–16, 319.  "Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity" because the "reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching the verdict."  *Id.* at 322.

To determine whether the Pennsylvania Supreme Court's ruling is contrary to or an unreasonable application of *Winship*, *Sandstrom*, and *Francis*, we must first "determine what arguments or theories supported or could have supported, the state court's decision." *Harrington*, 562 U.S. at 102.  As stated previously, the Pennsylvania Supreme Court did not explicitly state whether it was relying on federal or state precedent when it rejected Romero's claim of instructional error.  *Romero II*, 938 A.2d at 306–07.  However, closer inspection of the court's analysis suggests it was applying the rule of law outlined in *Thompson* and its progeny, i.e., when analyzing whether a vicarious liability jury instruction impermissibly obfuscates the government's burden to prove specific intent for first degree murder, the court considered the "entire jury charge" to determine whether the jury was, at any point, properly instructed on specific intent.  *See, e.g.*, *Bennett*, 57 A.3d at 1199; *Thompson*, 674 A.2d at 223.  Notably, the Pennsylvania Supreme Court's analysis in this case made *no* mention of the coconspirator liability instruction, having found that specific intent was properly mentioned in a different portion of the instructions.  *See Romero II*, 938 A.2d at 380.

With that understanding in mind, we must determine whether the state Court "appli[ed] a rule that contradicts the governing law set forth' in Supreme Court precedent.'" *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013) (quoting *Williams*, 529 U.S. at 405–06 ); *see also Hameen*, 212 F.3d at 235 (explaining that a state court decision is "contrary to" clearly established law only if "the state court arrive[s] at a conclusion opposite to that reached by the Supreme Court on a question of law . . . . (cleaned up)).  Here, the state rule—that a legally correct definition *somewhere* in the instructions is sufficient on its own—is contrary to the holding in *Francis*—that language, which "merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity."  And because the state rule may validate an instruction that relieves the government of its burden of proving an element of first degree murder beyond a reasonable doubt, it is contrary to the Supreme Court's holding in *Winship*.  *See Polk v. Sandoval*, 503 F.3d 903, 911 (9th Cir. 2007), *overruled in part on other grounds by*, *Babb v. Lozowsky*, 719 F.3d 1019, 1028–30 (9th Cir. 2013) ("The state court failed to analyze its own observations from *Byford* under the proper lens of *Sandstrom*, *Franklin*, and *Winship*, and thus ignored the law the Supreme Court clearly established in those decisions—that an instruction omitting an element of a crime and relieving the state of its burden of proof violates the federal Constitution.  Since the Nevada Supreme Court failed to apply the correct controlling authority, its decision was contrary to clearly established federal law, as determined by the Supreme Court." (cleaned up)); *Evanchyk v. Stewart*, 340 F.3d 933, 940 (9th Cir. 2003) ("Th[e state court's] reasoning, which would affirm a conviction so long as there is substantial evidence to support a conviction on the valid legal theory, is without question contrary to clearly established federal law holding that an instruction omitting an essential element is a constitutional violation.").

For similar reasons, even if we presume that the state court relied on *Winship*, *Sandstrom*, and *Francis* as the governing legal principles, it unreasonably applied the holdings of those cases to the issue before it.  "A state court decision is 'an unreasonable application of' clearly established federal law if it 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  *Williams,* 529 U.S. at 407.  Here, the Pennsylvania Supreme Court failed to consider the specific language of the challenged coconspirator instruction, failed to analyze its effect on a reasonable jury, and failed to recognize that a contradictory instruction does not, on its own, cure a deficiency.  Accordingly, even if the Pennsylvania Supreme Court implicitly recognized the relevant legal principles, it "disregarded those principles or applied those principles unreasonably to the jury instruction at hand." *Robertson v. Cain*, 324 F.3d 297, 303–04 (5th Cir. 2003) ("In its habeas decision upholding Robertson's erroneous jury instruction, the Louisiana Fourth Circuit Court of Appeal did not refer to the Supreme Court's decisions in *Sandstrom* or to this court's decision in *Flowers v. Blackburn*, but, because Robertson specifically relied on these decisions in his first petition for state habeas relief, we assume that the state court was aware of these decisions.  However, even if we assume that the state court 'identified' the correct constitutional principles governing this case, we must conclude that the Louisiana Fourth Circuit either disregarded those principles or applied those principles unreasonably to the jury instruction at hand.  The holding of the Louisiana Fourth Circuit—that 'the jury instruction on the law of principals was sufficient for the jury to conclude that the relator had the requisite specific intent'—cannot be squared with the constitutional principles articulated in *Winship* or *Sandstrom* . . . . The Louisiana Fourth Circuit should have recognized that the jury instruction allowed the jury to convict Robertson of first degree murder based on much less than what was required by Louisiana law and, therefore,

violated the Due Process Clause of the Fourteenth Amendment. The [Louisiana] Fourth

Circuit's failure to recognize this constitutional failing makes its decision contrary to

*Sandstrom*."); *Simpson*, 485 F. Supp. 3d at 581 n.15 ("Federal law clearly holds that each

element of a crime must be proven beyond a reasonable doubt. And it is a violation of federal

law if jury instructions relieve this burden of proof. Such is the case, indelibly when a defendant

is charged with the serious offense of first-degree murder. Because the state supreme court

determined that *Huffman* did not apply to Mr. Simpson's claim, and perhaps, in essence,

determined that federal due process was not violated, it unreasonably applied clearly established

federal law that to convict Mr. Simpson as a conspirator or accomplice, the Commonwealth must

have proven beyond a reasonable doubt that he possessed the requisite specific intent to kill."

(internal citations omitted)).

　　　　Accordingly, even if the state court's ruling was meant to encompass a denial of the

federal due process claim, that ruling is not entitled to deference because it is contrary to, or an

unreasonable application of, clearly established federal law. Accordingly, this Court considers

Romero's due process claim de novo.

*c.*　　*De Novo Review*

　　　　Romero argues that the vicarious liability jury instructions violated his federal due

process rights because they allowed the jury to convict him of first degree murder without having

to find that he had the specific intent to kill Bolasky. (*See* Doc. No. 89 at 204.) "A habeas

petitioner is entitled to relief on a direct due process challenge to erroneous jury instructions only

if the petitioner shows: [1] there is a reasonable likelihood that the jury applied the challenged

instruction in a way that violates the Constitution; and [2] the error was not harmless, i.e., it had

a substantial and injurious effect or influence in determining the jury's verdict." *Baker v. Horn*,

383 F. Supp. 2d 720, 760 (E.D. Pa. 2005) (quotation marks and citations omitted). We begin

128

with an overview of the vicarious liability jury instructions before analyzing whether they

resulted in a federal due process violation, and if so, whether that violation was harmless.

i.      <u>The Jury Instructions</u>

After giving multiple preliminary instructions, the trial court instructed the jury on the

specific charges that were being asserted against Lopez and Romero.  N.T. Mar. 19, 1996, at

173.  The court noted that "each Defendant before you is individually on trial" for the "crimes of

Criminal Homicide, Robbery, Theft, Receiving Stolen Property and Criminal Conspiracy. . . .

The same charges ha[ve] been filed against both Defendants.  So when I talk about one charge,

you know that that has been filed against both Defendants."  *Id.* at 173:6–18.  Beginning with the

charge of criminal homicide, the court defined first degree murder, second degree murder, and

third degree murder.  *Id.* at 173:19–174:2.  As relevant here, the court defined first degree

murder as "a murder in which the killer has the specific intent to kill," and it explained that the

jury could find "the defendant guilty of First Degree Murder" if it was "satisfied that the

following three elements had been proven beyond a reasonable doubt":

> First, that David Michael Bolasky is dead.
>
> Second, that the defendant killed him.
>
> And third, that the defendant did so with the specific intent to kill
> and with malice.
>
> A person has the specific intent to kill if he has a fully formed intent
> to kill and is conscious of his own intention.

*Id.* at 175:4–21; *see also id.* at 176:15–177:7 (discussing specific intent to kill).

After defining second and third degree murder, the court defined the crimes of robbery,

aggravated assault, theft, and receiving stolen property.  *Id.* at 177:8–184:7.  At the end of this

discussion, the trial court highlighted "a few more very important point[s] . . . that apply to all of

these crimes that I've just defined for you and reviewed with you."  *Id.* at 184:8–13.  The first

129

was "liability for the conduct of an accomplice":

> You may find the defendant guilty of a crime without finding that
> he personally engaged in the conduct required for commission of
> that crime or even that he was personally present when the crime
> was committed. A defendant is guilty of a crime if he is an
> accomplice of another person who commits that crime. A defendant
> does not become an accomplice merely by being present at the scene
> or knowing about a crime. He is an accomplice if with the intent of
> promotion or facilitating commission of the crime he solicits,
> commands, encourages, or requests the other person to commit it or
> aides, agrees to aide, or attempts to aide the other person in planning
> or committing it. However, a defendant is not an accomplice if,
> before the other person commits the crime, he stops his own efforts
> to promote or facilitate the commission of the crime and wholly
> deprives his previous efforts of effectiveness in the commission of
> the crime.
>
> You may find the defendant guilty of a crime on the theory that he
> was an accomplice as long as you are satisfied beyond a reasonable
> doubt that the crime was committed and that the defendant was an
> accomplice of the person who committed it.

*Id.* at 184:13–185:16.

The court then instructed the jury on liability for the conduct of a co-conspirator:

> Now, also liability for conduct of a co-conspirator.  A defendant
> may, by reason of being a member of a conspiracy, become liable
> for a crime he did not personally commit. He may be found guilty
> under this conspiracy theory in some situations where he could not
> be convicted under an accomplice theory. You may find the
> Defendant guilty of the crime of Criminal Homicide, Robbery, Theft
> or Receiving as a conspirator if you are satisfied beyond a
> reasonable doubt, first, that the Defendant[s] agreed with each other,
> Michael [sic] Moreno and/or George Barbosa, that they or other of
> them would commit the crime of Criminal Homicide, Robbery,
> Theft and/or Receiving Stolen Property. That the Defendant would
> aide them in the committing of these crimes.
>
> Second, that the Defendant so agreed with the intent of promoting
> or facilitating the commission of those crimes.
>
> Third, that while the agreement remained in effect, the crime of
> Criminal Homicide, Robbery, Theft or Receiving was committed by
> one of the co-conspirators.

> And fourth, that the crime of—the crimes, while they may differ from the agreed crimes, w[ere] committed by one of them in furtherance of his and the Defendants' common design.

*Id.* at 185:17–186:20.

Last, the court defined the only remaining charge, which was for the crime of criminal conspiracy to commit criminal homicide, robbery, theft, and/or receiving stolen property. *Id.* at 186:21–192:23. The trial court instructed:

> In order to find the Defendants guilty of Conspiracy to commit these crimes, you must be satisfied that the following three elements have all been proven beyond a reasonable doubt. The point here is, this is a separate criminal charge. I've given you certain instructions on accomplice theory and co-conspirator's theories for the other charges. This is a separate charge. I'm just trying to make that clear to you. So these are the elements for that particular charge of Criminal Conspiracy.
>
> First, that each defendant agreed with the other persons that one or more of them would engage in conduct which constitutes the crime of Criminal Homicide, Robbery, Theft and/or Receiving.
>
> Second, that the defendant and the other persons intended to promote or facilitate the committing of Criminal Homicide, Robbery, Theft and/or Receiving. In other words, they shared the intent to bring about that crime or to make it easier to commit that crime.
>
> And third, that the defendant or the other persons did the acts that are alleged to have been overt acts and did them in furtherance of their conspiracy.
>
> *      *      *
>
> Thus, you may find the defendant guilty of this crime if you are satisfied that he conspired with at least one alleged co-conspirator, at least one—to commit at least one alleged object crime and that he or that person did at least one alleged overt act in furtherance of the conspiracy. You must agree on the same person, the same object crime and the same overt act.

*Id.* at 188:19–190:19; *see also id.* at 192:2–18 (reiterating that "the defendant is not guilty [of criminal conspiracy] unless he and the others had an agreement or a common understanding and

shared the intention to commit these crimes").  The Court repeatedly emphasized that the criminal charge of criminal conspiracy was a "separate criminal charge" with instructions that are distinct from those given in connection with accomplice and coconspirator liability.  *Id.* at 188:23–189:2; *see also id.* at 230:9–12 (reiterating that the criminal charge of criminal conspiracy is a "separate and distinct charge").

During its deliberations, the jury submitted a question to the court, asking the judge to "supply [them] with the definition of Criminal Conspiracy."  N.T. Mar. 19, 1996, at 229:9–14. In response, the trial judge restated the charge of criminal conspiracy and the instructions previously given in connection with that charge.  *Id.* at 230:14–235:23.

After its deliberations, the jury found Romero guilty of criminal homicide—murder in the first degree; robbery; theft; receiving stolen property; and criminal conspiracy to commit criminal homicide, robbery, theft, and stolen property.  Verdict at 1–2; *see also* N.T. Mar. 19, 1996, at 237:8–24.

ii.      Merits Analysis

Romero contends that "the trial court's instructions on accomplice liability and co-conspirator liability violated his right to due process because they never specified that the jury had to find beyond a reasonable doubt that Mr. Romero had specific intent to kill in order to find him culpable as an accomplice or co-conspirator to first-degree murder."  (Doc. No. 89 at 204.) "To show that a jury instruction violates due process, a habeas petitioner must demonstrate both (1) that the instruction contained 'some ambiguity, inconsistency, or deficiency,' and (2) that there was 'a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt."  *Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (quoting *Waddington*, 555 U.S. at 179).  Applying this standard, we consider the accomplice liability instruction and the coconspirator liability

instruction in turn.

***Accomplice Liability Instruction***

Beginning with the accomplice liability instruction, Romero argues that the jurors could have convicted him of first degree murder "based on the idea that he was an accomplice to Mr. Moreno, Mr. Barbosa, and/or Mr. Lopez in the plan to rob Mr. Bolasky (or any of the other charged crimes) even if they were not convinced beyond a reasonable doubt that Mr. Romero intended to kill him."  (Doc. No. 89 at 205 (cleaned up) (citing *Laird*, 414 F.3d at 427 and *Tyson v. Superintendent Houtzdale SCI*, 976 F.3d 382, 393–95 (3d Cir. 2020)).)

After correctly defining first degree murder (and second degree murder, third degree murder, robbery, theft, and receiving stolen property),[62] the trial judge instructed the jury that they could find Romero "guilty of a crime without finding that he personally engaged in the conduct required for commission of *that crime*" if the jury finds "he is an accomplice of another person who commits *that crime*."  N.T. Mar. 19, 1996, at 184:15–22 (emphases added).  The judge then clarified that a defendant is "an accomplice if with the intent of promotion or facilitating commission of *the crime*[,] he solicits, commands, encourages, or requests the other person to commit it or aides, agrees to aide, or attempts to aide the other person in planning or

---

[62] The Commonwealth argues that there was no due process violation because the trial court correctly "defined first degree murder as requiring specific intent to kill."  (Doc. No. 91 at 121.)  But this argument misses the mark.  After correctly defining first degree murder, the trial judge stated that the jury could find Romero "guilty of a crime without finding that he personally engaged in the conduct required for commission of that crime" if the jury finds "he is an accomplice of another person who commits that crime."  N.T. Mar. 19, 1996, at 184:15–22.  This statement suggests the jury could find Romero guilty of first degree murder *solely* on the basis that he was the accomplice of someone else who satisfied the elements of first degree murder.  A correct first degree murder instruction, therefore, does nothing to cure the potential deficiency in the accomplice liability instruction.  *See Bennett*, 886 F.3d at 286 ("Even if the state court's interpretation of the first degree murder charge is correct, the charge as a whole still violated Bennett's due process rights.  The first degree murder charge, at the most, contradicted the erroneous conspiracy and accomplice liability instructions . . . .  Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." (quotation marks omitted)).

committing it."  *Id.* at 184:24–185:4 (emphasis added).

The specification of "*the* crime" or "*that* crime" throughout the instruction distinguishes this instruction from instructions found unconstitutional in similar cases.  For example, in *Laird*, the Third Circuit found unconstitutional the trial court's accomplice liability instruction, which referenced "a crime":

> A person is guilty of *a particular crime* if he is an accomplice of another person who commits *that crime*. . . . He is an accomplice . . . if with the intent of promotion or facilitating commission of *a crime* he solicits, or commands or encourages or requests the other person to commit it or if he aids, agrees to aid, or attempts to aid the other person in planning the crime or committing the crime. . . . You may find the defendant guilty of *a particular crime* on the theory that he was an accomplice so long as you are satisfied beyond a reasonable doubt that *the crime* was committed and *the defendant was an accomplice of the person who committed it*.

414 F.3d at 426–28 (quotation marks omitted) (emphases added).  The critical language here was that the defendant act "with the intent of promotion or facilitating commission of *a* crime."  *Id.* (emphasis added).  The Third Circuit agreed with the defendant that given this instruction, "the jury could easily have convicted Laird of first-degree murder based on his conspiring with [his codefendant] to kidnap or assault [the victim] even if jurors were not convinced beyond a reasonable doubt that Laird intended to kill [the victim]."  *Id.* at 427; *see also Tyson*, 976 F.3d at 393–94 ("The court's instruction on accomplice liability only made it more likely that a reasonable juror would misapprehend the law.  Rather than convey the crucial point that an accomplice must intend to kill to be guilty of first-degree murder, the court's explanation was general and defined an accomplice as one who intends to promote or facilitate 'a crime' . . . .").

Courts in this District have applied *Laird*'s holding to strike down other similarly flawed accomplice liability instructions.  For example, in *Bowers*, the defendant was convicted of first degree murder, robbery, kidnapping, possession of an instrument of crime, and criminal

conspiracy. 2016 WL 9306253, at *1. The trial court gave the following accomplice liability instruction:

> A defendant is guilty of *a crime* if he is an accomplice of another person or persons who commits *these crimes*. . . . He is an accomplice if with the intent of promotion or facilitating commission of *the crime*, he solicits, commands, encourages, or requests the other person to commit it, or aids, agrees to aid or attempts to aid the other person or persons in planning or committing *the crimes*. . . . Now you may find a defendant guilty of crimes on the theory that he was an accomplice as long as you're satisfied beyond a reasonable doubt that *the crime* was committed, that the defendant was an accomplice of the person or persons who committed it.

*Id.* at *15 (quotation marks omitted and emphases added). The district court explained that the "gist of the problem" was that the trial court had "used the phrase 'these crimes' explicitly to refer to *either* robbery *or* murder" in the paragraphs immediately preceding the coconspirator liability instruction. *Id.* at *18. Substituting the phrase "robbery or murder" for the phrase "these crimes," the district court reasoned that a jury "could reasonably have concluded that Bowers was guilty of 'a crime' (murder) because he was an accomplice of Simpson in the commission of 'these crimes' (*murder or robbery*)." *Id.* In other words, the instructions "'did not clarify whether accomplice means accomplice in the killing, accomplice in the robbery, or both. The charge thus blurred the distinction between accomplice in the robbery and accomplice in the killing, leading the jury to believe that an accomplice for one purpose is an accomplice for both.'" *Id.* at *30 (quoting *Smith*, 120 F.3d at 412); *see also Simpson*, 485 F. Supp. 3d at 578 (taking issue with the trial court's reference to "'these crimes' . . . without differentiating between the various charges lodged against [the defendant]" and finding that the instruction violated the defendant's "federal due process rights because it was reasonably likely that the ambiguous vicarious liability instructions permitted a jury to convict [the defendant] of first degree murder as an "accomplice of a different crime").

135

Although the instructions here are nearly identical to those reviewed in *Laird*, *Tyson*, *Bowers*, and *Simpson*, they differ in two minor, but critical, respects from the instructions found unconstitutional in those cases. First, unlike the instructions reviewed in *Bowers* and *Simpson*, here the trial court never referred to "these crimes." Although minor, the difference between "these crimes" and "that crime" is clear when the court substitutes those terms for the crimes to which they are referring:

> <u>*Bowers/Simpson* instruction</u>: A defendant is guilty of *a crime* [first degree murder] if he is an accomplice of another person or persons who commits *these crimes* [first degree murder *or* robbery].

> <u>Romero instruction</u>: A defendant is guilty of *a crime* [first degree murder] if he is an accomplice of another person who commits *that crime* [first degree murder].

Second, unlike the instructions in *Laird* and *Tyson*, the definition of "accomplice" given in Romero's case required a finding that Romero acted "with the intent of promotion or facilitating commission of *the* crime," and not merely "*a* crime":

> <u>*Laird/Tyson* instruction</u>: He is an accomplice . . . if with the intent of promotion or facilitating commission of *a crime* [first degree murder or kidnapping or assault] he solicits, or commands or encourages or requests the other person to commit it or if he aids, agrees to aid, or attempts to aid the other person in planning the crime or committing the crime.

> <u>Romero instruction</u>: He is an accomplice if with the intent of promotion or facilitating commission of *the crime* [first degree murder] he solicits, commands, encourages, or requests the other person to commit it or aides, agrees to aide, or attempts to aide the other person in planning or committing it. . . .

Given the trial judge's consistent reference to "the crime" and "that crime" in this case, the accomplice liability instruction did not impermissibly blur the line between Romero's role as an accomplice to murder and his role as an accomplice in the other underlying crimes:

> You may find the defendant guilty of *a crime* [first degree murder] without finding that he personally engaged in the conduct required

for commission of *that crime* [first degree murder] or even that he was personally present when *the crime* [first degree murder] was committed.  A defendant is guilty of *a crime* [first degree murder] if he is an accomplice of another person who commits *that crime* [first degree murder]. . . .  He is an accomplice if with the intent of promotion or facilitating commission of *the crime* [first degree murder] he solicits, commands, encourages, or requests the other person to commit it or aides, agrees to aide, or attempts to aide the other person in planning or committing it. . . .

You may find the defendant guilty of *a crime* [first degree murder] on the theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that *the crime* [first degree murder] was committed and that the defendant was an accomplice of the person who committed it.

Having found no ambiguity in the accomplice liability instruction, we need not address it further.

### *Coconspirator Liability Instruction*

The coconspirator liability instruction, on the other hand, is not so clear cut.  Romero argues that it "violated due process by allowing the jury to convict for first-degree murder without a finding that he had the specific intent to kill, as long as the killing was in furtherance of any or all of the other crimes with which Mr. Romero was charged."  (Doc. No. 89 at 206 (cleaned up) (citing *Laird*, 414 F.3d at 428 and *Simpson*, 485 F. Supp. 3d. at 579–80).)

The Third Circuit's discussion in *Bronshtein* is instructive.  In that case, the jury convicted the defendant of first degree murder, robbery, theft of movable property, and possession of an instrument of crime, as well as conspiracy to commit murder, robbery, and theft.  404 F.3d at 704.  On federal habeas review, the defendant argued that "the trial court's jury instructions violated his right to due process because they permitted the jury to convict him of first-degree murder on the theory of co-conspirator liability without finding an essential element of the offense, *viz.*, that he had the specific intent to kill."  *Id.* at 710.  The Third Circuit agreed.  The court noted that the jury instructions explained specific intent was required to find

137

the defendant guilty of first degree murder as the principal or as an accomplice. *Id.* at 711. But when it instructed on co-conspirator liability, it stated:

> You may find the defendant [guilty] of either the crime of murder, robbery or theft as a conspirator if you're satisfied beyond a reasonable doubt:  First, that the defendant agreed with [his coconspirator] that the defendant would aid [the coconspirator] in committing either the crime of murder, robbery and/or theft; second, that the defendant so agreed with the intent of promoting or facilitating the commission of the crime; third, that while the agreement remained in effect, the crime of murder, robbery and/or theft was committed by [the coconspirator]; and, fourth, that the crime of murder, robbery and/or theft, while it may differ from the agreed crime, was committed by [the coconspirator] in furtherance of his and the defendant's common scheme.
>
> What am I saying to you? If those four elements have been established, then, if you find that the defendant is guilty of the conspiracy, he is also guilty of anything that [a coconspirator] did in furtherance of it.

*Id.* at 711 (quotation marks omitted). The Third Circuit found that "this instruction misleadingly suggested that the defendant could be found guilty of first-degree murder even if he did not have the specific intent to kill." *Id.*  Indeed, a "literal reading of the instruction" showed that the jury could have found the defendant "guilty of first-degree murder if it found that he had conspired to commit the robbery and that another conspirator had killed [the victim] in furtherance of the robbery." *Id.*; *see also Simpson*, 485 F. Supp. 3d at 578 (finding the coconspirator instruction violated the defendant's "federal due process rights because it was reasonably likely that the ambiguous [coconspirator instruction]," which referred to "these crimes," "permitted a jury to convict [the defendant] of first degree murder as a coconspirator . . . of a different crime"); *Bowers*, 2016 WL 9306253, at *30 (finding the coconspirator liability instruction, which referred to "these crimes" and "the crimes charged" "blurred the distinction between conspiracy to rob, and one to kill").

Here, Romero argues that "the jurors could have reasonably understood the co-

conspirator liability instruction [in his case] to mean that, if they believed Mr. Romero conspired

to commit robbery (or theft or receiving stolen property) and a murder was committed in

furtherance of the conspiracy, they could on that basis alone convict him of first-degree murder."

(Doc. No. 89 at 206–07.)  We agree.  The coconspirator instruction given in Romero's trial read:

> You may find the Defendant guilty of the crime of *Criminal Homicide, Robbery, Theft or Receiving* as a conspirator if you are satisfied beyond a reasonable doubt, first, that the Defendant agreed with each other, Michael [sic] Moreno and/or George Barbosa, that they or other of them would commit the crime of *Criminal Homicide, Robbery, Theft and/or Receiving Stolen Property*. That the Defendant would aide them in the committing of *these crimes*.
>
> Second, that the Defendant so agreed with the intent of promoting or facilitating the commission of *those crimes*.
>
> Third, that while the agreement remained in effect, the crime of *Criminal Homicide, Robbery, Theft or Receiving* was committed by one of the co-conspirators.
>
> And fourth, that the crime of—*the crimes, while they may differ from the agreed crimes*, was committed by one of them in furtherance of his and the Defendants' common design.

N.T. Mar. 19, 1996, at 185:23–186:20 (emphases added).  This instruction suffers from the same

defects as the instruction given in *Bronshtein*.  By describing the crimes in the disjunctive, the

instruction suggests that the jury could find Romero guilty of first degree murder if it found that

he conspired to commit robbery (or theft or receiving stolen property) and a coconspirator killed

Bolasky in furtherance of the robbery (or theft or receiving stolen property).  So read, there is "a

reasonable probability that the jury, consistent with [the instruction's] terms, could have

proceeded on the incorrect belief that a specific intent to kill was not needed in order to convict

[Romero] of first-degree murder on the theory of co-conspirator liability."  *Bowers*, 2016 WL

9306253 at *30 (quoting *Bronshtein*, 404 F.3d at 712) (alterations adopted).

   In its opposition brief, the Commonwealth does not address the coconspirator instruction

139

or the Third Circuit's analysis in *Bronshtein*, and instead, looks to the trial court's instruction on

the separate count of criminal conspiracy, which said, "the defendant is not guilty unless he and

the other had an agreement or a common understanding *and shared the intention* to commit these

crimes."  (Doc. No. 91 at 121 (quoting N.T. Mar. 19, 1996, at 191–92).)  This argument is

unavailing.  Notably, it fails to consider the precise language of the coconspirator instruction.  It

also ignores the fact that the trial judge explicitly distinguished his instructions on the charge of

criminal conspiracy from his instructions on coconspirator liability on the remaining charges:

"[Criminal conspiracy] is a separate criminal charge.  I've given you certain instructions on

accomplice theory and co-conspirator's theories for the other charges.  This is a separate charge.

I'm just trying to make that clear to you."  N.T. Mar. 19, 1996 at 188:23–189:3.  Given this

clarification, there is a reasonable likelihood that the jury viewed the requirements of criminal

conspiracy as being separate from the requirements needed to find Romero guilty of first degree

murder as a coconspirator.

      For similar reasons, nothing in the first degree murder instruction or the accomplice

liability instruction cured the defective coconspirator liability instruction.  As with criminal

conspiracy, the trial court represented that coconspirator liability was an alternative means of

establishing first degree murder, stating that the jury could find Romero, "by reason of being a

member of a conspiracy, . . . liable for a crime he did not personally commit" and explaining that

he could "be found guilty under this conspiracy theory in some situations where he could not be

convicted under an accomplice theory."  *Id.* at 185:17–23.  The first degree murder and

accomplice instructions, therefore, did nothing to cure the deficient coconspirator liability

instruction.  *See Bronshtein*, 404 F.3d at 712 ("While the instructions on liability as a principal or

accomplice stressed the need to find a specific intent to kill, these instructions did not cure the

defect in the instructions on co-conspirator liability. As the District Court put it: 'A reasonable jury could have understood the co-conspirator language to be an alternate means to establish first degree murder, *sans* a finding of specific intent to kill.'" (citation omitted)); *see also Bennett*, 886 F.3d at 286 ("Even if the state court's interpretation of the first degree murder charge is correct, the charge as a whole still violated Bennett's due process rights. The first degree murder charge, at the most, contradicted the erroneous conspiracy and accomplice liability instructions . . . . Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." (quotation marks omitted)).

The Commonwealth also argues that the coconspirator liability instruction, when considered in the context of the trial as a whole, did not violate Romero's due process rights because the Commonwealth never relied on a theory of vicarious liability. (Doc. No. 91 at 129.) Instead, it "expressly argued that the evidence showed that each of the four conspirators specifically intended to kill the victim." (*Id.*) The Third Circuit's analysis in *Williams v. Beard* shows why this argument fails. At trial in *Williams*, "[t]he jury was presented with a stark choice: either [the defendant] was the principal in a first degree murder or he was ignorant of his friends' plans and nowhere near the cemetery when the killing occurred." 637 F.3d at 222. In other words, "[n]either party argued that [the defendant] was an accomplice to robbery or murder," nor did they introduce evidence which would have supported such a finding. *Id.* at 221–22. Accordingly, the habeas court found that even if the vicarious liability instruction was "almost identical to the instruction" given in *Laird*, there was no basis for finding that the jury "applied the instruction in a manner which relieved the Commonwealth of its burden of proof." *Id.* at 225. Because "[a]ccomplice liability [wa]s simply not in play," the ambiguity in the accomplice liability instruction was not "a critical error when viewed in the context of the trial

record as a whole." *Id.*

Here, unlike *Williams*, there was evidence from which the jury could find that Romero conspired to commit robbery or assault but did not form the specific intent to commit first degree murder, and thus, was only vicariously liable for Bolasky's murder.  (*See* Doc. No. 94 at 93 (discussing evidence).)  Notably, no physical evidence tied Romero to the murder, and Paladino testified that Romero held one of Bolasky's arm but "did not agree with what was happening" to Bolasky during the murder.  *Romero II*, 938 A.2d at 375 (quoting N.T. Mar. 12, 1996, at 163).[63] In addition, both Barbosa and Paladino provided evidence that the men went to the apartment intending to rob Bolasky, not to murder him, and that the plan changed in the moment.  *See* N.T. Mar. 15, 1996, at 25:24–27:6 (Barbosa testifying at trial that the plan was only to assault Bolasky, not kill him, and that it was only after Lopez hit Bolasky in the head with the pistol and handed the rope to Barbosa that the plan changed); N.T. Mar. 13, 1996, at 176:1–23 (Paladino testifying that according to Romero, Romero "never agreed to help kill Mr. Bolasky," and there was no "mention of any plan or agreement with him, Lopez or anyone else to kill Bolasky going into that apartment").  Given this evidence, the jury could have found Romero only vicariously liable for Bolasky's murder.  And it is not enough for the Commonwealth to argue that it also introduced evidence that Romero had a specific intent to kill.  *Cf. Williams*, 637 F.3d at 222.

\*     \*     \*

In sum, "there is a reasonable probability that the jury, consistent with [the instructions']

---

[63] In addition, although not evidence, the Court notes that ADA Holihan referred to Romero and Lopez as "accomplices" of Moreno and Barbosa in his closing argument. *See, e.g.*, N.T. Mar. 19, 1996, at 71:5–15 ("Make no mistake about it.  [Moreno and Barbosa] are accomplices. . . .  They are accomplices of Romero and Lopez in the murder of David Bolasky. . . .  No question about it.  The Judge will tell you that.  Romero and Barbosa are accomplices.  When he tells you how to consider their testimony, he will tell you that, they are accomplices.").

terms, could have proceeded on the incorrect belief that a specific intent to kill was not needed in order to convict [Romero] of first-degree murder on the theory of co-conspirator liability," *Bronshtein*, 404 F.3d at 712, and thus, a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Fourteenth Amendment Due Process Clause.

iii.    <u>Harmlessness</u>

Having found the coconspirator liability instruction was erroneous, the Court must next determine whether the error was harmless, such that habeas relief should nevertheless be denied. *See Baker*, 383 F. Supp. 2d at 760; *see also Simpson*, 485 F. Supp. 3d at 578 ("A constitutionally infirm set of instructions is not enough to secure federal habeas relief.  Indeed, it is not the ambiguity or confusion alone that gives rise to federal habeas relief.  Rather, the ultimate question is whether the deficient instructions nonetheless constituted harmless error.").  "In a collateral proceeding, the standard for harmlessness is 'whether the error had substantial and injurious effect or influence in determining the jury's verdict.'"  *Smith*, 120 F.3d at 417 (quoting *California v. Roy*, 519 U.S. 2, 5 (1996)).  Under this standard, "the crucial inquiry is the impact of the error on the minds of the jurors in the total setting," meaning the court must look to "whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error."  *Id.* at 418 (quoting *Yohn v. Love*, 76 F.3d 508, 523 (3d Cir. 1996)).  "If our analysis causes us 'grave doubt' about the integrity of the verdict, it can not [sic] be deemed harmless, and [Romero] is entitled to relief."  *Laird*, 414 F.3d at 428.

The Commonwealth argues that the instructional error was harmless in this case because the jury's ruling on the criminal conspiracy charge shows that it necessarily found Romero had the specific intent to kill.  *See* Draft N.T. Sept. 11, 2023, at 20:14–23:17.  Romero disagrees, arguing that this Court's analysis on harmlessness is governed by the Third Circuit's holding in *Laird.*  (Doc. No. 89 at 207–09.)

143

In *Laird*, the Third Circuit found a similar error in the trial court's jury instructions on vicarious liability. 414 F.3d at 425–28. Turning to harmlessness, the court rejected the Commonwealth's argument that "the error was harmless because Laird was convicted of *conspiracy* to commit murder." *Id.* at 428. Importantly, "Laird was convicted of conspiracy to commit *murder*, not conspiracy to commit *first-degree* murder," leaving open the question of whether the jury had found the defendant guilty of conspiracy to commit second or third degree murder, neither of which required a specific intent to kill. *Id.*; *see also id.* at 424–25 ("Laird and Chester were convicted of conspiracy to commit murder. Since second and third degree murder do not require the specific intent to kill, we can not [sic] agree with the state court's harmless error analysis." (citations omitted)). In addition, the court found telling that the criminal conspiracy instruction itself allowed the "jury to convict for first-degree murder without a finding that each conspirator had the specific intent to kill as long as the killing was 'in furtherance' of the kidnapping or assault Laird had been charged with." *Id.* at 428.

The Commonwealth seeks to distinguish *Laird*, arguing that in that case, the jury found the defendant guilty of first, second, and third degree murder, but here, the jury found Romero guilty of only first degree murder. Draft N.T. Sept. 11, 2023, at 19:25–23:17. The Commonwealth reasons that given this finding, the jury's conviction for criminal conspiracy to commit criminal homicide should be viewed as a conviction for criminal conspiracy to commit first degree murder. *Id.* Although compelling on its surface, a closer look at the verdict sheet shows that this argument is unavailing. Under the charge of criminal homicide, the jury was instructed: "If you find Defendant Guilty of First Degree Murder, you do not consider the other two types of Criminal Homicide." Verdict at ¶ 1.a. Because the jury was directed not to consider second or third degree murder, there is no way to know whether the guilty verdict for

144

criminal conspiracy to commit criminal homicide is premised solely on the basis of first degree

murder or if the jury based it on a finding of conspiracy to commit third degree murder—which

was defined in the jury instructions and did not require the specific intent to kill. *See Laird*, 414

F.3d at 424–25; *see also Commonwealth v. Johnson*, 719 A.2d 778, 785 (Pa. Super. Ct. 1998)

(discussing conspiracy to commit third degree murder, which does not require a finding of "a

specific intent to kill, or even a specific intent to harm the victim").

      Neither are we persuaded that the instructions on criminal conspiracy necessarily

required the jury to find Romero shared a specific intent to kill before holding him guilty of

criminal conspiracy to commit criminal homicide.  As with the instruction for coconspirator

liability, the trial court discussed the substantive crimes in the disjunctive when outlining the

charge of criminal conspiracy:

> So these are the elements for that particular charge of Criminal Conspiracy.
>
> First, that each defendant agreed with the other persons that one or more of them would engage in conduct which constitutes the crime of *Criminal Homicide, Robbery, Theft and/or Receiving*.
>
> Second, that the defendant and the other persons intended to promote or facilitate the committing of *Criminal Homicide, Robbery, Theft and/or Receiving*. In other words, they shared the intent to bring about that crime or to make it easier to commit that crime.
>
> And third, that the defendant or the other persons did the acts that are alleged to have been overt acts and did them in furtherance of their conspiracy.
>
> . . . .
>
> Thus, you may find the defendant guilty of *this crime* if you are satisfied that he conspired with at least one alleged co-conspirator, at least one—to commit *at least one alleged object crime* and that he or that person did at least one alleged overt act in furtherance of the conspiracy. You must agree on the same person, the same object crime and the same overt act.

*Id.* at 188:19–190:19 (emphases added); *see also id.* at 192:2–18 (reiterating that "the defendant is not guilty [of criminal conspiracy] unless he and the others had an agreement or a common understanding and shared the intention to commit *these crimes*" (emphasis added)).  By describing the crimes in the disjunctive, the trial court blurred the distinctions between each crime and left open the possibility that the jury would find a defendant guilty of criminal conspiracy to commit criminal homicide based on his role as a conspirator in the robbery.  This ambiguity was heightened by the court's later suggestion that the conspirators could be held liable for each other's actions:

> As a general rule, if conspirators have agreed to commit *a crime* and after that, one of the conspirators . . . does any act to carry out or advance their agreement, then he has done an overt act in furtherance of their conspiracy. The other conspirators do not have to participate in the act or even know about it. *In a sense, they are partners and like partners they are responsible for each others' actions.*

*Id.* at 189:20–190:4; *see also id.* at 191:16–18 ("Conspirators are like partners.  They can be responsible for each others' words and acts.").  And although the criminal conspiracy instructions did require a finding that the conspirators had a shared intent, the instructions never clarified that the jury had to find the defendants shared the intent to *kill*.  *See id.* at 189:10–16 (listing as an element of criminal conspiracy, the requirement that the "defendant and the other persons intended to promote or facilitate the committing of Criminal Homicide, Robbery, Theft *and/or* Receiving.  In other words, they shared the intent to bring about *that crime* or to make it easier to commit *that crime*." (emphases added)); *id.* at 192:9–12 ("The defendant is not guilty unless he and the others had an agreement or a common understanding and shared the intention to commit *these crimes*." (emphasis added)).[64]

---

[64] The Commonwealth relies on a third reference to shared intent in the criminal conspiracy instruction, which described the relevant question as "whether the conspirators shared the intent to

146

Given this ambiguity, and the lack of an explicit instruction requiring a shared intent to kill before the jury could find Romero guilty of criminal conspiracy to commit criminal homicide, the jury's finding on criminal conspiracy does not render harmless the coconspirator liability instruction. *Contra Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 480 (3d Cir. 2017) (finding any "error was harmless because the jury was instructed that the alleged co-conspirators must have 'shared the intent to commit the crime of first degree murder,' which 'would include the defendant having shared the specific intent to kill,' and the jury proceeded to return a guilty verdict on that charge" (citations omitted)); *Bronshtein*, 404 F.3d at 713–14 (finding error harmless where the jury found the defendant guilty of conspiracy to commit murder after receiving a supplemental instruction that "to find the defendant guilty of conspiracy to commit murder, you must be satisfied that two elements of the conspiracy have been proven beyond a reasonable doubt:  First, that the defendant agreed to aid another person . . . in either the planning or the commission of the crime of murder. . . . Second, that the defendant did so with the intent of promoting or facilitating the commission of the crime of murder").

Because the erroneous coconspirator liability instruction appears to have "had substantial and injurious effect or influence in determining the jury's verdict," we cannot find the error harmless. *See Smith*, 120 F.3d at 417–19 ("The evidence supporting this verdict demonstrates that it is *more likely* that Smith, rather than [his codefendant], killed [the victim].  However, this

---

promote or facilitate committing the *object crime*."  N.T. Mar. 19, 1996, at 191:1–3; *see also* Draft N.T. Sept. 11, 2023, at 22:14–16.  But this statement, which is merely inconsistent with the trial court's other references to shared intent, does not correct the ambiguity in the criminal conspiracy charge. *See Fuller*, 2021 WL 2004114, at *16 ("The next sentence [in the criminal conspiracy instruction] says, 'in other words, they shared the intent to bring about that crime or make it easier to commit that crime.'  This does not fix the problem, in this case, because the meaning of 'sharing' intent had been hopelessly muddled by constant repetition that a defendant can be liable for murder if he or one of his accomplices or co-conspirators has the intent to kill." (citations omitted)); *cf. Bennett*, 886 F.3d at 286 ("Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." (quotation marks omitted)).

evidence and the factual findings it supports are not the 'functional equivalent' of, nor do they 'effectively embrace' a finding of *beyond a reasonable doubt* that Smith killed [the victim]. . . . For [this and other] reasons, our harmless-error analysis leads inexorably to the conclusion that the error here was not harmless."); *see also Laird*, 414 F.3d at 429 (finding error was not harmless despite evidence that Laird was the actual killer because "[i]t was for the jury, not a court, to determine the identity and *mens rea* of the actual killer"). Accordingly, we hold that the coconspirator liability instruction violated Romero's rights under the Due Process Clause of the Fourteenth Amendment.[65]

### 3.   Conclusion

Romero is entitled to habeas relief as to his conviction for first degree murder to the extent he challenges the constitutionality of the coconspirator jury instruction in Claim 13.

### F.   Claim 14: Jury Pool

In Claim 14, Romero asserts that his Sixth Amendment rights were violated because the jury that decided his fate at trial was predominantly white and was "selected from a jury pool that did not reflect a fair cross-section of the community." (Doc. No. 89 at 217.) He claims that the jury selection procedures used in Lehigh County resulted in the unconstitutional systematic exclusion of people of color, namely, Hispanic and African American jurors, from the jury pool. (*See id.* at 218–26.)

Romero did not raise this claim on direct appeal, so it was deemed waived by the Pennsylvania Supreme Court on collateral appeal. *See Romero II*, 938 A.2d at 369. Nonetheless, for the reasons discussed above, *see supra* Part III.A., the Court reviews Romero's

---

[65] Because we find Romero is entitled to habeas relief on his claim for instructional error, we need not address his related claims for ineffective assistance of trial and appellate counsel.

148

claim on its merits.  Despite not raising this exact claim on direct appeal, Romero did raise this

issue in his first round of PCRA proceedings via a "layered" ineffective assistance of counsel

claim, in which he argued that his direct appeal counsel was ineffective for failing to argue that

his trial counsel was ineffective for failing to challenge his jury selection.  *See Romero II*, 938

A.2d at 369–71, 373.[66]  In evaluating the ineffective assistance of appellate counsel claim, the

Pennsylvania Supreme Court necessarily needed to determine trial counsel's alleged

ineffectiveness, and in doing so, evaluated whether the underlying claim itself had merit, such

that trial counsel should have objected on this basis or otherwise raised the cross-section claim.

*See id.* at 369–71.  Accordingly, although this claim is being presented as a standalone cross-

section claim, which was never considered by a state court, the Court is nonetheless required to

review the newly raised cross-section claim in accordance with the factual findings and legal

conclusions made by the Pennsylvania Supreme Court.[67]

On PCRA appeal, the Pennsylvania Supreme Court explained that, to establish a *prima*

*facie* cross-section claim, Romero must show:  "(1) the group allegedly excluded is a distinctive

group in the community; (2) representation of this group in the pool from which juries are

selected is unfair and unreasonable in relation to the number of such persons in the community;

---

[66] Romero does not pursue any claims of ineffective assistance of trial or appellate counsel arising out of this ground for relief in his habeas petition, despite pursuing those theories at the state court level. Rather, Romero's arguments as to Ground 14 are focused solely on the cross-section claim itself.

[67] As noted above, although this claim was not "presented" as a cross-section claim to the state court, the PCRA court and Pennsylvania Supreme Court nevertheless evaluated the merits of the cross-section challenge in their evaluation of Romero's layered ineffectiveness claims.  And those factual determinations about the claim which are now binding on the Court's habeas review.  *See* 28 U.S.C. § 2254(e)(1); *Cullen*, 563 U.S. at 181.  So, while the cross-section claim itself is technically before the court de novo, having not been considered on its own in any state court, the Court is still bound by state court factual findings underlying this claim.  *See Nara*, 488 F.3d at 200–01.  For these reasons, the Court reviews the state court's factual findings in accordance with § 2254(d)(2)'s deference.  Similarly, because the state court has already ruled on the legal merits of the cross-section challenge, which is now raised here as the central claim, the Court defers to the state court's legal conclusions in accordance with § 2254(d)(1)'s deference.

and (3) the under-representation is due to the systematic exclusion of the group in the jury selection process." *Romero II*, 938 A.2d at 373–74 (citing *Duren v. Missouri*, 439 U.S. 357 (1979)).  The state court found that Romero was unable to establish the second and third prongs of a cross-section claim.  *See id.*

As to the second prong, the court recounted Attorney Clark's testimony at the PCRA hearing, during which he stated that he "did not really recall the jury selection proceedings," but that, to the best of his knowledge, there were no Hispanic or African American members on Romero's jury.  *Id.* at 374.  Clark stated that there were "maybe one or two" African American individuals in the jury pool of approximately 100 people, and that "the Hispanic population of Allentown was approximately 6% of 100,000–110,000, so he would have expected a larger percentage of Hispanics on the panel."  *Id.* (internal citations omitted).  But the court noted that Attorney Clark "was unable to give statistics regarding the Hispanic and African American population of *Lehigh County as a whole*, from which the jury pool was selected."  *Id.* (emphasis added).[68]  Accordingly, Romero could not establish the second prong of a cross-section claim because he "failed to offer statistical evidence regarding Lehigh County's racial composition."  *Id.*

As to the third prong, the Pennsylvania Supreme Court cited ADA Holihan's testimony regarding Lehigh County's jury selection process:  "PennDOT sends the county a list of all licensed drivers residing in the county, and a computer randomly selects names from the list."  *Id.* (internal citations omitted).  Holihan asserted that there was "no way for the system to include or exclude venire persons based on race or gender."  *Id.*  The state court noted that Romero's

---

[68] The PCRA court also found that there was "simply a lack of proof produced by the defendant" to support this claim.  PCRA Opinion at 21–22 (Sept. 28, 2000) (filed in this action as Doc. No. 81-4 at 262–86).

codefendant, Lopez, had raised a similar cross-section challenge on his direct appeal, in which

the court found that Lehigh County's selection method "provided a greater number of

prospective jurors than were contained in the county's voter registration list, which is listed as an

acceptable means of selection in 42 Pa. C.S. § 4521(a)(2)." *Id.* (citing *Commonwealth v. Lopez*,

739 A.2d 485, 494 n.13 (Pa. 1999)). Relying on that finding, the Pennsylvania Supreme Court

held in Romero's case that Lehigh County's method of jury selection was "statutorily

permissible, and [Romero] has failed to demonstrate a violation of his Sixth Amendment right to

an impartial jury." *Id.*

Romero alleges that the Pennsylvania Supreme Court's decision is not entitled to deference

because the court's finding as to the second prong of the *Duren* test was based on unreasonable

findings of fact and that the court's finding as to the third prong of the *Duren* test was based on an

unreasonable application of clearly established federal law.[69] (*See* Doc. No. 89 at 226–27.) The

Court addresses each argument in turn.

### 1.   Alleged Unreasonable Findings of Fact

Romero argues that the Pennsylvania Supreme Court's decision as to the second *Duren*

prong was based on unreasonable findings of fact. (*See id.* at 226.) Specifically, Romero asserts

that the state court's finding that he did not present any statistical evidence of Lehigh County's

racial composition was unreasonable because it "failed to take into account that Mr. Romero

submitted census data to the state court showing that Hispanic and Black people were

underrepresented in his jury pool." (*Id.*) And if the state court had considered racial population

---

[69] Neither the PCRA court nor the Pennsylvania Supreme Court made any findings as to prong one—that the group allegedly excluded is a distinctive group in the community—and there is no dispute as to prong one raised here. In any event, prong one of the *Duren* test is easily met in these circumstances: "African Americans and Hispanics are 'distinctive groups' for purposes of a fair cross-section analysis." *United States v. Weaver*, 267 F.3d 231, 237 (3d Cir. 2001).

data from the 1990 and 2000 Censuses, it would have calculated that Hispanic people and

African American people were underrepresented in his jury pool. (*See id.* at 221–22.)[70]

Notably, Romero does not explain when, where, or how this census data was introduced

into the state court record. From the Court's review of the available materials, Romero did not

include any reference to census data in his amended PCRA petition submitted to the PCRA court

on March 28, 2000 (*see* Doc. No. 112-4 at 26), it is not contained in the PCRA evidentiary

hearing exhibits, and there was no discussion of census data at the evidentiary hearings before

the PCRA court in May 2000 (*see generally* N.T. May 31, 2000 (testimony by trial counsel and

---

[70] "There is no clear consensus around what methodology courts should use to measure underrepresentation under the second prong of the *Duren* test, nor is there a set percentage of underrepresentation required to satisfy the disparity threshold." *Berghuis v. Smith*, 559 U.S 314, 330 n.4 (2010). Indeed, in the absence of any guidance from the United States Supreme Court, the Third Circuit has consistently utilized "absolute disparity" and "comparative disparity" calculations to analyze the merits of the second prong. *See Weaver*, 267 F.3d at 241–42. "Absolute disparity" is the "difference between [(x)] the percentage of a certain population group eligible for jury duty and [(y)] the percentage of that group who actually appear in the venire." *Ramseur v. Beyer*, 983 F.2d 1215, 1231 (3d Cir. 1992). "Comparative disparity is calculated by dividing [(x)] the absolute disparity by [(y)] the population figure for a population group." *Id.* Statistical evidence of the racial composition of the relevant jury selection area, such as census data, is necessary to calculate these disparities. *See Duren*, 439 U.S. at 365 (accepting census data as "prima facie evidence of population characteristics"). Romero argues that, of the 100 people in his jury pool, "none of the potential jurors had a Hispanic surname and only two appeared to be people of color." *Id.* (citing N.T. May 31, 2000 at 611–13). Romero claims that, according to the 2000 Census, the Hispanic population in Lehigh County was 10.2% and the African American population in Lehigh County was 3.6%. (Doc. No. 89 at 221 (citing A1007–A1010).) Assuming that the two people of color were Hispanic, Romero calculates the absolute disparity as 8.2% and comparative disparity at 80.39%. (*Id.*) Assuming that the two people of color were African American, Romero calculates the absolute disparity as 1.6% and the comparative disparity at 44.44%. (*Id.* at 222.) But even these numbers are "borderline" in demonstrating a racial disparity in Lehigh County's jury process. *See Weaver*, 267 F.3d at 243 ("Looking first at the comparative disparity figures, we find that they are quite high—40.01% and 72.98%—but that because African–Americans and Hispanics comprise such a small percentage of the population, the results of this analysis are of questionable probative value."); *Ramseur*, 983 F.2d at 1232 ("Courts addressing the question of whether a given absolute disparity constitutes 'substantial underrepresentation' have held that absolute disparities between 2.0% and 11.5% do not constitute substantial underrepresentation."). Further, Romero does not articulate why he relies on *2000* Census data for the calculations contained in his habeas petition—this data did not exist at the time of his jury selection in 1996. And although it did exist at the time Romero filed his state court appellate brief in 2001, he nonetheless relied on the 1990 Census. Thus, the Court cannot discern why, even if it considered these calculations on their merit, any information from the 2000 Census would be relevant.

prosecutor about jury selection process)).  The only reference to census data appears in Romero's brief to the Pennsylvania Supreme Court following the PCRA Court's denial of his PCRA petition.  (Doc. No. 89-2 at 68–69 ("Census data reveals that in 1990, the population of Lehigh County was 291,130; the population of black persons was 6,776; and the population of Hispanic persons was 15,001.  Thus, at least 2% of the Lehigh County population was black and 5% was Hispanic at the time of Appellant's trial.").)  But Romero cannot slip new facts—which were not raised in Romero's initial PCRA petition nor introduced to the PCRA court during evidentiary proceedings—into a state court appellate brief and then claim that those facts should have been reviewed by the Pennsylvania Supreme Court as part of the established record.[71]  In reviewing the denial of a PCRA petition, the Pennsylvania Supreme Court's mandate is to "determine whether the ruling of the PCRA court is supported *by the record*[.]"  *Commonwealth v. Paddy*, 15 A.3d 431, 441–42 (Pa. 2011) (emphasis added); *Romero II*, 938 A.2d at 369 ("In reviewing an order granting or denying post-conviction relief, we examine whether the PCRA court's determination is supported *by the evidence*[.]" (emphasis added)).  But averments made in a legal brief are not *evidence in the record*.

There is simply no indication that the census data was made part of the state court record, and the Pennsylvania Supreme Court was not unreasonable for failing to consider facts that were not before it for review.  For this reason, we cannot accept that the state court's factual findings as

---

[71] The Court emphasizes that this issue was open for development before the PCRA court on initial review, which is why the evidentiary hearing testimony by Attorney Clark and ADA Holihan pertaining to jury selection was elicited in the first place; any census data to support Romero's cross-section claim should have been introduced into the record at that time.  The Court will not allow Romero's state court appellate brief to serve as a Trojan horse for raising helpful facts that were not admitted when they should have been.  And to the extent that Romero attempts to introduce this census data for the first time on habeas review, the Court reiterates that it is limited in its consideration of the record that was before that state court that adjudicated the claim on the merits, *see Cullen*, 563 U.S. at 181, and that under § 2254(e)(1), the Court presumes that all factual findings by the state court are correct.

to prong two of *Duren*—that representation of Hispanic and African Americans in the jury pool

was representative of the number of such persons in the community—were unreasonable.

### 2.   <u>Alleged Unreasonable Application of Federal Law</u>

The Court now turns to Romero's contention that the Pennsylvania Supreme Court's

decision as to the third *Duren* prong was an unreasonable application of clearly established

federal law.  (Doc. No. 89 at 227.)[72]  The United States Supreme Court has long held that "the

Sixth Amendment promises all criminal defendants a trial by a jury drawn from a pool broadly

representative of the community as assurance of a diffused impartiality.'" *Taylor v. Louisiana*,

419 U.S. 522, 530–31 (1975) (cleaned up).  "A violation of this right occurs where jury wheels,

pools of names, panels, or venires from which juries are drawn exclude distinctive groups in the

community."  *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 264 (3d Cir. 2019) (citing

*Duren*, 439 U.S. at 363–64).  To state a claim under *Duren*, a showing of discriminatory intent is

not required under the third prong; instead, "systematic disproportion itself demonstrates an

infringement of the defendant's interest in a jury chosen from a fair community cross section."

*Duren*, 439 U.S. at 368 n.26; *see also Weaver*, 267 F.3d at 244 ("We must be careful to note that

intentional discrimination need not to be shown to prove a Sixth Amendment fair cross section

claim.").

Romero argues that the Pennsylvania Supreme Court's conclusion that there was "no way

for the [Lehigh County jury selection] system to include or exclude venire persons based on race

or gender," *Romero II*, 938 A.2d at 374, impermissibly "inserts an element of intent" into the

---

[72] Technically, because Romero could not establish the second *Duren* prong, his claim fails
regardless of whether the third prong is met.  *See Weaver*, 267 F.3d at 244 ("While we need not reach the
third prong, it merits our attention because the District Court placed some degree of reliance on this
aspect.").  However, for the sake of completion, the Court will examine the final portion of this claim.

*Duren* analysis.  (Doc. No. 89 at 227.)  Romero contends that the Pennsylvania Supreme Court's reliance on the fact that Lehigh County's jury selection method is "facially neutral" was unreasonable, because according to *Duren*, that does not mean that the method "could not produce systematic exclusion."  (*Id.*)

The Court does not agree that the Pennsylvania Supreme Court unreasonably applied *Duren* by considering whether Lehigh County's policy was facially neutral as to race.  Although the United States Supreme Court explained that statistical discrepancies, alone, are sufficient to demonstrate systematic exclusion, it did not hold that the discriminatory purpose of a policy was entirely irrelevant to the third prong of a cross-section claim.  In fact, *Duren* itself involved a facially discriminatory policy, which allowed an automatic exemption from jury service for women upon request.  *See* 429 U.S. at 366–67.  The Court found that, "obviously," the statistical underrepresentation of women in the final jury pool "was due to the operation of Missouri's exemption criteria[.]"  *See id.* at 367.  But in the absence of "readily apparent" discriminatory jury selection policies like the one in *Duren*, the third prong is established by showing "a large discrepancy over time such that the system must be said to bring about the underrepresentation." *Howell*, 939 F.3d at 269 (citing *Weaver* 267 F.3d at 244).  Courts consider "the nature of the system, length of time studied, and efforts at reform to increase the representativeness of jury lists in determining whether the jury selection system caused the under-representation."  *Id.* (citing *Ramseur*, 983 F.2d at 1234–35).  But Romero produced no such evidence.[73]

---

[73] Romero did not present any evidence at the state court level that is demonstrative of persistent exclusion of Black and Hispanic individuals from PennDOT access.  *See Weaver*, 267 F.3d 231, 244 (3d Cir. 2001) ("The government emphasizes that Weaver has shown no evidence of any interference with the opportunity to vote.  In other words, there has been no showing of anything in the system that has discouraged or prevented a group from participating [in voter registration lists].").  In his habeas petition, Romero claims for the first time that he "has shown that the Lehigh County's reliance on a single source—PennDOT's list of licensed drivers—and that source's inherent exclusion of Hispanic and Black people produced a systematic underrepresentation of these distinctive groups from the county's jury

Moreover, the Pennsylvania Supreme Court did not rely solely on the fact that Lehigh

County's jury selection process was racially neutral or add discriminatory intent as a fourth

element of the claim. *Cf. Howell*, 939 F.3d at 265 ("The state court did not address the three

factors identified in the *Duren* test, but instead rested its decision exclusively on Howell's failure

to identify a discriminatory purpose. . . . By requiring proof of this additional element, the

Superior Court imposed greater restrictions on Howell than those required by the Supreme Court,

contrary to and in an unreasonable application of clearly established federal law.") Instead, it

considered the nature of the jury selection system and noted that Lehigh County's reliance on

PennDOT records was actually an overinclusive method (more so than relying on voter

registration records) in gathering jurors from the county. *See Romero II*, 938 A.2d at 374; *see

also Howell*, 939 F.3d at 269 (holding that county properly drew its master list of jurors from the

county's list of registered voters and PennDOT's driving records); *Ramseur*, 983 F.2d at 1235

(holding that jury selection process satisfied third prong of *Duren* where it pulled names from

both the voter registration and DMV lists). Finally, the Pennsylvania Supreme Court also noted

that the jury selection system had been previously challenged on this basis by Romero's

codefendant and was deemed constitutionally permissible. *See Romero II*, 938 A.2d at 374

(citing *Commonwealth v. Lopez*, 739 A.2d 485 (1999) (holding that Lehigh County's jury

selection process was constitutional)); *see also Robinson v. Beard*, No. 06-CV-00829, 2020 WL

---

venire." (Doc. No. 89 at 227.) He relies on a report filed in 2003 by the General Assembly of the
Commonwealth of Pennsylvania, entitled "Minority Representation in the Jury Selection Process in
Pennsylvania." (*Id.* (citing Doc. No. 81-3 at 418 (the "2003 Report")).) According to Romero, the 2003
Report relies on 2000 Census data that demonstrates certain racial discrepancies in Lehigh County's
juries. (*See id.*) But this report was not considered by the PCRA court or the Pennsylvania Supreme
Court, and in fact did not exist at the time of his evidentiary hearings in 2000. And to the extent the 2003
Report discusses 2000 Census data, it is of questionable relevance, *see supra* n.70. Again, the Court
emphasizes that in deciding if the state court acted reasonably, the federal court is limited to the record
that was before the state court that adjudicated the claim on the merits. *See Cullen*, 563 U.S. at 181.

5362133, at *47 (E.D. Pa. Sept. 8, 2020) (finding that the Pennsylvania Supreme Court's approval of Lehigh County's process of drawing its jury pool from the list of licensed drivers in the county does not unfairly misrepresent the community and was not an unreasonable application of federal law).  Romero does not challenge either of these legal conclusions by the Pennsylvania Supreme Court, which were properly considered in light of the third prong of *Duren*.  Accordingly, the Court accepts that the state court's application of federal law was reasonable and defers to the state court's conclusion that Romero has not satisfied *Duren*'s third prong.

*   *   *

For the above-stated reasons, the Court defers to the state court's findings and conclusions that Romero failed to satisfy the second and third prongs of the *Duren* test. Accordingly, Claim 14 does not provide Romero with habeas relief.

### G.    Claim 15: Cumulative Prejudice

In Claim 15, Romero's final claim, Romero argues that if the Court finds habeas relief unwarranted under each of the claims discussed in this Memorandum, we should nevertheless grant habeas relief because "the cumulative effect of the multiple violations is sufficiently prejudicial to require relief."  (Doc. No. 89 at 228.)  *See, e.g.*, *United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir. 1980) ("[T]he cumulative effect of the alleged errors may violate due process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless.")  Because the Court grants relief on Claims 8 and 13 individually, we need not rule on whether relief is also warranted under a theory of cumulative prejudice.  Accordingly, Claim 15 is denied as moot.

## IV.    CONCLUSION

Habeas relief is granted only on Claims 8 and 13 and only as to Romero's conviction of first degree murder.  A certificate of appealability is granted as to these discrete issues.  Habeas relief is denied on Romero's remaining claims for guilt phase relief, and no certificate of appealability is issued as to these claims.  An appropriate order follows.